UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| QUINCY MEDICAL CENTER, INC., ) | |
| QMC ED PHYSICIANS, INC., ) | Case No. 11-16394 |
| QUINCY PHYSICIAN CORPORATION, ) | |
| ) | (Jointly Administered) |
| Debtors. ) | |

# DECLARATION OF MARK O'NEILL IN SUPPORT OF FIRST DAY MOTIONS

I, Mark O'Neill, declare and state as follows:

## I.   Introduction

1. I am Senior Vice President of Finance and Chief Financial Officer of each of Quincy Medical Center, Inc. ("QMC"), QMC ED Physicians, Inc. ("QED") and Quincy Physician Corporation ("QPC" and, with QMC and QED, the "Debtors" or the "Company").

2. I have been associated with the Company since November, 2009 and am familiar with the Company's operations, business affairs, and books and records.

3. The Company filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on July 1, 2011 (the "Petition Date"). The Company intends to manage its business and financial affairs as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. In order to enable the Company to operate effectively and without undue disruption during the early stages of its Chapter 11 cases, and to place its Chapter 11 cases on solid footing, the Company seeks certain "first day" relief from the Court.

4. I submit this declaration in support of the Company's first day motions in its jointly-administered Chapter 11 cases. For the convenience of the Court, unless otherwise defined herein, the capitalized terms I use shall have the meanings ascribed to them in the respective motions

referred to herein. In addition, except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Company's operations and financial condition, or information provided to me by employees of the Company working at my direction and under my supervision. If I were called to testify, I could and would testify competently to the facts set forth herein. I am authorized by the Company to submit this declaration on its behalf.

## II.     Background

5.      The Company is a non-profit corporation formed to provide quality medical care, including emergency care, to the Quincy, Massachusetts community and surrounding communities. QMC's signature asset is its 196-bed acute care hospital (the "Hospital") located in Quincy, Massachusetts. QMC operates the Hospital, and related medical and health care facilities. QED and QPC are captive entities as to QMC. Their sole purpose is to own certain managed care provider numbers and contracts under which QMC services are billed to third-party payors, and neither QED nor QPC own any assets other than these provider numbers and contracts, nor do they have any other business relationships. All of the revenues generated under the provider numbers and contracts are remitted to QMC. QMC, QED and QPC operate as a single business enterprise—Quincy Medical Center—and to that end have administered their business and financial affairs on a consolidated basis; the Company accounts for all operations and financial matters on a consolidated basis and maintains no separate accounting of QED or QPC revenues or expenses.

6.      The Company has filed for Chapter 11 for the purpose of consummating a sale of its assets on a going concern basis to Steward Health Care System ("Steward"). The Company selected Steward as the best-qualified acquirer of the Company's business after conducting, with the assistance of its financial and legal advisors, an extensive solicitation process directed toward identifying the potential acquiror best able to promote the interests of the Company and its

Summary of Prepetition Indebtedness

7. On or about May 28, 2008, QMC obtained financing through the issuance for its benefit of $60,250,000 of Massachusetts Health and Educational Facilities Authority ("MHEFA") Revenue Bonds, Quincy Medical Center Issue, Series A (2008) (the "Bonds"). The Bonds included four separate types reflecting differing amounts, maturities and interest rates/yields as follows:

| Amount | Interest Rate | Maturity | Yield | CUSIP |
|---|---|---|---|---|
| $ 3,020,000 | 5.125 % | Jan. 15, 2012 | 5.30 % | 57586C2B0 |
| 6,565,000 | 5.850 % | Jan. 15, 2018* | 6.00 % | 57586CZ73 |
| 17,745,000 | 6.250 % | Jan. 15, 2028* | 6.50 % | 57586CZ81 |
| 32,920,000 | 6.500 % | Jan. 15, 2038* | 6.72 % | 57586CZ99 |

* Yield to the January 15, 2018 optional redemption date at a redemption price of 100%.

As of the Petition Date, the amount owed by QMC on account of the Bonds is approximately $56.4 million including accrued interest of approximately $1.8 million, against which obligations QMC holds approximately $10.5 million in certain bond reserve funds, including reserves for debt service of approximately $6.3 million and a project fund of approximately $4.2 million.

