UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| In re: | Chapter 11 |
| QUINCY MEDICAL CENTER, INC., QMC ED PHYSICIANS, INC., QUINCY PHYSICIAN CORPORATION, | Case No. 11-16394 |
| Debtors. | (Jointly Administered) |

## DEBTORS' MOTION FOR AUTHORITY TO SELL SUBSTANTIALLY ALL ASSETS (INCLUDING THROUGH ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS) PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE AND COURT-APPROVED SALE PROCEDURES

Quincy Medical Center, Inc. ("QMC"), QMC ED Physicians, Inc. ("QED") and Quincy

Physician Corporation ("QPC" and, with QMC and QED, the "Debtors" or the "Company")

hereby move this Court pursuant to Sections 363 and 365 of the Bankruptcy Code, Fed. R. Bankr. P.

6004 and 6006, and MLBR 6004-1 for authority to sell substantially all of the Company's assets

utilized by the Company in operating its business, including without limitation the Company's (i)

interests in real property, including the Company's fee interest in real property improved by its 196-

bed acute care hospital (the "Hospital"), (ii) personal property (including equipment, furniture and

inventory used to operate the Hospital), (iii) third-party payor provider numbers and contracts under

which the Company collects most of its revenue from government and third-party payors, and other

unexpired leases and executory contracts as designated by purchaser (the "Assigned Agreements"),

and (iv) accounts receivable, work in process, intellectual property (including the Quincy Medical

Center name), and other miscellaneous, specified assets (collectively, the "Assets"), to Steward

Medical Holdings Subsidiary Five, Inc. ("Steward") or such other entity that submits the highest or

otherwise best offer to acquire the Assets as determined through the sale process to be authorized

by this Court pursuant to the Company's related motion for approval of sale procedures filed

concurrently herewith (the "Proposed Sale"). The Proposed Sale is to be made pursuant to the

Asset Purchase Agreement between the Company and Steward attached as <u>Exhibit A</u> (the "APA"),

including as it may be modified by agreement between the Company and the successful bidder for

the Assets. By the APA, Steward has agreed to pay up to $38,000,000 and to assume certain

liabilities of the Company having a book value of approximately $8.6 million as of May 31, 2011.

Steward also has agreed to operate the Hospital for at least 10 years if the Hospital operates

profitably, and has committed to spend at least $34,000,000 over the next five years to repair and

improve the Hospital's physical plant and its operating infrastructure.

The Proposed Sale of the Assets is to be made free and clear of all liens, claims and

encumbrances except as otherwise provided for by the APA. Because Steward is a for-profit entity

acquiring the nonprofit Company's assets, the Office of the Attorney General of Massachusetts (the

"Mass. AGO") has regulatory review over the transaction pursuant to Massachusetts General Laws,

Chapter 180, Section 8(A)(d). The Proposed Sale is also subject to the approval of the

Massachusetts Department of Public Health (the "Mass. DPH").

As described in greater detail below, the APA and the Company's selection of Steward as the

stalking horse bidder for the Proposed Sale is the result of an extensive prepetition sale process

undertaken by the Company under the guidance of its financial and legal advisors. That sale process

will continue during this Chapter 11 case pursuant to sale procedures approved by the Bankruptcy

Court. The Company envisions a sale process leading to solicitation of competing bids (if any) by

late July, with a sale hearing to be conducted by mid-September and the Company's selection of the

purchaser of the Assets, and the final APA, approved by the Bankruptcy Court. The Company

hopes to obtain the requisite regulatory approval of  Steward's acquisition of the Hospital by mid-

September, or by mid-October at the latest (the approving body meets once a month for regulatory

approval purposes); that time frame would be delayed if an entity other than Steward were selected

as the purchaser of the Assets, as the regulatory approval process would need to consider the

qualifications of the newly proposed purchaser.  Once the Mass. AGO completes its regulatory

review and the requisite Mass. DPH approval is obtained, then the Company, with the assent of the

Mass. AGO, would seek the Bankruptcy Court's ratification of the regulatory approval (outside of

Chapter 11, such ratification would be obtained from the Supreme Judicial Court of Massachusetts).

Pursuant to MLBR 6004-1(c)(1)(F), the Company provides the practical and abbreviated

equivalent of the adequate information that would be required in a disclosure statement for a

Chapter 11 plan involving the sale of the Assets.

## I.      The Company's Business and Financial Affairs

### A.      The Company's Business

QMC was originally founded in 1890 as Quincy City Hospital.  In 1999, QMC was

incorporated in conjunction with a Home Rule petition approved by the City of Quincy and the

legislature of the Commonwealth of Massachusetts.  With these approvals, QMC completed its

transformation from a municipal medical center under the City of Quincy to a new nonprofit

organization.  QMC's mission as a nonprofit corporation is to provide quality medical care,

including emergency care, to the residents of Quincy, Massachusetts and adjoining communities.

QMC's signature asset is its 196-bed acute care hospital (the "Hospital") located in Quincy,

Massachusetts.  QMC operates the Hospital, and related medical and health care facilities.  QED

and QPC are captive entities as to QMC.  Their sole purpose is to own certain third-party payor

numbers and contracts under which QMC services are billed to third-party payors, and neither QED

nor QPC own any assets other than these provider numbers and contracts, nor do they have any

other business relationships.  All of the revenues generated under the provider numbers and

contracts are remitted to QMC.  QMC, QED and QPC operate as a single business enterprise—

Quincy Medical Center—and to that end have administered their business and financial affairs on a consolidated basis; the Company accounts for all operations and financial matters on a consolidated basis and maintains no separate accounting of QED or QPC revenues or expenses.

The Hospital is located on an approximately 15-acre site and consists of two major buildings comprising 418,309 gross square feet and several smaller buildings, all of which were constructed or renovated between 1920 and 1990. The Company operates as a full-service medical facility, and currently staffs 93 of the Hospital's 196 licensed beds. The variance between licensed and staffed beds reflects current patient volume resulting in part from industry reorientation toward more outpatient services.

### *Community Focus*

The Company prides itself on its commitment to the local community. The Company's purpose, embodied in its written mission statement, is "***To provide the highest quality health care services in a personal, warm and compassionate manner for all residents of our community***." In its role as Quincy's community hospital and one of the largest employers in the surrounding area, the Company is a leader in public health initiatives in the City of Quincy and surrounding communities. The Company supports local health education programs for children and elders to promote good health and to encourage younger groups to become familiar with health care as a career. The Company also partners with local community agencies and organizations, schools and colleges to prepare students for their chosen careers by serving as a clinical training site. The Company promotes community outreach programs such as its *Women, Infants and Children Nutrition (WIC) Program* that has provided nutrition counseling and food vouchers to thousands of women and children through seven offices and additional screening events throughout Norfolk and Plymouth counties. The WIC Program collaborates with numerous health and social service

4

agencies to help improve the health and well being of women and children in the communities it serves.