8. As security for the Company's obligations under the Bonds, the trustee for the holders of the bonds (the "Bond Trustee") asserts a first priority mortgage against and security interest in substantially all of the Company's assets, including the Hospital and all revenues generated through its operation.

3

9. Boston Medical Center Corporation ("BMCC") asserts a claim in the amount of approximately $2,525,850 as of the Petition Date, arising out of the Company's clinical affiliations with BMCC, and represented by two secured, subordinated promissory notes dated June 30, 2008 and June 30, 2009, respectively. BMCC asserts a first priority security interest in the Company's property to secure its claim. Pursuant to a subordination agreement by and among QMC, the Bond Trustee and BMCC dated as of June 30, 2008, BMCC's claim and security interest are subordinated to the claims and security interest asserted by the Bond Trustee.

10. As of the Petition Date, the Company's accrued unsecured liabilities totaled approximately $18.2 million, including accounts payable and accrued expenses of approximately $11.5 million, amounts due to third-party payors of approximately $2.2 million, and accrued obligations to employees for accrued payroll and accrued vacation or earned time of approximately $4.5 million. A significant portion of these liabilities, including principally the employee and certain third-party payor obligations, will (to the extent not previously paid in the ordinary course pursuant to orders of this Court) be assumed by Steward in connection with its acquisition of the Company's assets and business enterprise (or, it is anticipated, by any successful competing bidder).

<u>Proposed Sale by October 2011</u>

11. Concurrently with the filing of the motion seeking approval of the proposed sale to Steward (the ("Sale Motion"), the Company has filed its motion seeking approval of the procedures for soliciting purchase offers and conducting the planned sale (the "Sale Procedures Motion"). The Company will request that a hearing on the Sale Procedures Motion be scheduled for mid-July, with the proposed sale process completed by mid-September. The proposed sale is subject to certain regulatory approvals that the Company has initiated and, once Steward or another bidder is selected as the purchaser of the Company's assets, will pursue to completion; if the winning bidder is known by mid-September, the Company hopes to be able to obtain regulatory approval by no later than

4

### III.     First Day Relief

12.     Concurrently with the filing of its Chapter 11 petitions, the Company has filed, for the Court's approval, a number of motions (the "First Day Motions") seeking orders (the "First Day Orders") that the Company believes are necessary to enable it to operate in Chapter 11 and effectively administer the Company's estates with a minimum of disruption and loss of productivity. The Company respectfully requests that each of the First Day Orders be entered to enable the Company to operate effectively and without undue disruption during the early stages of its Chapter 11 cases, and to place its Chapter 11 cases on solid footing for an effective sale process. A description of each of the First Day Motions is provided below.

**A.**     **Honor Existing Obligations**

**Debtors' Motion for Order Authorizing the Debtors to Honor Obligations to Employees and Medical Providers (the "Wage Motion")**

13.     As of the Petition Date, QMC employs 17 physicians and approximately 1,050 non-physician employees (the "Employees"). Approximately 45 percent of the Company's employees work full time, and the remaining 55 percent of employees work part-time or on a "per diem" basis. The Company's employees are responsible for much of the medical care provided to hospital patients, as well as for maintenance of the Company's physical plant and management and administration of its business operations and financial affairs. The majority—approximately 85 percent—of employees belong to one of three unions and are subject to collective bargaining agreements with QMC. These three unions include: Massachusetts Nurses Association ("MNA") (approximately 270 employees); Service Employees International Union ("SEIU) 1199 SEIU

5

14. The Company provides a good portion of its medical services through non-employee physicians, nurses and other medical providers affiliated with the Hospital, including admitting physicians and other independent contractors who provide essential services to the Company in such areas as radiology, obstetrics/gynecology, pediatrics, family practice, cardiology, nephrology, oncology, orthopedics and emergency care (the "Medical Providers"). Absent the services provided by the Medical Providers, the Company could not operate the Hospital.

15. The fundamental importance of the Employees to the Company's business is recognized in the pending sale of the Company to Steward, as Steward has expressly undertaken to offer the Employees employment upon its acquisition of the Company's assets, and has agreed to assume the Company's obligations to the Employees, including accrued vacation or other earned time of approximately $3.6 million as of May 31, 2011 and the Company's obligations under its employee health plans (medical and dental) and dependent care flexible spending arrangements.