### *Workforce*

As of the Petition Date, QMC employs 17 physicians and approximately 1,045 non-physician employees (the "Employees"). Approximately 45 percent of the Company's employees work full time, and the remaining 55 percent of employees work part-time or on a "per diem" basis. The Company's employees are responsible for much of the medical care provided to hospital patients, as well as for maintenance of the Company's physical plant and management and administration of its business operations and financial affairs. The majority—approximately 85 percent—of employees belong to one of three unions and are subject to collective bargaining agreements with QMC. These three unions include: : Massachusetts Nurses Association ("MNA") (approximately 270 employees); Service Employees International Union ("SEIU") 1199 SEIU (United Healthcare Workers East) (approximately 440 employees); and Laborers' International Union of North America ("LIUNA") Local 367 (approximately 170 employees). The Company's gross payroll obligations to its employees total approximately $1 million per week.

The Company provides a good portion of its medical services through non-employee physicians, nurses, and technicians who provide essential services to the Company in such areas as radiology, obstetrics/gynecology, pediatrics, family practice, cardiology, nephrology, oncology, orthopedics and emergency care (the "Medical Providers"). The Medical Providers are employed by or are otherwise made available to the Company through third-party agencies who contract with the Company to provide the Medical Providers. For example, the Hospital's emergency room physicians are all non-employee Medical Providers whose services are obtained through contract with Quincy Emergency Care, PC, a medical services agency. The Company normally spends about $1 million per month for the services of the Medical Providers.

### *Scope of Services*

The Company provides a full spectrum of high quality, state-of-the-art medical and surgical services on both an inpatient and outpatient basis, focused on patient-centered care and clinical excellence furnished in a community-oriented setting. The core services offered by QMC in furtherance of its community health mission include:

**Surgical Care** - QMC offers a full range of surgical services including general surgery, anesthesiology and pathology, minimally invasive/laparoscopic surgery, breast (including reconstructive) surgery, colorectal, cosmetic, ear, nose and throat, gynecologic, neurosurgery, ophthalmologic, orthopedic, pediatric, podiatric, thoracic, urologic, and vascular surgery. Areas of special expertise, including acute and chronic pain management and pediatric and neurological anesthesia.

**Cardiovascular Care** - The Hospital's Cardiovascular Center provides comprehensive diagnostic services, treatment, and ongoing management of a wide range of cardiac and vascular conditions, including coronary artery disease, congestive heart failure, peripheral vascular disease, stroke and irregular heartbeat. The Hospital is highly regarded for its cardiovascular services and was recognized in 2009 and 2010 by the American Heart Association for achievement in using evidence-based guidelines to provide the best possible care to patients. Cardiovascular patients have access to the Hospital's full range of diagnostic imaging services, while complex surgeries such as angioplasty, stent placements and valve repair are handled by Tufts Medical Center, a nationally recognized leader in cardiovascular care with whom QMC enjoys a clinical affiliation

**Cancer Care** - QMC's oncologists and surgeons are highly regarded for their dedication to providing patients with the best possible cancer care in the community. QMC has received an unconditional three-year approval as a Community Hospital Cancer Program from the America College of Surgeons' (ACoS) Commission on Cancer (COC). Both surgical and medical treatment modalities are available on site, including chemotherapy. Patients who need radiation therapy receive treatment through the South Suburban Oncology Center, a partnership in which QMC is a 20% limited partner. QMC's highly trained multi disciplinary cancer care team - which includes medical and surgical oncologists, radiation oncologists, pathologists, diagnostic radiologists, clinical nurses, an oncology nurse navigator, social workers and rehabilitation specialists - work closely with patients and their families to provide expert care through all stages of diagnosis and treatment and is devoted to addressing each patient's physical, emotional and psychological needs. QMC also offers several cancer-focused educational programs, screenings and other outreach programs each year, and maintains a Cancer Resource Center offering patients with cancer and their families a comprehensive health and wellness resource, with particular emphasis on the prevention, diagnosis and treatment of many forms of cancer.

**Neurology** - The Hospital's neurology department is staffed by highly trained neurologists and neurosurgeons who work with health providers in other specialties to diagnose, treat and manage conditions such as cognitive disorders caused by trauma or a degenerative disorder, stroke, multiple sclerosis, epilepsy, and genetic disorders that impact the brain, muscles and nerves. The neurology department also staffs a clinic to seek early diagnoses and treatment of cognitive disorders, and conducts clinical research into Alzheimer's Disease. In February 2011, QMC was selected as one of the 20 sites in the U.S. and the only site in Massachusetts approved by the FDA for a Phase 2 clinical trial for Alzheimer's disease.

**Emergency Medicine** - QMC's emergency department ("ED") treated approximately 37,900 patients in 2010. The Hospital's ED handles all medical emergencies with professional, compassionate care.

The breadth of QMC's up-to-date emergency services includes the immediate delivery of clot-busting medication for heart attacks and strokes, and the use of state-of-the-art medical imaging for rapid diagnosis. The importance of the ED services to the Quincy community is recognized by the Hospital's restrictive deed covenant requiring continued use of the Hospital facility to provide emergency services. The ED is a consistent contributor to the Hospital's patient volume;  in fiscal year ended September 30, 2010, 15 percent of emergency room visits resulted in inpatient admissions and 85 percent of total Hospital admissions resulted from the ED.

**Intensive & Critical Care** - The Hospital's Intensive Care Unit provides critical care services to patients through a multidisciplinary team of clinicians with particular expertise in critical care medicine.  The team includes physicians with formal training and board certification in critical care medicine, a nursing staff who specializes in intensive care, respiratory therapists, pharmacists, registered dietitians, and physical, occupational, and speech therapists.  These core members are augmented by broad range of physicians from multiple specialties, including cardiology, pulmonary medicine, nephrology, infectious diseases, neurology, anesthesiology, and a variety of surgical subspecialties, who routinely participate in the care of seriously ill patients at QMC.

**Long Term Acute Care Services** - Through a lease and purchased service agreement with Radius Specialty Hospital, the Company provides a 38-bed ong term acute care hospital (under Radius's license) comprising approximately 20,700 square feet located within QMC.

**Primary, Geriatric and Women's Health** - QMC's primary care doctors are the liaison to the Hospital's full spectrum of services.   These physicians specialize in Internal Medicine or Family Medicine and provide annual physicals, health screenings based on individual health history, evaluation and treatment , and referrals to specialists when necessary.  QMC's geriatricians specialize in helping patients maintain their health and manage chronic health problems that often accompany the aging process.  QMC sponsors programs and services—notably, QMC's Center of Healthy Aging—designed to best meet the specialized needs of elderly patients, including on an outreach basis to numerous area nursing homes, continuing care communities, and assisted living facilities.  In May 2010, QMC was recognized for its outstanding geriatric care, receiving the designation as a Nurses Improving Care for Healthsystem Elders ("NICHE") site.  NICHE is the largest geriatric nursing program and the only national geriatric initiative to improve the care of older hospitalized adults.  QMC is a leader in providing comprehensive Geriatric Psychiatry Services, including through its operation of Quincy Heights, a 22-bed secure, inpatient geriatric psychiatry unit at the Hospital that includes psychiatric assessment, medical assessment and treatment, psychosocial assessment, neuropsychological testing, individual/family counseling, and group therapy.