16. The continued and uninterrupted service of the Employees and the Medical Providers is essential to the Company's continuing operations. Without the continued services of the Employees and the Medical Providers, the Company's ability to provide top-notch medical care might be compromised, with potentially adverse consequences to the Company's existing patients, its ability to continue to attract patients, and the value of its ongoing business enterprise. Any significant loss of Employees or disruption of working conditions for the Employees and Medical Providers would also threaten the pending sale to Steward.

17. By the Wage Motion, the Company seeks authority to continue to honor in the ordinary course of its business all of its prepetition obligations to the Employees and the Medical Providers. The prepetition obligations that the Company seeks authority to pay and described in

6

18. The Company estimates that, as of the Petition Date, its gross accrued and unpaid obligations related to Employee payroll (other than for accrued vacation and earned time, which to the extent not paid in the ordinary course will be assumed by Steward) total approximately $722,000, including accrued, unpaid net wages and salaries of approximately $415,000, accrued, unpaid payroll taxes of approximately $193,000, accrued, unpaid employee deductions of approximately $108,000 (covering items such as retirement plan contributions, medical and dental insurance, life insurance, short and long term disability insurance, flexible spending account, uniforms, and union dues), reimbursable expenses of approximately $1,000, the Company's matching retirement plan contributions of approximately $6,000, and tuition reimbursement of approximately $300. The Company estimates that its prepetition obligations to the Medical Providers total approximately $350,000. Notwithstanding these estimates, the Company seeks authority to pay and otherwise honor in the ordinary course all of its prepetition obligations to the Employees and to the Medical Providers.

19. To enable the Company to transition seamlessly to postpetition business operations, it is essential that it be permitted to meet its obligations to the Employees and the Medical Providers in the ordinary course of business. As to the Employees, these obligations are predominantly, if not entirely, entitled to priority status under Section 507(a)(4), (5), or (8) of the Bankruptcy Code. As to

20.    To assist in the implementation of the relief requested, the Company further requests that its banks be authorized to honor: (i) prepetition payroll checks or wires and (ii) all other checks or wires issued for payments approved by the Wage Motion, regardless of whether such checks or wires were drawn prior to or after the Petition Date.  The Company also seeks authorization to reissue prepetition checks or wires for payments approved by the Wage Motion that are dishonored by its banks notwithstanding the forgoing requested authorization.

21.    The Company's requested authorization will be subject to the Company's exercise of its business judgment as to the payment of any particular workforce expense, and is not intended to determine the administrative expense status of any particular obligation, expense or liability that the Company may elect to pay pursuant to such authorization, nor to constitute the Company's assumption (or the Court's approval) of any employment agreement or employee benefit plan or program.

**Debtors' Motion for Interim and Final Orders Authorizing the Debtors to Refund Overpayments By Patients and Insurers (the "Patient Refund Motion")**

22.    In the ordinary course of business, the Company receives overpayments from patients (the "Patient Refunds") and providers of medical insurance (the "Insurance Company

8

[1] Patient Refunds arise in a number of situations. For example, a patient whose insurance policy has both copay and deductible components might be presented with a bill containing an estimate of the portion of the bill that is the patient's responsibility. Often that estimate is not correct on account of, among other things, improper estimation of the remaining deductible or copay. If the estimated copay turns out to be lower than the actual copay after the patient paid for the services, the patient is entitled to a credit. Similarly, Insurance Company Refunds arise in various ways including mis-coded services, other billing errors, or duplicate or improperly credited payments. The Company in the ordinary course of business regularly remits Refunds to patients and insurers to address these overpayments.

23. By the Patient Refunds Motion, pursuant to sections 105(a) and 363(c) of the Bankruptcy Code and the "doctrine of necessity", the Company seeks authority to continue to remit the Refunds in the ordinary course of business, regardless of whether claims to such overpayments arose prepetition or arise postpetition. The Refunds are not ultimately the Company's funds, and retention of the funds would only create problems. If patients did not receive reimbursements in the event that they overpaid for medical services, the Company would suffer reputational damage as a service provider, thereby diminishing the value of its assets and business enterprise, to the detriment of the Company and its creditors. In addition, if the Company were to retain Refunds owed to insurers and third-party payors, those entities would likely assert rights of setoff or recoupment in order to collect the overpayments, which would likely adversely impact the Company's cash flow and business operations. The transactional costs of dealing with a disrupted insurance collections system could be significant. Accordingly, the Company submits that continued payment of Refunds in the ordinary course of business, regardless whether a particular refund arose prepetition or postpetition, is in the best interest of the Company and its creditors.