**Pain Management** - The Pain Clinic at Quincy Medical Center offers a multi-disciplinary, individualized approach to relieve and treat acute, sub-acute and chronic pain.  Treatment offered through the Clinic is designed to ease pain conditions including: arthritis or joint pain, back pain, cancer-related pain, head and neck pain, muscle pain, neuralgia (including shingles, post-injury pain, and post-operative nerve pain). Clinic physicians are Board-Certified in both Anesthesia and Pain Management and are members of Anesthesia Associates of Massachusetts, PC, which operates pain clinics at six hospitals in Massachusetts.

**Rehabilitation Services** - QMC's department of rehabilitation services provides physical therapy, occupational therapy and speech/language pathology services in a spacious, well-equipped facility at the Hospital.  QMC's rehabilitation services may benefit patients who experience difficulty with motor function, speech, and/or activities of daily living due to stroke, arthritis, respiratory disorders, chronic pain, neurological disorders, musculoskeletal disorders, neuromuscular disorders, cancer, recent surgery, hand injuries, knee replacements, and hip fractures.

**Sleep Disorders Center** - QMC's Sleep Disorders Center is designed to evaluate, analyze, and treat the range of sleep disorders that prevent many people from getting a good night's sleep.   QMC's Sleep

Disorders Center utilizes state-of-the-art recording equipment to monitor brain wave activity, breathing efforts, oxygen levels, heart rhythm, eye movements and body activity in order to assist in the diagnosis and subsequent development of a treatment plan for complex sleep disorders.  .

**Occupational Health Services** - Occupational Health Services at QMC works with employers to help manage workplace health and safety issues.  QMC specialists in occupational and environmental health contract with more than 250 area businesses and municipalities to decrease their costs for worker's compensation by managing work-related injuries and ensuring workplace safety and injury prevention.  Services include physical examinations for pre-employment, civil service, fitness-for-duty, and return-to-work purposes, drug and alcohol testing, injury management, workers compensation, and immunizations;  the department also offers customized, on-site health and safety training programs.

**Hospitalist Services** - The Hospitalist Medicine Program at QMC consists of a team of physicians, nurse practitioners, and a physician assistant who is trained in internal medicine or family medicine and provides round-the-clock specialized care to hospitalized patients.  Hospitalists manage each patient's course through the hospital, coordinating and consulting with primary care physicians and specialists, ordering diagnostic imaging studies and laboratory tests, monitoring the patient's progress, and attending to patient discharge and post-discharge instructions and planning.

**Nutritional Services** - QMC's registered dietitians work closely with the medical and nursing staff to help patients learn about the dietary changes that will improve their health.  Special areas of expertise include: weight management, glucose control for patients with diabetes, cardiac risk management, high blood pressure, high cholesterol, kidney disease, lactose intolerance, nutrition during pregnancy, and nutrition for general health.  The Hospital was honored in April 2010 when a QMC manager was recognized as the Massachusetts Dietitian of the Year by the Massachusetts Dietetic Association.

## *Payor Mix*

QMC receives payments for services rendered to patients from the Medicare and Medicaid programs, commercial insurers, and patients directly.  Generally, the Company's revenues are determined by a number of factors, including the payor mix, the number and nature of procedures performed, and the rate of payment for the procedures.  During the fiscal year ended September 30, 2010, the Company derived approximately 62 percent of its revenues from Medicare and Medicaid, approximately 35 percent from Blue Cross and commercial insurance payors, and approximately 3 percent from patient payments.  The Company maintains relationships with all of the significant commercial/third-party payors in its market, and continually assesses its third-party payor contracts in order to negotiate the favorable reimbursement rates for the services it provides.

*Recent Operational Initiatives*

In 2010, the Company commenced a clinical affiliation with Tufts Medical Center. This affiliation provided the Company and its patients access to certain services otherwise unavailable at the Hospital, both through referral of patients to Tufts facilities, and through use of Tufts medical staff to provide expanded services at the Hospital.

Another principal initiative of the Company has been outreach efforts to inform the surrounding community about the Hospital's services and to increase the community's utilization of those services. This effort has focused on outreach to the significant concentrations of elderly and Asian individuals in the Quincy community. The Company has also undertaken ongoing efforts to streamline operations and minimize the costs of providing services while continuing efforts to enhance the quality of patient care.

**B.    The Company's Decision to Consider Strategic Alternatives**

The Company operates in a competitive, mature market for health care services. The delivery of medical services is becoming increasingly regulated, and there is pressure from both national and state constituencies to rein in what appear to be inexorably rising health care costs. One approach intended to promote more rational, cost-effective delivery of medical services is consolidation of hospitals into corporate groups that can obtain the benefits of a bigger patient base, a broader insurance pool, and resulting increased leverage in negotiating payment rates with insurers and government payors. Consolidation can also reap the benefits of more efficient use of corporate overhead, infrastructure, and information technology.

In Massachusetts, consolidation of hospitals is further affected by two additional factors. One is Governor Patrick's proposed health care payment overhaul that would restrict provider payments to annual budgets for delivered care instead of payment for individual visits and procedures. Two is a push by state and federal officials to create so-called accountable care

organizations—groups of doctors and hospitals that would band together to provide medical care under new global payment systems. The push for consolidation is reflected by Steward's campaign to build a chain of for-profit community hospitals in eastern Massachusetts and beyond; Steward's entry into the APA is but one of a number of Steward's planned acquisitions of struggling community hospitals into a more efficient management structure.

Due largely to the competitive pressures of its marketplace and the push toward delivery of more medical services on an outpatient basis, the Company in 2009 began to experience a decline in operating performance. As a result, the Hospital failed to meet a minimum days cash on hand bond covenant in late 2009, triggering an operational assessment of the Hospital by a third party industry consultant, Alvarez & Marsal. As a result of this assessment, the Company brought on new executives to oversee the Company's efforts to improve operating and financial performance, including its Interim Chief Executive Officer John Kastanis, a 30-year industry veteran, and Mark O'Neill, another industry veteran who serves as the Company's Chief Financial Officer. Messrs. Kastanis and O'Neill have guided the Company's implementation of certain operational improvements to effect cost savings and improve revenue realization. In addition, the Hospital consolidated or eliminated certain services to improve operating performance. While these efforts generated significant savings and improved efficiency in many areas, the fundamental issue facing the Company remained—how to prosper and survive in an increasingly competitive—and increasingly consolidated—industry and marketplace.

The pressures on the Company's business operations resulted in deteriorating financial performance. The Company's EBIDA decreased approximately $3.6 million from 2009 to 2010 (fiscal years ended September 30) primarily due to a drop in net patient service revenue of approximately $4.4 million. Net patient service revenue decreased mainly as a result of lower patient volume, patient days, and outpatient surgeries during 2010. This trend has continued in 2011 to

date; EBIDA for the year-to-date period through May 31, 2011 decreased approximately $589,000

as compared to the same period in 2010. The lower EBIDA was primarily a result of lower

admissions and outpatient surgeries, though an increase in uncollectable receivables also contributed.

Revenues totaled approximately $64.1 million for the year-to-date period through May 31, 2011, a

decrease of approximately two percent from the previous year. Year-to-date patient discharges

through May 31, 2011 totaled 4004, a 3.4 percent decease for the same period in 2010.