---

[1] The amount of Refunds remitted or credited monthly by the Company averages approximately $975,000.

9

24. In addition, the Company requests that all banks and other financial institutions be authorized and directed to receive, process, honor, and pay any and all checks drawn on the Company's disbursement accounts to pay Refunds authorized hereunder whether such checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments. The Company expects that it can identify any outstanding checks representing payment of Refunds to avoid inadvertent payment of prepetition liabilities whose payment has not been authorized by this Court.

25. To enable the Company to transition seamlessly to postpetition business operations, it is essential that it be permitted to satisfy its obligations to pay Refunds, and such payments are appropriately authorized under the doctrine of necessity applied by bankruptcy courts in similar circumstances. Only by providing the Company with the tools necessary to achieve undisrupted business operations will the Company be able to maintain the value of its business, provide high-quality care to its existing patients, and continue to attract new patients during the pending sale process. For these reasons, the Company respectfully requests that it be authorized to pay, in the exercise of its business judgment, any and all Refunds as described in the Patient Refund Motion.

**B.** <u>**Maintain Existing Business Procedures**</u>

**Debtors' Motion for Order Approving (A) Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Business Forms, (C) Maintenance of Cash Management System, and (D) Limited Waiver of Section 345 Section Requirements with Respect to Bank Accounts (the "Cash Management Motion")**

26. I have been informed that in order to supervise the administration of Chapter 11 cases, the Office of the United States Trustee for this district has established certain operating guidelines for a debtor-in-possession. These guidelines require a Chapter 11 debtor, among other things, to close all existing bank accounts and open new debtor-in-possession bank accounts, to establish debtor-in-possession accounts for all estate monies required for the payment of taxes, including payroll taxes, to maintain a separate debtor-in-possession account for cash collateral, and,

10

27. Through the Cash Management Motion, the Company seeks entry of an order: (a) authorizing the Company to maintain certain existing bank accounts identified therein; (b) authorizing the Company to continue to use the Company's business forms; (c) authorizing the Company to maintain its prepetition cash management system; and (d) granting the Company a limited waiver of the requirements of Section 345 of the Bankruptcy Code with respect to the Company's bank accounts.

28. Under the Company's cash management system, virtually all receipts from operation of the business are deposited into a concentration account, from which the Company funds various disbursement accounts through which it pays its operating expenses and liabilities. The non-interest bearing concentration account is linked to an interest-bearing sweep account into which all concentration account funds in excess of $50,000 are swept every evening and returned with interest to the concentration account the following morning. These accounts and several others are maintained with Eastern Bank. The Debtor also maintains various accounts with Bank of America, Rockland Trust Company, Sovereign Bank, and State Street Bank & Trust Company (collectively, with Eastern Bank, the "Banks"). Except for State Street Bank & Trust Company, each of these banks is an approved depository under the OGRR. A listing of the Company's bank accounts (the "Bank Accounts") is included in the Cash Management Motion, as is a flow chart presenting the Company's cash management system in graphical format.

29. The Company believes that the transition to Chapter 11 will be smoother and more orderly, with a minimum of harm to the Company's operations, if it can continue to use its existing Bank Accounts postpetition. The Company will inform the Banks to not honor checks drawn prepetition except for payments authorized to be made by order of this Court. The Company is

11

30.     The Company also requests authority to continue to use its current business forms, including, but not limited to, letterhead, purchase orders, invoices, envelopes, marketing materials, etc. (the "Business Forms"), without reference to its status as debtors-in-possession. The Company, in the ordinary course of business, uses various pre-printed Business Forms. Significant time and expense would be required in order to print new Business Forms and many of the parties with whom the Company deals could be confused by a change in the Company's forms. Furthermore, entities conducting business with the Company will receive direct notice (or will otherwise be made aware) of these Chapter 11 cases and accordingly will be aware of the Company's status as Chapter 11 debtors-in-possession. Forcing the Company to use new debtor-in-possession Business Forms would impose a cost to the Company unmatched by any legitimate business or bankruptcy purpose, and would disrupt the Company's business operations at a time when maintaining the status quo is necessary to preserve and protect the value of the Company's business.