Faced with continued deterioration in operating and financial performance, lack of capital

reinvestment, and in order to strengthen the long term operating viability of the Hospital and

enhance its access to capital, the Company's Board of Trustees decided to explore strategic

partnership opportunities with other hospital systems, including an affiliation with a larger not-for-

profit hospital system or a sale of the Hospital's assets to a for-profit hospital system. The

Company hoped to partner with a well-capitalized, growth-oriented hospital system that would

accommodate the Company's continued focus on providing high-quality health care in a patient-

centered, community-oriented setting. The Company believes that there is substantial opportunity

for a larger hospital operator to realize significant synergies by integrating the Company's operations

into a larger system, including through such areas as managed care contracting, physician

recruitment, business development, and cost structure efficiencies; in addition, any acquirer would

be able to reap the benefits of the Hospital's high profile and strong reputation in Quincy and

surrounding communities, its strategic location (only minutes from downtown Boston), and its

recognized history as a highly rated, cost-efficient provider of high quality medical services.

## C.   Retention of Financial Advisor; Sale Effort to Date

After deciding to explore strategic alternatives, the Company on March 1, 2011 engaged

Navigant Capital Advisors, LLC and Navigant Consulting, Inc. (together, "Navigant"), a specialty

investment banking and consulting firm with substantial expertise in mergers and acquisitions in the

hospital and medical services industry, to serve as the Company's financial advisor.  Navigant's

engagement was directed to two principal tasks:  one, to assist the Company in assessing potential

strategic initiatives, including potential merger or sale of the Company, and to help the Company

implement any chosen course of action; and two, to provide operational and financial advice and

support services to promote the more efficient operation of the Company as it pursued its strategic

alternatives.

Upon its engagement, Navigant assisted the Company in assessing various strategic and

operational initiatives.  These efforts were directed to positioning the Company to prosper in an

increasingly competitive and regulated industry while protecting the Company's nonprofit,

community-oriented mission.  Recognizing the consolidation underway in the hospital industry, the

Company under Navigant's guidance determined that remaining an independent hospital was

unlikely to promote the Hospital's survival as a viable business enterprise.  Consequently, the

Company decided to explore the level of interest for acquisition of the Hospital, focusing on

potential acquirers best-suited to promote the Company's nonprofit, community-oriented mission.

Navigant spearheaded the Company's sale solicitation effort.  It worked with Company

management to position the Company for potential sale, including through preparation and review

of marketing materials and other due diligence items contained in a virtual data room, compiling a

list of potential acquirers, working with the Company and its counsel to prepare for the planned sale,

and providing sale-related advice to the Company.  Commencing in early April, 2011, Navigant

solicited 23 potential buyers, including many significant national or regional for profit hospital

companies and  all local market strategic players.  Ten of these companies executed a confidentiality

and non-disclosure agreement that entitled them to conduct due diligence about the Company.

Only two companies submitted a formal, written proposal to acquire the Company by the late May

deadline established by the Company, one of which was Steward Health Care System LLC

("Steward"), a Boston-based owner of eight hospitals in eastern Massachusetts and Rhode Island
(with two additional hospitals under agreement) that is actively engaged in expanding its network of
community-based hospitals.

During June 2010, Navigant and the Company continued discussions and negotiations
toward refined acquisition offers from each of Steward and the competing bidder, and with the
Company's legal advisors worked toward definitive asset purchase agreements with each suitor.
These continued negotiations led to the Company's decision on June 27, 2011 to accept (subject to
Bankruptcy Court approval after conclusion of the Court-authorized sale process) Steward's offer
embodied in the APA.  The Company then filed its Chapter 11 case, and has filed this sale motion,
in order to effectuate the planned sale to Steward and thereafter provide for the distribution of sale
proceeds (and other estate assets) in accordance with the priority scheme set forth in the Bankruptcy
Code.  The Company has by separate motion filed concurrently herewith requested the Bankruptcy
Court's approval of the Company's proposed sale procedures.

D.    **Summary of Company's Assets and Liabilities**

As of May 31, 2011, the Company had approximately $73 million of assets at book value.
This total includes $3.1 million of cash and cash equivalents and approximately $13.9 million of
patient accounts receivable, allowing for uncollectible amounts.  The mix of receivables from
patients and third party payors is primarily comprised of Medicare, Medicaid, commercial payors
such as Blue-Cross Blue Shield, and self-pay.

Assets whose use is limited totaled approximately $18.7 million as of May 31, 2011 and
includes investments, a Project Fund which was created from the 2008 Series A Bond offering that
is used to finance specified projects, funded interest which consists of a required deposit for interest
payments, assets held by trustees under bond indenture agreements and designated assets set aside
by the Board of Trustees for future capital improvements.  Assets held under bond indenture

agreements are restricted for debt services, payment of interest, and to finance capital projects.

Total liabilities were approximately $79.4 million as of May 31, 2011, including approximately $58.2

million of senior secured indebtedness owed to the Company's bondholders, approximately $2.1

million of subordinated secured indebtedness owed to Boston Medical Center arising out of the

Company's clinical affiliation with that entity, and approximately $19.1 million of unsecured

liabilities, including accounts payable and accrued expenses, accrued payroll and vacation liability,

amounts due to third-party payors, and asset retirement obligations related to the Hospital's change

to private status in 1999.

### E.     Prepetition Financing of the Company

<u>MHEFA Bond Obligations</u>

On or about May 28, 2008, QMC obtained financing through the issuance for its benefit of

$60,250,000 of Massachusetts Health and Educational Facilities Authority ("MHEFA") Revenue

Bonds, Quincy Medical Center Issue, Series A (2008) (the "Bonds").  U.S. Bank, N.A. serves as

trustee for the holders of the Bonds (the "Bond Trustee").  The Bonds included four separate types

reflecting differing amounts, maturities and interest rates/yields as follows:

| Amount | Interest Rate | Maturity | Yield | CUSIP |
|---|---|---|---|---|
| $ 3,020,000 | 5.125 % | Jan. 15, 2012 | 5.30 % | 57586C2B0 |
| 6,565,000 | 5.850 % | Jan. 15, 2018* | 6.00 % | 57586CZ73 |
| 17,745,000 | 6.250 % | Jan. 15, 2028* | 6.50 % | 57586CZ81 |
| 32,920,000 | 6.500 % | Jan. 15, 2038* | 6.72 % | 57586CZ99 |

\*  Yield to the January 15, 2018 optional redemption date at a redemption price of 100%.

As of the Petition Date, the amount owed by QMC on account of the Bonds is approximately $56.4

million including accrued interest of approximately $1.8 million, against which obligations QMC

holds approximately $6.3 million in certain bond reserve funds, including reserves for debt service.

As security for the Company's obligations under the Bonds, the Bond Trustee asserts a first priority mortgage against and security interest in substantially all of the Company's assets, including the Hospital and all revenues generated through its operation.

BMCC Obligations

Boston Medical Center Corporation ("BMCC") asserts a claim in the amount of approximately $2.1 million as of the Petition Date arising out of the Company's clinical affiliations with BMCC and represented by two secured, subordinated promissory notes dated June 30, 2008 and June 30, 2009, respectively.   BMCC asserts a first priority security interest in the Company's assets to secure its claim.  Pursuant to a subordination agreement by and among QMC, the Bond Trustee and BMCC dated as of June 30, 2008, BMCC's claim and security interest are subordinated to the claims and security interest asserted by the Bond Trustee.  Based on the expected value to be realized by the Company from the Proposed Sale, the Company believes that BMCC's claim is unsecured.