31. Through the Cash Management Motion, the Company requests authority to continue to utilize its cash management system postpetition. The Company also requests authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts. The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts. In accordance with existing practices, the Company will maintain strict records of all postpetition deposits into and disbursements from the Bank Accounts in order to be able to identify and distinguish all postpetition transactions from prepetition transactions and to be able to account fully for all intercompany transfers. The Company believes that continued use of its existing cash management system is critical both to the Company's continued operations and to the preservation of the value of its business.

32. The Company will work closely with its banks to ensure that appropriate procedures are in place so that checks issued prior to the Petition Date will not be honored absent approval from the Court. The Company will also maintain records of all transfers within the cash management system, so that all transfers and transactions will be documented in its books and records to the same extent such information was maintained by the Company prior to the Petition Date.

33. The Bank Accounts are maintained with financially sound institutions in FDIC-insured accounts. The Bank Accounts other than the Concentration Account typically do not carry balances in excess of the FDIC insurance limits for significant time periods, if at all, because funds collected in such accounts are transferred to the Concentration Account on a frequent (often daily) basis. Only the Concentration Account has historically contained funds in excess of FDIC insurance levels, and under temporary FDIC rule, even the Concentration Account, as a non-interest bearing account, has unlimited FDIC insurance coverage through December 31, 2012, as described

34. In sum, the Company believes that the Bank Accounts are (and will be) in substantial compliance with Section 345. Nevertheless, to the extent that funds in any Bank Account may periodically exceed the FDIC-insurance limits or are otherwise not in strict compliance with Section 345, the Company seeks a limited waiver of compliance with the requirements of Section 345 of the Bankruptcy Code. Requiring the Company to issue a bond or other form of security in favor of the United States would as a practical matter provide no greater protection than what already exists, and would provide no benefit to the Company's estates for the expense incurred.

35. It is important that the Company be allowed to continue to use its existing cash management system. The Company's business is substantial and complex, and one of the keys to a successful sales process in these cases is to minimize disruption of the Company's daily business operations. This simply cannot be accomplished if there is substantial disruption in the Company's cash management procedures. Granting the relief requested in the Cash Management Motion is in the best interest of the Company's estates and its creditors and, accordingly, the Cash Management Motion should be approved.

**C.     Postpetition Financing**

**Debtors' Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Providing Adequate Protection (the "Cash Collateral Motion")**

36.     Through the Cash Collateral Motion, the Company seeks authority, on both an interim and final basis, to use cash collateral subject to the asserted security interests of (i) U.S. Bank National Association, as Trustee (the "Bond Trustee") for the holders of $60,250,000 of Massachusetts Health and Educational Facilities Authority ("MHEFA") Revenue Bonds, Quincy Medical Center Issue, Series A (2008) (the "Bonds"), and (ii) Boston Medical Center Corporation ("BMCC") (together, the "Cash Collateral Claimants").  Each of the Cash Collateral Claimants may claim an interest in some portion of the Company's accounts receivable, inventory and proceeds thereof.  The Company requires the use of the cash generated from business operations, including cash on hand as of the Petition Date and thereafter generated through collection of accounts receivable ("Cash Collateral") in order to fund its business operations, to maintain the value of its assets, and to avoid irreparable harm to the Company and its bankruptcy estates pending completion of the sale process.

37.     The Company needs this Court's immediate authority to use the Cash Collateral in order to continue the operation of the Hospital and related health care business.  The Company needs cash to purchase medical supplies and services, to pay its employees, and to meet other expenses necessary to maintain operations, preserve its assets, maintain effective patient care, and maximize value during the sale process.  The Company will be irreparably harmed unless it is authorized immediately to obtain authority to use Cash Collateral for these purposes.  Particularly in view of the Company's need to avoid disruption of patient care, the requested use of Cash Collateral is essential to maintain the value of the Company's business enterprise and the health, safety and welfare of existing patients and of the surrounding community that relies on the Company for emergency medical care.