Unsecured Debt

As of May 31, 2011, the Company's accrued unsecured liabilities totaled approximately $19.1 million, including accounts payable and accrued expenses of approximately $8.1 million, amounts due to third-party payors of approximately $2.2, and accrued obligations to employees of approximately $6.4 million, and $2.4 million of asset retirement obligations related to the Hospital's change to private status in 1999.  It is anticipated that a significant portion of these liabilities, including principally the employee and certain third-party payor obligations, will be assumed by Steward (or other purchaser) in connection with its acquisition of the Company's assets and business enterprise.

II.    **The Chapter 11 Case**

The Company filed its voluntary petitions commencing its Chapter 11 case on July 1, 2011.
The Chapter 11 case will provide the Company with a stable operating environment while it pursues
the Proposed Sale.  The Company believes that this Chapter 11 case, and the Proposed Sale,
provides the best means for maximizing the value of the Company's assets for the benefit of the
Company's creditors.

A.    **"First Day" Relief**

Upon filing for Chapter 11, the Company filed several motions with the Bankruptcy Court
requesting certain "first day" relief to enable the Company to seamlessly transition its business
operations into Chapter 11.  These motions included requests for: (i) joint administration of the
cases of QMC, QED and QPC, to facilitate the orderly and efficient administration of their
consolidated business enterprise; (ii) authority to use cash collateral subject to the asserted security
interests of the Bond Trustee and BMCC, to meet the ordinary course operating expenses of the
Company and the ongoing expenses of administering the sale process and the Chapter 11 case; (iii)
authority to honor its prepetition obligations to employees and medical providers (i.e., to meet five
days of payroll accrued before July 1, 2011 and  otherwise to pay vacation and other employee
benefits in the ordinary course), in order to ensure the continued services of the Company's
workforce essential for providing quality health care services and thereby generating the Company's
revenues; (iv) authority to maintain the Company's existing bank accounts and cash management
systems, rather than suffer the business disruption attendant to closing prepetition accounts and
opening new debtor-in-possession accounts; and (v) authority to pay patient and insurer
overpayments and to honor its obligations under a state program promoting health care for women
and children, for which the Company is reimbursed by the state.  In sum, the Company's requests

16

for "first day" relief are intended to ensure that the Company's normal business operations, and its continued delivery of high-quality medical services, are not disrupted as a result of the sale process.

### B. Creditors' Committee

Since it is usually impractical for unsecured creditors to participate directly in a Chapter 11 case, bankruptcy law provides for an official committee of unsecured creditors (which usually selects and is represented by counsel compensated by the estate) to represent the interests of the unsecured creditors as a group. The membership of the creditors' committee typically includes the largest unsecured creditors who are willing to serve, provided that they are representative of the creditor body. The committee is appointed by the United States Trustee, a federal official with administrative responsibilities in bankruptcy cases. The Company expects that the United States Trustee will appoint a creditors' committee during the second week of July, 2011. Once appointed, the creditors' committee will play an active role in this case, including to oversee the sale process, to negotiate with the Company's secured creditors concerning the appropriate distribution of sale proceeds, and otherwise to provide its views on other issues in this case.

### C. Postpetition Funding

The Company has no means of paying for ongoing expenses of operating its business and preserving and protecting its assets during this Chapter 11 case except through the use of funds in which each of the Bond Trustee and BMCC claim an interest as cash collateral (e.g., proceeds of the Company's accounts receivable). On the Petition Date, the Company filed a motion seeking authority to use cash collateral. In brief, the cash collateral usage proposed by the Company authorizes the Company to use cash collateral subject to its secured creditors' security interests to operate its business and pay certain Chapter 11 administrative expenses in accordance with a proposed budget, all for the purpose of administering an orderly sale process intended to generate the greatest possible recovery for the secured (and unsecured) creditors. As adequate protection of

the secured creditors' interest in the cash collateral that the Company proposes to use, the Company

has proposed that each of the Bond Trustee and BMCC be granted a replacement lien in

postpetition assets (but expressly excluding the bankruptcy estate's avoidance actions such as

potential actions to recover preferences or fraudulent transfers) to secure any diminution in value of

its prepetition collateral resulting from the Company's use of such collateral.  The Company expects

that the Bankruptcy Court will conduct hearings to consider both interim and final relief, incident to

which the Company expects to engage the Bond Trustee (and possibly BMCC) in discussions

concerning consensual use of cash collateral.

III.     **Summary of the Proposed Sale**

The Proposed Sale embodies the Company's decision to seek a larger and financially strong

owner and operator of the Hospital in order to assure its continued viability as the medical provider

of choice to the Quincy community.  The Bidder operates a community-based hospital system in

eastern Massachusetts and Rhode Island, and is growing.  It is a physician-led organization, and is

already the second-largest private employer in the Commonwealth of Massachusetts.  Although the

Proposed Sale's approval by the Mass. DPH and the satisfactory completion of the Mass. AGO's

regulatory review process cannot be assured as to any purchaser, the Company believes that the

selection of the Bidder—reputationally, financially, and in terms of its commitment to the future of

the Hospital--maximizes the prospect of expeditious regulatory approval.

By this Motion, the Company seeks authority to sell the Assets to Steward pursuant to the

APA (or to a competing bidder that submits the highest or otherwise best offer to acquire the Assets

for operation of the Hospital on a going concern basis), as determined through the sale process to

be authorized by this Court pursuant to the Company's related motion for approval of sale

procedures filed concurrently herewith.  The principal terms and conditions of the Proposed Sale are

summarized below:

- **Assets Being Sold**

The Assets to be sold constitute substantially all of the Company's real and personal property used to operate the Hospital and related health care business, aside from the Company's cash on hand, restricted funds, and other assets identified as "Excluded Assets" under the APA and described below. The Assets include the Company's third-party payor provider numbers and contracts and many of the Company's significant contracts for goods and services used in the operation of the Hospital. Because the Assets are utilized in the operation of the Company's business, and because the Company believes that the highest and best value for the Assets will be obtained through a sale of the Company's business as a going concern, the Company does not anticipate that prospective competing bidders will be interested in acquiring less than substantially all of the Assets. Nevertheless, any prospective purchaser may elect to acquire less than all of the Assets by so specifying in its offer. The Company, in consultation with the Committee, will determine which offer (or offers) represents the highest or otherwise best offer for the Assets.

- **Cash Consideration; Deposit**

Steward has agreed to pay the Company up to $38,000,000 for the Assets (at least $35,000,000, with upward adjustments tied to how quickly the sale closes), and has also agreed to assume certain liabilities and to undertake certain post-closing commitments summarized below. The cash component of the purchase price is subject to adjustment based on certain additional liabilities that Steward may elect to assume. Under the APA, Steward has delivered an earnest money deposit of $3.5 million. This deposit will be applied to the cash purchase price at closing. If the sale does not close, then disposition of the deposit will be governed by the APA, which in certain circumstances involving Steward's breach of its APA obligations entitles the Company to receive a portion (50 percent) of the deposit as liquidated damages; the APA also provides the Company with the option to seek specific performance of Steward's obligations.