38.     As adequate protection for any diminution in the value as of the Petition Date in each Cash Collateral Claimant's interest in Cash Collateral that results from the Company's use thereof, the Company proposes that each Cash Collateral Claimant be granted postpetition replacement liens ("Postpetition Liens") upon all of the Company's assets acquired or generated after the Petition Date (including without limitation inventory and accounts receivable, but excluding any rights, remedies or causes of action under Chapter 5 of the Bankruptcy Code) to the same extent and with the same priority that such Cash Collateral Claimant would have had a valid and perfected lien on such assets but for the filing of the Company's Chapter 11 petitions (collectively, the "Postpetition Collateral").  Each Cash Collateral Claimant will have the same rights in its Postpetition Collateral as it has in its prepetition collateral of the same type and, to the extent its interest in its prepetition collateral is determined to be invalid or avoidable, the Cash Collateral Claimant's Postpetition Liens shall to the same extent be invalid or avoidable.  As between the Bond Trustee and BMCC, their respective Postpetition Liens shall be subject to their prepetition subordination agreement.[2]

39.     As reflected in the Forecast, the Company expects that ongoing postpetition operations will generate and maintain sufficient levels of replacement Cash Collateral to provide each Cash Collateral Claimant with adequate protection of its interest in the Cash Collateral. Because the Cash Collateral Claimants are undersecured, neither will be entitled to accrue interest on its claim during the Chapter 11 case, and accordingly the Company's projected maintenance of working capital and asset values projects to provide sufficient adequate protection of each Cash Collateral Claimant's secured claim.  And in any event, the Company's continued operations made possible through use of Cash Collateral will preserve and protect the Cash Collateral Claimants'

---

[2] The Company believes that, by virtue of the subordination agreement and the value of the Company's assets, BMCC is an unsecured creditor, but the relief requested by the Cash Collateral Motion preserves and provides adequate protection of whatever secured claim, if any, that BMCC might be determined to hold.

16

interests in the Company's assets far better than could be achieved through the closure and forced liquidation of the Company's business that would result if authority to use cash collateral were not granted.

40. As additional adequate protection, the order entered on the Cash Collateral Motion should recognize that each Cash Collateral Claimant has the right to a superpriority administrative claim pursuant to Section 507(b) of the Bankruptcy Code to the extent, but solely to the extent, that its Postpetition Liens fail to provide adequate protection against diminution in the value of its interest in Cash Collateral by reason of the Company's use thereof after the Petition Date. The proposed order that would govern the Company's use of cash collateral contains many additional terms and conditions negotiated with the Company's principal secured creditor that are too numerous to properly address here but that I understand to be consistent with the type of consensual arrangement for use of cash collateral customarily negotiated in similarly-sized Chapter 11 cases involving sophisticated lenders.

41. The Company seeks interim authority to use cash collateral in accordance with the Forecast through the date of the final hearing on the Cash Collateral Motion. The interim relief sought is limited to an amount necessary to avoid immediate and irreparable harm to the Company and its estates. **Because the Company requires authorization to use cash collateral to purchase medical supplies and services and to meet other critical expenses over the holiday weekend commencing Friday, July 1, 2011, the Company respectfully requests an emergency hearing on the Cash Collateral Motion on Friday, July 1, 2011 or, alternatively, that the Court grant immediate, ex parte relief permitting the Company to use up to $200,000 of cash collateral pending a hearing on the Cash Collateral Motion conducted after the holiday weekend and not later than Wednesday, July 6, 2011.** The Company further requests that, at any interim hearing on the Cash Collateral Motion, the Court grant the Company authorization to use

17

**IV.   Conclusion**

42.   The primary goals that the Company seeks to effectuate by means of these Chapter 11 cases include:

    (a)   maintenance of the Company's ordinary course business operations and delivery of high-quality medical care;

    (b)   maximizing the value of the estates through the sale process; and

    (c)   confirmation of a liquidating plan (or implementation of an equivalent mechanism) to distribute sale proceeds and the value of any other assets to creditors.

43.   Allowance of the First Day Motions will enable the Company to operate effectively and without undue disruption during the early stages of its Chapter 11 cases, and will place the Company's Chapter 11 cases on solid footing for an effective sale process, to the benefit of the Company's creditors, employees and other parties in interest.

44.   Accordingly, for the reasons stated herein and in each of the First Day Motions, the Company respectfully requests that the First Day Motions be approved and the First Day Orders be entered.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed at Quincy, Massachusetts this **30** day of June 2011.

*/s/ Mark O'Neill*
Mark O'Neill, Chief Financial Officer of
Quincy Medical Center, Inc., *et al.*

56547.0/511190.1