- **Assumption of Certain Liabilities**

Prospective purchasers may elect to assume certain of the Company's liabilities that might appropriately be assumed by an acquirer intending to maintain the Company's ongoing business enterprise, such as, by way of example, the Company's obligations for accrued vacation earned by employees to whom the acquirer wishes to offer employment. The Company, in consultation with the Committee, will take offers to assume liabilities into account in determining the highest or otherwise best offer to be obtained by the Company and its bankruptcy estate through the sale process. Under the APA, Steward has agreed to assume certain of the Company's liabilities, including all obligations to the Company's employees who accept employment with Steward, all of the Company's liabilities under its third-party payor provider numbers and contracts, and all of the Company's liabilities associated with the purchased Assets that arise on or after closing of the sale. Steward will also be responsible for payment of any cure costs associated with the Company's assumption and assignment to Steward of executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code. The Bidder will have an additional period to designate for assumption certain Transitional Contracts, as to which it will be required to provide cure in the amounts found by the Court as being owed to the non-Company party prior to the commencement of the Chapter 11 case.

- **Steward's Post-Closing Commitments**

In addition to Steward's payment of the cash purchase price and assumption of liabilities, an important element of the Proposed Sale is Steward's post-closing commitments directed to ensure continued operation of the Hospital in furtherance of its mission to provide patient-oriented, high quality medical care in a community-oriented atmosphere. This continuity of the Hospital's mission will be achieved through Steward's express commitments to spend not less than $34,000,000 on capital improvements and operational infrastructure during the first five years post-closing, to continue to operate the Hospital as an acute-care facility providing emergency services for at least five years post-closing, and to permit local control over much of the Hospital's operations through a local governing board, to be populated by Hospital and community representatives, that will have decision making authority over such matters as changes in provided services, strategic planning for community outreach, and approval of capital and operating budgets and significant borrowings. The Company considers these aspects of Steward's APA to be integral to the overall value to be obtained through the Proposed Sale and would expect competing bidders to compete aggressively in this area.

- **Utilization of the Company's Workforce**

The Company presumes that any prospective purchaser would want to retain the Company's employees through offers of employment to be effective at closing of the sale transaction. Steward has agreed to do so, and to assume the Company's existing obligations to those employees who accept employment. The Company would expect any prospective bidder to offer employment and assume employee obligations to the same degree as undertaken by Steward.

- **Excluded Assets**

While the Proposed Sale will involve substantially all of the Company's assets utilized in operation of its business, certain assets will be excluded from the sale. Excluded assets include the Company's cash, cash equivalents and bank deposits, all deposits such as customer deposits and security deposits for utilities, and all donor-restricted funds and assets in which the Company has a beneficial or other interest as of the closing date. The Company's rights, claims and causes of action under Chapter 5 of the Bankruptcy Code (e.g., its right to seek avoidance and recovery of preferential and fraudulent transfers for the benefit of creditors) will also be excluded from the assets to be sold.

- **Sale Free and Clear**

The Proposed Sale of the Assets will, pursuant to Section 363 of the Bankruptcy Code, be free and clear of all liens, claims and encumbrances, including without limitation all consensual liens and security interests and all liens or claims arising by operation of law, except for those permitted exceptions specified in the APA. Any and all such liens, claims, and encumbrances shall attach with equal effect and priority to the proceeds of sale. Significant permitted exceptions include the restrictive covenant in the deed to the Hospital realty restricting the ability to close the emergency services department, and purchase money security interests in various items of personal property such as equipment.

- **Regulatory Approval**

The Proposed Sale of the Hospital is subject to regulatory review by the Mass. AGO and approval by the Mass. DPH. The Company hopes to obtain the requisite regulatory approval of Steward's acquisition of the Hospital by early to mid-September (the approving body meets once a month for regulatory approval purposes); that time frame would be delayed if an entity other than Steward were selected as the purchaser of the Assets, as the regulatory approval process would need to consider the qualifications of the newly proposed purchaser. Once the requisite regulatory approval is obtained from the Mass. DPH and the Mass. AGO, then the Company, with the assent of the Mass. AGO, would seek the Bankruptcy Court's ratification of the regulatory approval (outside of Chapter 11, such ratification would be obtained from the Supreme Judicial Court of Massachusetts).

- **Contingencies to Closing**

The APA contains a number of conditions to closing that if not satisfied would permit either the Company or Steward to terminate the agreement. From the Company's perspective, Steward's conditions to closing have been narrowly tailored to ensure as much certainty of closing as possible. Nevertheless, there are several material conditions that must be satisfied before Steward can be required to close the Proposed Sale, including (i) Bankruptcy Court approval of the Proposed Sale, (ii) Mass. DPH and Mass. AGO approval of the Proposed Sale, (iii) the lack of any material breach of certain fundamental representations and warranties of the Company, and (iv) the lack of any events or circumstances that would have a material adverse effect on the operation of the Hospital and its perceived value to Steward, other than as a result of matters applicable to the health care industry as a whole, and as more particularly described in the APA. Steward may not interpose failure of a condition to closing that results from its own non-performance of its obligations under the APA. Notably, the APA promotes certainty of closing by providing the Company with the right to seek specific performance of the APA against Steward, helping to ensure that if the conditions to closing are met, the Company can obtain the benefit of its bargain. The Company in consultation with the Committee will review closely any conditions to closing imposed by competing bidders that place certainty of closing at risk.

- **Sale Escrow; Indemnification**

Under the APA, $500,000 will be held in escrow for six months post-closing to secure the Company's indemnification obligations to Steward arising out of any breach by the Company of its representations or warranties to (subject to any materiality condition as to such representations and conditions). The Company will have no indemnification obligation until valid indemnification claims total more than $100,000 in the aggregate, and its exposure is capped at $600,000 less the $100,000 safe harbor, an amount equivalent to the $500,000 holdback.

- **Miscellaneous Provisions**

The Proposed Sale contemplates that prospective bidders will abide by confidentiality restrictions with respect to the Company's confidential information and that each prospective bidder will bear its own expenses associated with negotiation, documentation, and efforts to obtain Bankruptcy Court approval of its offer and related definitive purchase agreement. The proposed sale procedures also contemplate other terms and conditions customary to an asset sale of the nature

involved.  For a thorough review and understanding of such terms and conditions, and for greater detail of the specific terms and conditions summarized above, it is recommended that you review the APA and the Company's motion for approval of sale procedures filed concurrently herewith.

- **Break-Up Fee and Overbid Protection**

In consideration of Steward's expenditure of considerable time and expense in pursuing the Proposed Sale and entering into the APA by which Steward serves as the stalking horse bidder, the Company has agreed to pay Steward a break-up fee of $875,000 if another competing bidder submits a higher or otherwise better offer to acquire the Assets that is accepted by the Company, approved by the Bankruptcy Court, and closes.  The break-up fee will be paid only upon closing of the alternate sale transaction, and only out of the proceeds of sale.  To ensure that the overall value from sale of the Assets is not diminished by the necessity of paying the break-up fee, the APA provides that the minimum amount of any competing bids must have a value not less than $875,000 more than the Cash Purchase Price provided by the APA.  These provisions of the APA are subject to approval of the Bankruptcy Court incident to the Company's motion to establish sale procedures for the Proposed Sale.

- **Sale Hearing; Competing Bids**

The proposed sale procedures contemplate that "Qualified Bids" to purchase Assets must be submitted to the Company by a bid deadline of late July, 2011.  If more than one Qualified Bid is submitted (inclusive of Steward's Qualified Bid embodied in the APA), the Company, in accordance with the proposed sale procedures, will conduct a sealed-bid auction among Qualified Bidders at which each Qualified Bidder will be entitled to submit its final, best offer to acquire Assets, after which the Company, in consultation with the Committee, will determine the highest or otherwise best offer (or offers) for the Assets to be submitted to the Bankruptcy Court for approval.  The Company encourages all prospective bidders to contact the Company's financial advisor or counsel immediately in order to obtain further information about the Assets, the Company's business enterprise, and the procedures for obtaining due diligence and participating in the sale process.

## IV.   Possible Alternatives to the Proposed Sale

The Company believes that there are two alternatives to the Proposed Sale—liquidation of

the Company under Chapter 7, or a Chapter 11 liquidating plan providing for a sale of the Company

as a going concern, which the Company views as a more expensive, time-consuming, and uncertain

means of pursuing the same objective as the Proposed Sale.[1]

---

[1] Another alternative that existed before the Petition Date would have been to pursue the sale outside of bankruptcy. The Company believes that, given the Company's financial condition, this could only have been achieved through significant payments to the Company's general unsecured creditors (principally vendors) to ensure their acquiescence to the sale and continued support of Hospital operations, which payments would have to have been funded by either the Bondholders or Bidder.

As to the Chapter 7 alternative, it is as likely as not that even a Chapter 7 liquidation would end up with a sale of the Hospital as a going concern—the difficulties and risks attendant to closing an operating hospital the size of the Hospital, and the devastating impact on the value to be realized by the Company's creditors if the Hospital were to be shuttered, suggests that even in Chapter 7 the Hospital would be operated long enough to conduct its orderly sale on a going concern basis. Thus, under the particular circumstances, the process ultimately undertaken in Chapter 7 would likely be equivalent to that proposed to be taken here, but with the delay attendant to appointment of a Chapter 7 trustee and disruption of the orderly sale process otherwise administered by the Company's existing management and advisors.

As to the liquidating plan alternative, the Company has carefully considered that option, and has elected to pursue a Section 363 sale, principally for the reason that a Section 363 sale better promotes the prompt sale of the Hospital before it faces any significant liquidity (cash flow) issues. The Proposed Sale contemplates reasonably prompt approval of sale procedures, followed by a reasonable period within which to solicit competing bids, conduct an auction involving any competing bidders, and hold a hearing to approve the sale; the Company envisions that this process could be completed in approximately 10 weeks. Conducting the sale pursuant to a plan would require at least two months to obtain approval of a plan filed on the Petition Date in order to kick off the sale process. Of course, one could start the sale process before plan confirmation and then have the plan incorporate the sale process previously undertaken, but this merely underscores that the plan would constitute little more than the mechanism for distribution of sale proceeds, rather than an essential element of the sale process. The Company has elected to pursue a Section 363 sale to ensure the timely and procedurally straightforward sale of its business, recognizing that a liquidating plan—even one filed within the next few days—would provide an appropriate

mechanism for disposition of sale proceeds and remaining estate assets rather than an expeditious means of conducting the necessary sale.

Finally, the Company's essential problem—how best to position itself in the competitive, consolidating marketplace—would not be addressed through a mere financial restructuring. True, a deleveraged Company would face better financial prospects. But remaining a stand-alone hospital in its current operating environment would likely only lead to an eventual partnering with a larger and financially stronger entity. The Company sees no reason to delay its partnership with Steward, and the Proposed Sale provides the most straightforward and prompt means of cementing that partnership.

## V.    Claims Against the Company

The following is a summary of the Company's liabilities:

### A.    Secured Claims

A claim is "secured" when a creditor holds a lien on particular assets ("collateral") to assure payment of the claim. In general, proceeds from any sale of collateral must be applied first to the repayment of any claims secured by the collateral. If the amount of the claim exceeds the value of the collateral, then the claim is considered to be a "secured claim" under the Bankruptcy Code only to the extent of value of the collateral. The Bankruptcy Code permits the holder of a secured claim to require that the claim be paid in full, although payment may be made over a period of time if the secured creditor keeps its lien or receives equivalent assurance of payment.

Secured claims against the Company include the claims of the Bond Trustee and of BMCC described above in Section I.E. The Company believes that the Bond Trustee is undersecured, because the likely realizable value of the Assets is less than the indebtedness owed to the Bond Trustee. If so, then the Company believes that BMCC's ostensible secured claim is actually

unsecured, as a result of BMCC's having subordinated its claim and security interest to those of the Bond Trustee.

Other secured claims against the Company include claims of various equipment lessors or financiers secured by the particular items of leased or financed equipment and which might be determined to be secured financing arrangements rather than true leases. Because the Company expects that any acquirer of the Company's business as a going concern will want to assume these leases, the Company expects that if there is a successful sale that there will not be any significant claims asserted against the Company with respect to these leases.

**B.      Priority Claims**

The Bankruptcy Code entitles certain types of unsecured claims to be paid in full prior to other claims. These "priority claims" include expenses incurred during the Chapter 11 case (including fees of professional persons), wages incurred within 90 days and employee benefits incurred within 180 days before the beginning of the Chapter 11 case (up to $11,725 per employee), and most taxes arising before the Chapter 11 case. The Company believes that it has paid most if not all prepetition taxes entitled to priority. The prepetition priority claims of employees are expected to be paid in the ordinary course during the period up to closing of the Proposed sale (i.e., normal payroll and utilization of vacation paid out of ongoing operating revenues), and to be assumed by Steward at closing. Accordingly, the Company anticipates that there will be little if any prepetition priority claims remaining to be paid once the Proposed Sale takes place.

Postpetition liabilities entitled to priority as administrative expenses include professional fees of Chapter 11 professionals (i.e., the Company's and the Creditors' Committee's attorneys and financial advisors) and other costs of administering the Company's estate, which will be paid in the

ordinary course from ongoing business revenues,[2] or from proceeds of the sale of the Company's

assets and (in the case of professional fees) also from any prepetition retainers received by

professionals.

Postpetition priority claims could also potentially include any claims of the Company's

vendors not paid in the ordinary course and any claims of employees for vacation accrued

postpetition and not yet utilized.  The Company expects that any acquirer of the Company's going-

concern business operations will want to employ the Company's employees and will agree to assume

postpetition accrued vacation obligations as well as obligations and accounts payable relating to

assumed contracts, all of which obligations are to be assumed by Steward under the APA.

### C.    General Unsecured Claims

Unsecured claims not entitled to priority under the Bankruptcy Code are called "general

unsecured claims."  If a claimant supplied goods or services to the Company prior to July 1, 2011

(when the Company's Chapter 11 case was filed) and has not been paid, then that claimant probably

holds a general unsecured claim against the Company.  The Company estimates that its general

unsecured liabilities as of May 31, 2011 total approximately $19.1 million, including the anticipated

unsecured claim of BMCC but excluding any unsecured portion of the Bond Trustee's claim.  Of

this amount, the Company expects that certain liabilities having a book value as of May 31, 2011 of

approximately $8.6 million will be assumed by Steward under the APA.  This does not include

potential claims that could arise in favor of non-Company parties to leases or executory contracts if

the Company were to reject such agreements; most of the Company's significant agreements are to

be assumed by Steward under the APA, and the Company would anticipate that any competing

bidder might also assume many of the Company's existing contracts.

---

[2] In the case of professionals' fees, upon compliance with and subject to the compensation procedures established by the Bankruptcy Court.

26

The Company currently anticipates that there will be sufficient proceeds from sale of the Assets to pay only a portion of the Bond Trustee's claim, and that all other claims are at risk of non-payment. The Company does expect that negotiations among the Company, the Committee and the Bond Trustee will provide for payment of the administrative expenses of the Chapter 11 case and for some recovery to general unsecured creditors. Additional amounts for distribution to general unsecured creditors may be generated from pursuit of avoidance actions such as the recovery of preferential or fraudulent transfers, and other causes of action of the estate, if any. While the Company believes that there will be some distribution to general unsecured creditors, the Company cannot at this time estimate the magnitude or timing of any such distribution, other than to estimate that it will fall far short of any significant recovery.

**VI.**   **Other Assets of the Estate**

As noted above in the summary description of the Proposed Sale, certain of the Company's assets are to be excluded from sale, including cash and cash equivalents, deposits with banks and third parties, and donor-restricted funds or other property in which the Company holds a beneficial interest. The Company anticipates that any cash and deposits as of sale closing will be used to meet Chapter 11 administrative expenses and/or the Company's obligations to secured creditors. The Proposed Sale does not affect the Company's right to assert claims, such as actions to avoid preferential or fraudulent transfers. Potential avoidance actions arising under Sections 544 through 553 of the Bankruptcy Code are not subject to the liens of the Bond Trustee or any other creditor. Typically, principal avoidance actions would include avoidance of preferential transfers and avoidance of fraudulent transfers.

**A.**   **Preferential Transfers**

The Bankruptcy Code permits a debtor's bankruptcy estate to avoid and recover certain transfers of an interest in the debtor in property, if the transfers were made within 90 days before

the bankruptcy filing or, in the case of a transfer to an insider of the debtor, within one year before the bankruptcy filing. In general terms, such a transfer can be recovered if it was made by an insolvent debtor, to or for the benefit of a creditor, on account of an antecedent debt, and the transfer allowed the creditor to receive more than it would have under a Chapter 7 liquidation. However, the Bankruptcy Code also provides various defenses to recipients of such transfers. An otherwise preferential transfer is excepted from recovery if, for example, the transfer was made in the ordinary course of business, or the creditor receiving the transfer provided the debtor with new value (such as additional products or services) after the transfer.

The Company has not yet conducted an analysis of potential available preferences. The Company anticipates that determination of whether and when to pursue potential preference actions will most properly be made in consultation with the Committee upon conclusion of the sale process. Any proceeds of preference actions are not subject to the liens of secured creditors, and would therefore be available for payment of priority claims (including the expenses of administration of this Chapter 11 case), and, thereafter, for distribution to general unsecured creditors.

**B.        Fraudulent Transfers**

The Bankruptcy Code and state law also permit a debtor to recover fraudulent transfers. There are two categories of transfers which could be fraudulent: first, transfers made for less than reasonably equivalent value while the debtor was in financial distress; and second, transfers made by the debtor with actual intent to hinder, delay or defraud its creditors. The Company does not believe that it has made any fraudulent transfers. The Company expects that the Committee will undertake its independent assessment of whether there exist grounds for assertion of any avoidable fraudulent transfers.

VII.   **Claims Objections**

No claim will be paid unless it is allowed by the Bankruptcy Court.  The Company will

discuss with the Committee an appropriate deadline for the assertion of claims against the

Company's bankruptcy estate, and will seek an order of the Bankruptcy Court to establish a deadline

and related procedures for the assertion of claims.  If a claimant files a valid proof of claim before

the deadline established by the Court, then the claim will be automatically allowed unless the

Company or another interested party files a written objection with the Bankruptcy Court.  Even if a

claimant does not file a proof of claim, any liability of the Company that the Company has listed in

the Schedules of Liabilities filed with the Bankruptcy Court, and has not listed therein as disputed,

unliquidated or contingent, will be automatically allowed unless an objection to allowance is filed

with the Bankruptcy Court.

If an objection to a claim is filed, a copy of the objection will be sent to the claimant, who

will also receive a notice specifying the deadline to file a written response to the objection, as well as

the date, time and place of the hearing regarding the merits of the claim.

VIII.   **The Bankruptcy Process for Approval of the Proposed Sale**

A.      **Objections**

If a party in interest, such as a creditor, does not believe that the Proposed Sale is reasonable

or in the best interest of the Company and its creditors, it can object to this Motion by filing a

written objection setting forth the basis for the objection.  The deadline for submitting an objection

will be set by the Court as will the date of the hearing on this Motion, at which objecting parties may

be heard.  Notice of the objection deadline and hearing will be provided to the Company's creditors.

The Company believes that the Proposed Sale is in the best interest of creditors, particularly since

the Proposed Sale contemplates, and the sale procedures governing the Proposed Sale are intended

to elicit, the highest or otherwise best offer to purchase the Assets though an acquisition of the Company's business as a going concern.

**B.      Offers to Acquire the Assets**

Any party interested in submitting an offer to purchase the Assets (or any portion thereof) should contact the undersigned Company's counsel at the earliest possible date, and comply with the deadline and governing procedures for submission of offers to be established by the Bankruptcy Court.

**C.      Sale Order**

The Company intends that Bankruptcy Court approval of the Proposed Sale will be effected through entry of a sale order (i) approving the APA, (ii) authorizing the Company's sale of the Assets free and clear of liens, claims and encumbrances (other than the permitted exceptions set forth in the APA), with any and all such liens, claims and encumbrances to attach to sale proceeds, (iii) authorizing the Company's assumption and assignment of the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code, and (iv) containing such additional provisions and protections of the estate and the purchaser as are typical for an all-asset sale pursuant to Section 363 of the Bankruptcy Code.  A proposed form of sale order is attached hereto as <u>Exhibit B</u>.

<u>Conclusion</u>

WHEREFORE, the Company respectfully requests that this Court: (a) enter an order, in substantially the form attached hereto, granting this Motion; and (b) grant such other and further relief as this Court may deem just and proper.

Dated:  July 1, 2011

QUINCY MEDICAL CENTER, INC.
QMC ED PHYSICIANS, INC.
QUINCY PHYSICIANS CORP.
By their attorneys,


/s/ John T. Morrier
John T. Morrier (BBO #628624)
Michael J. Goldberg (BBO #551869)
A. Davis Whitesell (BBO #551462)
Andrew T. Imbriglio (BBO #676049)
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210
Tel: 617-426-5900
Fax: 617-426-8810
Email: morrier@casneredwards.com