# EXHIBIT A

EXECUTION VERSION

Asset Purchase Agreement

by and among

Quincy Medical Center, Inc.,

QMC ED Physicians, Inc. and

Quincy Physician Corporation

and

Steward Medical Holdings Subsidiary Five, Inc. and

Steward Medical Holdings LLC

**Dated as of June 30, 2011**

TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS                                                              1
    1.1      Certain Definitions.............................................................. 1
    1.2      Terms Defined Elsewhere in this Agreement ................................... 13
    1.3      Other Definitional and Interpretive Matters ..................................... 13

ARTICLE II     PURCHASE AND SALE OF ASSETS; ASSUMPTION OF
               LIABILITIES                                                             15
    2.1      Purchase and Sale of Assets................................................. 15
    2.2      Excluded Assets ............................................................. 17
    2.3      Assumption of Liabilities.................................................... 18
    2.4      Excluded Liabilities ........................................................ 19
    2.5      Cure Amounts ............................................................... 20
    2.6      Further Conveyances and Assumptions........................................... 21
    2.7      Bulk Sales Laws............................................................. 21
    2.8      Transfer of Certain Protected Health Information............................. 22
    2.9      Title...................................................................... 22

ARTICLE III    CONSIDERATION                                                           22
    3.1      Consideration .............................................................. 22
    3.2      Purchase Price Deposit ..................................................... 23
    3.3      Payment of Cash Purchase Price.............................................. 23
    3.4      Escrow Agent............................................................... 23
    3.5      Steward Assurance .......................................................... 24

ARTICLE IV     CLOSING AND TERMINATION                                                 24
    4.1      Closing Date............................................................... 24
    4.2      Deliveries by Seller....................................................... 25
    4.3      Deliveries by Purchaser ................................................... 26
    4.4      Termination of Agreement................................................... 26
    4.5      Procedure For Termination ................................................. 28
    4.6      Effect of Termination...................................................... 28

ARTICLE V      REPRESENTATIONS AND WARRANTIES OF SELLER               30
    5.1      Organization and Good Standing............................................. 30
    5.2      Authorization of Agreement ................................................ 30
    5.3      Contravention; Consents of Third Parties; Contractual Consents ..... 31

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 5.4 | Financial Statements | 31 |
| 5.5 | Title to Purchased Assets | 32 |
| 5.6 | Taxes | 32 |
| 5.7 | Real Property | 33 |
| 5.8 | Litigation | 33 |
| 5.9 | Tangible Leased Personal Property | 34 |
| 5.10 | Intellectual Property | 34 |
| 5.11 | Contracts | 34 |
| 5.12 | Insurance | 35 |
| 5.13 | Employee Benefits | 35 |
| 5.14 | Employee Relations; Medical Staff; Labor | 37 |
| 5.15 | Compliance with Laws | 38 |
| 5.16 | Environmental Matters | 39 |
| 5.17 | Permits | 40 |
| 5.18 | Privacy Laws; Health Information Laws | 40 |
| 5.19 | Relationships With Affiliates | 41 |
| 5.20 | Financial Advisors | 41 |
| 5.21 | Full Disclosure | 41 |
| 5.22 | No Other Representations or Warranties; Schedules | 41 |

**ARTICLE VI    REPRESENTATIONS AND WARRANTIES OF PURCHASER 42**

| | | |
|---|---|---|
| 6.1 | Organization and Good Standing | 42 |
| 6.2 | Authorization of Agreement | 42 |
| 6.3 | Consents of Third Parties; Conflicts | 43 |
| 6.4 | Litigation | 43 |
| 6.5 | Financial Advisors | 43 |
| 6.6 | Financial Capability | 43 |
| 6.7 | Healthcare Regulatory Compliance Status | 44 |
| 6.8 | Acknowledgement Regarding Condition of the Business | 45 |

**ARTICLE VII    BANKRUPTCY COURT MATTERS    46**

| | | |
|---|---|---|
| 7.1 | Approval of Break-Up Fee and Overbid Protection | 46 |
| 7.2 | Competing Transaction | 46 |
| 7.3 | Bankruptcy Court Filings | 46 |

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 7.4 | Purchaser's Assurance | 46 |
| **ARTICLE VIII** | **CERTAIN COVENANTS AND AGREEMENTS** | **47** |
| 8.1 | Negative Covenants Pending Closing | 47 |
| 8.2 | Access to Information | 49 |
| 8.3 | Conduct of the Business Pending the Closing | 50 |
| 8.4 | Consents | 50 |
| 8.5 | Insurance | 51 |
| 8.6 | Permits | 51 |
| 8.7 | Regulatory Approvals | 51 |
| 8.8 | Chapter 180 Review | 54 |
| 8.9 | Real Property Violations | 54 |
| 8.10 | Mechanics Liens | 54 |
| 8.11 | Hazardous Materials | 54 |
| 8.12 | Operation of Real Property | 54 |
| 8.13 | Delivery of Financial and Other Information | 55 |
| 8.14 | Further Assurances | 55 |
| 8.15 | Confidentiality | 55 |
| 8.16 | Preservation of Records | 56 |
| 8.17 | Publicity | 56 |
| 8.18 | Use of Name | 56 |
| 8.19 | Supplementation and Amendment of Schedules; Disclosure of Contracts | 57 |
| 8.20 | Post-Closing Obligations | 57 |
| 8.21 | Treatment of Transitional Contracts | 60 |
| 8.22 | Treatment of Collective Bargaining Agreements | 60 |
| **ARTICLE IX** | **EMPLOYEES AND EMPLOYEE BENEFITS** | **61** |
| 9.1 | Offers of Employment | 61 |
| 9.2 | Employment Terms; Employee Benefits | 61 |
| **ARTICLE X** | **CONDITIONS TO CLOSING** | **63** |
| 10.1 | Conditions Precedent to Obligations of Purchaser | 63 |
| 10.2 | Conditions Precedent to Obligations of Seller | 64 |
| 10.3 | Conditions Precedent to Obligations of Purchaser and Seller | 64 |

TABLE OF CONTENTS
(continued)

Page

10.4    Frustration of Closing Conditions ........................................................ 65

**ARTICLE XI    INDEMNIFICATION; REMEDIES    65**

11.1    Survival ................................................................................... 65
11.2    Indemnification ........................................................................... 65
11.3    Satisfaction of Indemnification Claims ................................................. 66
11.4    Limitation on Indemnification ........................................................... 66
11.5    Indemnification Procedures .............................................................. 67
11.6    Calculation of Losses .................................................................... 69
11.7    Tax Treatment of Indemnity Payments ..................................................... 69
11.8    Exclusivity .............................................................................. 70
11.9    No Consequential Damages ................................................................. 70
11.10   Specific Performance ..................................................................... 70

**ARTICLE XII    TAXES    70**

12.1    Transfer Taxes ........................................................................... 70
12.2    Taxes .................................................................................... 71
12.3    Purchase Price Allocation ................................................................ 71
12.4    Cooperation .............................................................................. 71

**ARTICLE XIII    MISCELLANEOUS    72**

13.1    Expenses ................................................................................. 72
13.2    Submission to Jurisdiction; Consent to Service of Process ................................ 72
13.3    Waiver of Right to Trial by Jury ......................................................... 72
13.4    Entire Agreement; Amendments and Waivers ................................................. 72
13.5    Governing Law ............................................................................ 73
13.6    Notices .................................................................................. 73
13.7    Severability ............................................................................. 74
13.8    Binding Effect; No Third-Party Beneficiaries; Assignment ................................. 74
13.9    No Personal Liability .................................................................... 74
13.10   Estate Representative .................................................................... 75
13.11   Counterparts ............................................................................. 75

## ANNEX

1        Business

## SCHEDULES

| | |
|---|---|
| 1.1(a) | Knowledge of Seller |
| 1.1(b) | Knowledge of Purchaser |
| 1.1(c) | Purchase Money Security Interests |
| 1.1(d) | Transitional Contracts |
| 2.1(a) | Purchased Real Property Leases |
| 2.1(b)(iii) | Purchased Vehicles |
| 2.1(d) | Purchased Contracts |
| 2.2(b) | Excluded Contracts |
| 2.2(d) | Excluded Personal Property Leases |
| 2.2(r) | Other Excluded Assets |
| 2.3(f) | Assumed Trade Creditor Liabilities |
| 2.9(a) | Permitted Exceptions for Owned Property |
| 2.9(b) | Permitted Exceptions for Purchased Real Property Leases |
| 4.6 | Positions Subject to Non-Solicitation |
| 8.3 | Exceptions to Conduct of Business in the Ordinary Course |
| 8.12 | Permitted Improvements and Capital Projects |
| 10.3(d) | Required Governmental Consents |
| 12.3 | Purchase Price Allocation |
| 8.20(a) | Seller's Community Benefit and Charity Care Policies |

Seller Disclosure Schedule
Purchaser Disclosure Schedule

## EXHIBITS

| | |
|---|---|
| Exhibit A | Bill of Sale |
| Exhibit B | Assignment and Assumption Agreement |
| Exhibit C | Form of Deed |
| Exhibit D | Medical Services Agreement |

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of June 30, 2011 (this "Agreement"), by and among Quincy Medical Center, Inc., QMC ED Physicians, Inc., and Quincy Physician Corporation, each a Massachusetts nonprofit corporation (collectively "QMC" or "Seller"), Steward Medical Holdings Subsidiary Five, Inc., a Delaware corporation ("Purchaser"), and Steward Medical Holdings LLC, a Delaware limited liability company ("Steward").

WHEREAS, QMC owns and operates a hospital located in Quincy, Massachusetts, known as Quincy Medical Center (the "Hospital").

WHEREAS, Seller also owns, controls and/or operates other businesses related to Seller's operation of the Hospital (all health care and health care related business operations and services provided by Seller and its Affiliates at or associated with the Hospital, including those identified in Annex 1, and including the ownership and operation of the Hospital, are referred to collectively as the "Business").

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller, the Business, including all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein.

WHEREAS, Seller desires to effectuate the contemplated sale of the Business to Purchaser through a sale conducted under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and to that end Seller intends to file presently, in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing Seller's bankruptcy case (the "Bankruptcy Case") (the date of Seller's filing of such voluntary chapter 11 petition, the "Petition Date"), and to seek the Bankruptcy Court's approval of the contemplated sale pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"AGO" means the Office of the Attorney General of the Commonwealth of Massachusetts.

"8A(d) Advance" and "8A(d) Review" have the meanings set forth in Section 8.8.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; except that, for purposes of this Agreement, Affiliate shall not include any member of Steward, Cerberus Capital Management, L.P. or any of its funds (collectively, "CCM").

"Allocation Statement" has the meaning set forth in Section 12.3.

"Antitrust Division" has the meaning set forth in Section 8.7(b).

"Antitrust Laws" has the meaning set forth in Section 8.2.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Plans" has the meaning set forth in Section 2.3(i).

"Bankruptcy Case", "Bankruptcy Code", and "Bankruptcy Court" have the meanings set forth in the fourth recital of this Agreement.

"Bankruptcy Rules" has the meaning set forth in Section 8.18.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Seller that, among other things, (i) establishes procedures for the submission of Competing Bids, (ii) approves the Break-Up Fee and Overbid Protection, all as defined in Section 7.1, on the terms and conditions set forth in Section 7.1 and (iii) authorizes and schedules an auction for the sale of the Purchased Assets and establishes procedures with respect to such auction, and provides for the scheduling of a hearing on the Sale Motion and establishes deadlines for objections thereto.

"Break-Up Fee" has the meaning set forth in Section 7.1.

"Business Day" means any day of the year on which national banking institutions in Massachusetts are open to the public for conducting business and are not required or authorized to close.

"Business" has the meaning set forth in the second recital of this Agreement.

"Cafeteria Plan Participants" has the meaning set forth in Section 9.2(c).

"Cash Purchase Price" has the meaning set forth in Section 3.1(a).

"CERCLA" has the meaning set forth in Section 5.16(c).

"Chapter 180" has the meaning set forth in Section 5.3(b).

"CHOW" has the meaning set forth in Section 4.2(k).

"Closing" and "Closing Date" have the meanings set forth in Section 4.1.

"Closing Date Extension Fee" has the meaning set forth in Section 4.4(a).

"CMS" means the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services.

"COBRA" has the meaning set forth in Section 5.13(d).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Competing Bid" has the meaning set forth in Section 7.2.

"Confidential Information" and "Confidentiality Agreement" have the meanings set forth in Section 8.15.

"Contemplated Transactions" has the meaning set forth in Section 2.1.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement.

"DEA" means the United States Drug Enforcement Administration.

"Deed" has the meaning set forth in Section 4.2(f).

"Demand" has the meaning set forth in Section 11.5(a).

"Deposit" has the meaning set forth in Section 3.2.

"Disputed Claim" has the meaning set forth in Section 11.5(c).

"DMA" means the Commonwealth of Massachusetts, Executive Office of Health and Human Services, Division of Medical Assistance.

"DMH" means the Department of Mental Health of the Commonwealth of Massachusetts.

"Documents" means all data, files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing

documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials and information related exclusively to the Business and the Purchased Assets in each case whether in written or electronic form or other media.

"DPH" means the Department of Public Health of the Commonwealth of Massachusetts.

"Effective Time" has the meaning set forth in Section 4.1.

"Employee Benefit Plans" has the meaning set forth in Section 5.13(a).

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by Seller in the conduct of the Business, together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing.

"Environmental Law" means any applicable foreign, federal, state or local statute, regulation, or ordinance currently in effect relating to the environment, pollution, radiation or protection of human health, safety or the environment, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any organization that is a member of Seller's controlled group of organizations under Sections 4.4(b), (c), (m) or (o) of the Code.

"Escrow Agent" has the meaning set forth in Section 3.2.

"Escrow Expiration Date" has the meaning set forth in Section 3.2.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.2(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Matter" means any one or more of the following:  (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects the healthcare industry (including a general adverse change in health care services payment rates); (iii) the effect

of any change arising in connection with earthquakes, hurricanes or other natural disasters or acts of God; (iv) the effect of any change arising in connection with hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (v) the effect of any action taken by Purchaser or its Affiliates, including their respective employees, with respect to the Contemplated Transactions or with respect to Seller; (vi) the effect of any changes in applicable Laws or accounting rules that are not directed at Seller, Purchaser or hospitals operated by for-profit entities, in each instance to the exclusion of others; (vii) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Contemplated Transactions; or (viii) any effect resulting from the filing of the Bankruptcy Case and reasonably anticipated effects thereof or Seller's compliance with the Bankruptcy Code.

"Foreign Privacy Laws" shall mean (i) the Directive 95/46/EC of the Parliament and of the Council of the European Union of 24 October 1995 on the protection of individuals with regard to the collection, use, disclosure, and processing of personal data and on the free movement of such data, (ii) the corresponding national rules, regulations, codes, orders, decrees and rulings thereunder of the member states of the European Union and (iii) any rules, regulations, codes, orders, decree, and rulings thereunder related to privacy, data protection or data transfer issues implemented in other countries.

"FTC" has the meaning set forth in Section 8.7(b).

"Fundamental Representations and Warranties" has the meaning set forth in Section 10.1(a).

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment and leasehold improvements used or held for use by Seller at the Owned Properties or the property subject to the Real Property Leases, or otherwise owned or held by Seller for use in the conduct of the Business, in each case on the Closing Date, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"General Commercial Software" means non-exclusively licensed Software, including but not limited to Software made available as a software as a service or hosted solution, that (i) is commercially available for license and is licensed pursuant to "shrink-wrap" or "click-through" license agreements or is pre-installed in the ordinary course of business as part of hardware and (ii) for which the aggregate annual license, maintenance and other fees does not exceed $15,000 per year.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Materials" means (i) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "hazardous air pollutants," "contaminants," "toxic chemicals," "toxins," "hazardous chemicals," "extremely hazardous substances" or "pesticides" under any applicable Environmental Law, or (ii) any petroleum or petroleum products, oil, natural or synthetic gas, radioactive materials, asbestos-containing materials, polychlorinated bi-phenals, urea formaldehyde foam insulation, radiation or radon.

"Healthcare Applications" has the meaning set forth in Section 8.7(a).

"Healthcare Programs" has the meaning set forth in Section 5.15(a).

"Healthcare Regulatory Consents" shall mean in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, certifications, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the Contemplated Transactions in compliance with all applicable Law relating to health care or healthcare services of any kind, including relating to the operation of the Business following the Closing, and shall include, without limitation, obtaining any such consents, approvals, authorizations, waivers, certifications, Orders, licenses or Permits from, or providing required notices to, DPH, DMH, CMS, DMA, DEA and, as applicable, the AGO, and shall include, without limitation, Purchaser obtaining from DPH (i) a Determination of Need with respect to the transfer of ownership of the Hospital, (ii) suitability approval regarding its ability to obtain a license to operate the Hospital following the transfer of ownership, and any consents, approvals, authorizations, waivers, Orders, licenses or Permits issued by DPH, DMH, CMS, DMA, DEA or other Governmental Body needed for Purchaser to consummate the Contemplated Transactions and to operate the Hospital.

"Health Information Law" has the meaning set forth in Section 5.18(d).

"HIPAA" means, collectively, the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act (HITECH), and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

6

"Hospital" has the meaning set forth in the first recital of this Agreement.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Indemnified Party" has the meaning set forth in Section 11.5(a).

"Indemnifying Party" has the meaning set forth in Section 11.4(c).

"Indemnity Notice Period" has the meaning set forth in Section 11.5(a).

"Intellectual Property Licenses" means (i) any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property and (ii) any grant to Seller of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person, to the extent, and only to the extent, such right is in writing and transferable by Seller (taking into consideration the provisions of Section 8.4).

"Intellectual Property Rights" means all U.S. and foreign (i) patents, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) inventions (whether or not patentable), (iii) trademarks, service marks, trade names, service names, brand names, trade dress rights, corporate names, and logos (in each case regardless whether registered) and goodwill associated with any of the foregoing, (iv) Internet domain name registrations, (v) copyrights (regardless whether registered), (vi) all trade secrets and confidential business information (including, without limitation, ideas, concepts, formulae, know-how, research and development information, drawings, specifications, designs, plans, proposals, technical data, financial, business and marketing plans, and customer and supplier lists and related information), (vii) registrations and applications for registration for the foregoing, (viii) all other intellectual property rights and (ix) all rights of Seller to the names "Quincy Medical Center" and any variations thereof.

"IRS" means the U.S. Internal Revenue Service.

"Joint Commission" has the meaning set forth in Section 5.15(a).

"Knowledge of Purchaser" means the actual knowledge of those officers of Purchaser identified on Schedule 1.1(a), as well as any knowledge that such individuals would have possessed had they made reasonable inquiry with respect to the matter in question.

"Knowledge of Seller" means the actual knowledge of those officers of Seller identified on Schedule 1.1(b), as well as any knowledge that such individuals would have possessed had they made reasonable inquiry with respect to the matter in question.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body or before a private arbitration body whose decisions can be entered in a court for judgment.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"Losses" has the meaning set forth in Section 11.2(a).

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" shall mean any fact, circumstance, event, change, effect, casualty, condition or occurrence that, individually or in the aggregate, has had or is reasonably likely to have a material adverse effect on (i) the property or the condition of the Purchased Assets, taken as a whole, or (ii) the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement, in each case other than an effect resulting from an Excluded Matter.

"Medicaid" or "MassHealth" means the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. Sections 1396 et seq., as amended) and applicable Massachusetts statutes and administered by DMA.

"Medicare" means the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. Sections 1395 et seq., as amended) and administered by CMS.

"Non-Fundamental Representations and Warranties" has the meaning set forth in Section 10.1(b).

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of the Bankruptcy Court or other Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business as conducted through the date hereof consistent with past practice and in accordance with policies in effect on the date hereof, subject, however, in respect of the period after the Petition Date, to those actions necessary and incident to the Bankruptcy Case and to comply with the Bankruptcy Code.

"Organizational Documents" has the meaning set forth in Section 5.1.

"Overbid Protection" has the meaning set forth in Section 7.1.

"Owned Properties" has the meaning set forth in Section 5.7(a).

"Patient Records" shall mean any Documents containing information concerning medical or behavioral health services provided to, or the medical or behavioral health of, any individual, the disclosure of which are subject to: (i) state law; (ii) HIPAA; (iii) 42 C.F.R. Part 2 governing the confidentiality of alcohol and drug abuse patient records; and (iv) any applicable federal law.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, Determinations of Need, Healthcare Regulatory Consents, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body or other regulatory entity, including all pending applications therefor and renewals thereof.

"Permitted Exceptions" means (i) zoning, entitlement and other land use and environmental regulations or designations by any Governmental Body provided that such regulations or designations have not been violated; (ii) with respect to the Owned Property, those matters set forth on Schedule 2.9(a); (iii) with respect to the Purchased Real Property Leases which are Real Property Tenant Leases, (a) title of a lessor thereunder and (b) those matters set forth on Schedule 2.9(b); (iv) with respect to the Purchased Real Property Leases which are Real Property Landlord Leases, those matters set forth on Schedule 2.9(b); and (v) the purchase money security interests listed on Schedule 1.1(c); and with respect to each of clauses (i) through (v), none of which would materially impair the Purchased Assets or Purchaser's operation of the Business.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Property Leases" means any lease by Seller (as lessor or lessee) of personal property, including Furniture and Equipment, used in connection with the Business.

"Petition Date" has the meaning set forth in the fourth recital of this Agreement.

"PHI" has the meaning set forth in Section 2.8.

"Post-Closing Commitments" has the meaning set forth in Section 8.20.

"Post-Closing Tax Period" means any Tax period (or portion thereof) ending after the Closing Date.

"Pre-Closing Tax Period" means any Tax period (or portion thereof) ending on or before the Closing Date.

"Property Agreements" has the meaning set forth in Section 5.7(b).

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Contracts" has the meaning set forth in Section 2.1(d).

"Purchased Intellectual Property" means all Intellectual Property Rights owned by Seller and/or its Affiliates and used in connection with the Business (or which would be infringed in the conduct of the Business but for valid rights thereto), except for any that is an Excluded Asset.

"Purchased Intellectual Property Licenses" has the meaning set forth in Section 2.1(c).

"Purchased Permits" has the meaning set forth in Section 2.1(h).

"Purchased Personal Property Leases" has the meaning set forth in Section 2.1(b).

"Purchased Real Property Leases" has the meaning set forth in Section 2.1(a).

"Purchased Securities" has the meaning set forth in Section 2.1(l).

"Purchased Vehicles" has the meaning set forth in Section 2.1(b).

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser Cafeteria Plan" has the meaning set forth in Section 9.2(c).

"Purchaser Disclosure Schedule" has the meaning set forth in the introductory paragraph to ARTICLE VI.

"Purchaser Documents" has the meaning set forth in Section 6.2.

"Purchaser Parties" has the meaning set forth in Section 11.2(a).

"Purchaser Plans" has the meaning set forth in Section 9.2(b).

"Real Property Leases," "Real Property Landlord Leases" and "Real Property Tenant Leases" have the meanings set forth in Section 5.7(a).

"Release" has the meaning specified in CERCLA.

"Rent Roll" has the meaning set forth in Section 5.7(c).

"Retained Deposit" has the meaning set forth in Section 3.2.

"Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Sale Order.

"Sale Order" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the Contemplated Transactions.  Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and Permitted Exceptions) claims, encumbrances and interests (to the fullest extent permitted under applicable law) such Liens, claims encumbrances and interests to attach only to the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; and (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement.

"Satisfaction/Waiver Date" has the meaning set forth in Section 4.1.

"Seller Balance Sheet," "Seller Balance Sheet Date," "Seller Interim Balance Sheet," "Seller Interim Balance Sheet Date" and "Seller Financial Statements" have the meanings set forth in Section 5.4(a).

"Seller Cafeteria Plan" has the meaning set forth in Section 9.2(c).

"Seller Disclosure Schedule" has the meaning set forth in the introductory paragraph of ARTICLE V.

"Seller Documents" has the meaning set forth in Section 5.2.

"Seller Parties" has the meaning set forth in Section 11.2(b).

"Software" means any and all of the following used in the Business (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"Straddle Period" means any Tax period beginning before the Closing Date and ending after the Closing Date.

"Successor Hospital" has the meaning set forth in Section 8.20(a).

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, lease, service, alternative or add-on minimum, transfer, franchise, profits, inventory, capital stock, license, environmental, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes, including any attachment or schedule thereto, and including any amendment thereof.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"Termination Date" has the meaning set forth in Section 4.4(a).

"Third Party Claim" has the meaning set forth in Section 11.5(d).

"Transfer Taxes" has the meaning set forth in Section 12.1.

"Transferred Employees" has the meaning set forth in Section 9.1.

"Transferred Patient Records" has the meaning set forth in Section 8.20(g).

"Transitional Contracts" means those executory contracts and leases listed on Schedule 1.1(d) hereto or as otherwise designated pursuant to Section 8.19(b).

"US Privacy Laws" shall mean any rules, regulations, codes, orders, decrees, and rulings thereunder of any federal, state, regional, county, city, municipal or local government of the United States or any department, agency, bureau or other administrative or regulatory body obtaining authority from any of the foregoing that relate to privacy, data protection or data transfer issues, including all implementing laws, ordinances or regulations, including, without limitation, the Fair Credit Reporting Act of 1970, as amended; the Privacy Act of 1974, as amended; the Family Education Rights and Privacy Act of 1974, as amended; the Right to Financial Privacy Act of 1978, as amended; the Privacy Protection Act of 1980, as amended; the Cable Communications Policy Act of 1984, as amended; the Electronic Communications Privacy Act of 1986, as amended; the Video Privacy Protection Act of 1988, as amended; the Telephone Consumer Protection Act of 1991, as amended; the Driver's Privacy Protection Act of 1994, as amended; the Communications Assistance for Law Enforcement Act of 1994, as amended; the Telecommunications Act of 1996, as amended; the Children's Online Privacy Protection Act (COPPA) of 1998, as amended; the Financial Modernization Act (Graham-Leach-Bliley Act) of 2000, as amended; and HIPAA.

1.2    Terms Defined Elsewhere in this Agreement.    Other terms used in this Agreement shall have the meanings set forth in the sections where such terms are defined.

1.3    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Periods.    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Delivered.    Any requirement in this Agreement relating to Seller's delivering or making delivery to Purchaser of any document or other material shall, except with regard to materials required to be delivered by Seller to Purchaser pursuant to Section 4.2, be deemed to be satisfied by Seller's providing electronic access for Purchaser to such documents or material in Seller's secure

deal room, provided that Seller or its representative (i) causes the deal room to remain operational and accessible by Purchaser at all times prior to the Closing and (ii) promptly notifies Purchaser via e-mail when such documents or materials are first made available to Purchaser in the deal room.

(iii)     Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iv)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it reasonably relates to the subject matter of such other Schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.  On or before July 14, 2011, Seller shall deliver to Purchaser the Seller Disclosure Schedule and other Schedules provided for in this Agreement other than the Purchaser Disclosure Schedule, it being understood that for purposes of determining Seller's compliance with its representations and warranties in ARTICLE V, Seller shall be deemed to have delivered the Seller Disclosure Schedule  on the date of this Agreement.  If (i) the Seller Disclosure Schedule provides exceptions to Seller's representations and warranties contained in Sections 5.5 (Title to Purchased Assets), 5.6 (Taxes), 5.11 (Contracts), 5.14 (Employee Relations; Medical Staff; Labor), 5.15 (Compliance with Laws) or 5.16 (Environmental Matters) or makes disclosures pursuant to Sections 5.4 (Financial Statements), 5.8 (Litigation) or 5.17 (Permits) and (ii) the exceptions or disclosures, as applicable, with respect to such Sections disclose either a Material Adverse Effect or a condition or event that represents an immediate threat to Seller's ability to continue to operate the Business and that was not disclosed in a document delivered to Purchaser prior to the date hereof, then Purchaser may terminate this Agreement upon written notice to Seller, provided such notice is delivered no later than three (3) Business Days after Seller's delivery of the Seller Disclosure Schedule.  With respect to all other Schedules other than the Purchaser Disclosure Schedule, including without limitation the classification of executory contracts as Purchased Contracts, Excluded Contracts or Transitional Contracts, such Schedules (including any amendments to the original Schedules) shall be subject to the mutual agreement of the parties as embodied in (i) such Schedules as exist and are appended to this Agreement as of the date hereof and (ii) such Schedules as are subsequently included and incorporated into this Agreement.

(v)     Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(vi)     Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or

14

be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vii)   Herein.   The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(viii)   Including.   The word "including" or any variation thereof means "including, without limitation" and, unless otherwise expressly stated, shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)   The parties hereto have been advised by counsel and have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1   Purchase and Sale of Assets.   On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser (the "Contemplated Transactions"), all of Seller's right, title and interest in, to and under all of Seller's properties, assets and rights, tangible and intangible, of every nature, kind and description, wherever located, relating to the Business and existing as of the Closing, other than any that are Excluded Assets, free and clear of any and all Liens (to the fullest extent permitted under applicable law) other than Permitted Exceptions (collectively, the "Purchased Assets"), including without limitation:

(a)   the Owned Properties and, subject to Section 2.5, the Real Property Leases listed on Schedule 2.1(a) (the "Purchased Real Property Leases"), together with all improvements and fixtures thereto and other appurtenances and rights in respect thereof;

(b)   (i) all of the Furniture and Equipment, (ii) the inventory, tools, spare parts, supplies, medical supplies and other tangible personal property used or held for use by Seller at the Owned Properties or the property subject to the Real Property Leases or otherwise owned or leased by Seller for use in the conduct of the Business, in each case on the Closing Date, (iii) all vehicles identified on Schedule 2.1(b)(iii) (the "Purchased Vehicles"), and (iv) subject to Section 2.5, the Personal Property Leases (the "Purchased Personal Property Leases");

15

(c)    (i) the Purchased Intellectual Property (subject to Section 8.18), and (ii) the rights of Seller as licensor or, subject to Section 2.5, as licensee under the Intellectual Property Licenses (the "Purchased Intellectual Property Licenses");

(d)    subject to Section 2.5, the Contracts listed on Schedule 2.1(d) (the "Purchased Contracts") and the Transitional Contracts which Purchaser expressly assumes in accordance with Section 8.21;

(e)    all pre-paid expenses of Seller;

(f)    to the extent transferable, grants from Governmental Bodies;

(g)    subject to the provisions of Sections 2.8 and 8.16, all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to the services provided by the Business, the marketing of the Business's services (including advertising and promotional materials), Purchased Intellectual Property, personnel files for Transferred Employees, Patient Records, and files including credit information and supplier lists, to the extent physically located at or maintained by Seller from any of the premises referred to in clause (a) above, but excluding (i) personnel files for Employees of Seller who are not Transferred Employees, (ii) such files (if any) as may not be provided to Purchaser hereunder in compliance with applicable Law regarding privacy and security of Patient Records, (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) any Documents required to realize the benefits of any Excluded Assets;

(h)    all Permits used by Seller in the Business to the extent assignable (the "Purchased Permits");

(i)    to the extent transferable to Purchaser, all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(j)    all rights of Seller, to the extent transferable, under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided to Seller after the Closing or to the extent affecting any Purchased Assets;

(k)    all of Seller's Medicare and other third party payor provider numbers and agreements;

(l)    to the extent transferable, Seller's ownership interest in South Suburban Oncology Center Limited Partnership (the "Purchased Securities");

(m)    all goodwill and other intangible assets associated with the Business, including without limitation customer and supplier lists, the goodwill associated with the Purchased Intellectual Property, the internet domain name

www.quincymc.org and any other internet domain names (including registrations and applications therefor) of Seller used in connection with the Business;

(n)     accounts receivable and similar contract rights with respect to the Purchased Contracts, together with any unpaid financing charges accrued thereon and the benefit of all security for such accounts receivable, but only insofar as such rights entail rights of setoff, recoupment or similar rights as to obligations of Seller existing on the Closing Date or thereafter arising; and

(o)     any rights to settlement and retroactive adjustments, if any, for open periods ending on or before the Closing Date arising from or against the federal government under the terms of the Medicare program or under MassHealth or any other Medicaid or third party payor program.

2.2     Excluded Assets.  Notwithstanding Section 2.1, nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all of its right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean all right, title and interest of Seller in, to and under:

(a)     all cash, cash equivalents, bank deposits or similar cash items of Seller and all securities owned by Seller, other than the Purchased Securities;

(b)     the Contracts identified on Schedule 2.2(b), including any accounts receivable, right of setoff or recoupment, or claim or cause of action arising out of or with respect to any such Contract (the "Excluded Contracts"), and the Transitional Contracts which Purchaser elects not to assume in accordance with Section 8.21;

(c)     all deposits (including customer deposits and security deposits for rent, electricity, telephone or other utilities and deposits posted under any Purchased Contract);

(d)     the Personal Property Leases identified on Schedule 2.2(d);

(e)     any confidential personnel records pertaining to Employees who are not Transferred Employees;

(f)     any Documents (A) that relate to Seller's planning for or conduct of the Bankruptcy Case, (B) that constitute or contain information protected by any privilege of Seller, including without limitation the attorney-client privilege, or (C) that Seller is required by Law to retain or that Seller determines are necessary or advisable to retain, including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that, subject to Section 8.15, Purchaser shall have the right to make copies of any portions of Documents retained solely under foregoing clause (C) that relate to the Business as conducted before the Closing (except as prohibited by Law) or that relate to any of the Purchased Assets and the Assumed Liabilities;

(g)     any information management systems of Seller not used or held for use in whole or in part in the conduct of the Business and not necessary or useful to the conduct of the Business;

(h)     any Documents relating to proposals to acquire the Business by Persons other than Purchaser;

(i)     any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Pre-Closing Tax Period other than a Straddle Period;

(j)     all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets;

(k)     any rights, claims, counterclaims, demands or causes of action of Seller against third parties relating to assets, properties, Business or operations of Seller arising out of events occurring prior to the Closing Date or arising out of the Closing, other than any arising under or pursuant to any warranties, representations and guarantees referred to in Section 2.1(j);

(l)     any rights, claims, counterclaims, demands or causes of action of Seller arising under chapter 5 of the Bankruptcy Code;

(m)     any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate), regardless of when received and whether or not designated to be applied or used in respect of the Business;

(n)     all rights of Seller under this Agreement, the Seller Documents and the Contemplated Transactions;

(o)     all minute books and other corporate records of Seller provided that Purchaser may obtain copies on request;

(p)     all donor-restricted funds and assets in which Seller has a beneficial or other direct or indirect interest immediately prior to the Closing Date;

(q)     all assets of the Employee Benefit Plans (other than the Assumed Plans); and

(r)     all assets listed on Schedule 2.2(r).

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms the following Liabilities of Seller relating to or arising out of the ownership and operation of the Business or the Purchased Assets, in each case

existing as of the Closing, other than any that are Excluded Liabilities (collectively, the "Assumed Liabilities"):

(a)   subject to Section 2.5, all Liabilities under the Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases, Purchased Permits and Purchased Intellectual Property Licenses;

(b)   all obligations and Liabilities as of the Closing Date in respect of (i) accrued payroll and (ii) paid time off (including, but not limited to, vacation, sick leave, personal days) of the Transferred Employees;

(c)   all accrued expenses payable to Healthplans Inc. for health insurance claims related to Transferred Employees;

(d)   all Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement;

(e)   all Liabilities with respect to the Business or the Purchased Assets incurred on or after the Closing Date;

(f)   all Liabilities existing prior to the Petition Date owed to trade creditors listed on Schedule 2.3(f), including as such Schedule 2.3(f) may be amended by mutual agreement of Purchaser and Seller, provided that Purchaser shall receive a credit to the Cash Purchase Price for the aggregate dollar amount of liabilities listed on Schedule 2.3(f);

(g)   all Liabilities under Seller's Medicare provider numbers and related provider agreements;

(h)   all Liabilities from or related to any overpayments duplicate payments, refunds, discounts or adjustments due to Medicare, MassHealth or any third party payor program;

(i)   all obligations and Liabilities as of the Closing Date with respect to the health care (including medical and dental) and dependent care flexible spending arrangements maintained by Seller (collectively, the "Assumed Plans"); and

(j)   all Liabilities relating to amounts otherwise required to be paid by Purchaser hereunder or otherwise related to the ownership, operation, and maintenance of the Business and the Purchased Assets upon and after the Closing.

2.4   Excluded Liabilities.   Purchaser will not assume or be liable for any Excluded Liabilities. "Excluded Liabilities" shall mean only the following Liabilities of Seller:

(a)   all Liabilities associated with or arising with respect to the Excluded Assets;

(b)     except as otherwise provided in Section 2.3(d) and ARTICLE XII, all Liabilities for Taxes of Seller for any Pre-Closing Tax Period;

(c)     all Liabilities of Seller existing as of the Petition Date not included in the Assumed Liabilities pursuant to Sections 2.3(a), (b), (c), (e), (f), (g), (h), (i) and (j);

(d)     the administrative expenses of the Bankruptcy Case, including Liabilities constituting expenses or accounts payable incurred in the Ordinary Course of Business between the Petition Date and the Closing Date, and Seller's professionals' fees and expenses;

(e)     all Liabilities relating to Employees who are not Transferred Employees;

(f)     all Liabilities constituting amounts required to be paid by Seller hereunder;

(g)     all Liabilities for violations of any Law to the extent arising from acts or omissions prior to the Closing, including, without limitation, those pertaining to Medicare and MassHealth false claims, the Ethics in Patient Referrals Act, or fraud or abuse;

(h)     all Liabilities in connection with claims of tort liability, product liability and professional malpractice to the extent arising out of or relating to acts, omissions, events or occurrences prior to the Closing;

(i)     all Liabilities associated with Employee Benefit Plans other than the Assumed Plans; and

(j)     all Liabilities that are not Assumed Liabilities.

2.5     Cure Amounts. Except as otherwise permitted by the next sentence of this Section 2.5, at the Closing and pursuant to section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall assume from Seller, the Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases, Purchased Permits and Purchased Intellectual Property Licenses. The cure amounts, if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from any defaults on the part of Seller under the Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases, Purchased Permits and Purchased Intellectual Property Licenses shall be paid by Purchaser (or Purchaser shall have delivered to the Escrow Agent to be held in escrow on terms reasonably acceptable to Seller amounts sufficient to pay any claim therefor that remains disputed as of the Closing such amount as the Bankruptcy Court may determine) at or before the Closing, such that all Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases, Purchased Permits and Purchased Intellectual Property Licenses may be assumed by Seller and assigned to Purchaser in accordance with section 365 of the Bankruptcy Code, and Seller shall have no liability for any such cure amount, except for the adjustments to

20

the Cash Purchase Price provided for by Section 2.3(f). This Agreement shall not constitute an agreement to assign any Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases, Purchased Permits and Purchased Intellectual Property Licenses if, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without obtaining a consent from any applicable third party, would constitute a breach thereof or in any way negatively affect the rights of Seller or Purchaser, as the assignee, and no breach of this Agreement shall have occurred by virtue of such nonassignment. If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, such third party consent is required but not obtained, Seller shall, at Purchaser's sole cost and expense, cooperate with Purchaser in any reasonable arrangement proposed by Purchaser, including Purchaser's provision of credit support, designed to provide Purchaser the benefits and obligations of or under any such Purchased Contract, Purchased Personal Property Lease, Purchased Real Property Lease, Purchased Permit and Purchased Intellectual Property License; provided, however, that nothing in this Section 2.5 shall (i) require Seller to make any expenditure or incur any obligation on its own or on Purchaser's behalf or (ii) prohibit Seller from ceasing operations or winding up its affairs following the Closing. Any assignment to Purchaser of Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases, Purchased Permits and Purchased Intellectual Property Licenses that shall, after giving effect to sections 363 and 365 of the Bankruptcy Code, require the consent of any third party for such assignment as aforesaid shall be made subject to such consent being obtained. If Purchaser determines that such consent cannot be obtained on terms reasonably satisfactory to Purchaser within thirty (30) days after the Closing, Purchaser may on notice to Seller reclassify such item as an Excluded Asset.

    2.6    Further Conveyances and Assumptions.

        (a)    From time to time following the Closing, Seller and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the Contemplated Transactions; provided, however, that nothing set forth in this Section 2.6(a) shall prevent or prohibit Seller from ceasing operations or winding up its affairs after the Closing.

        (b)    In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller.

    2.7    Bulk Sales Laws. Purchaser hereby waives compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may

otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

2.8    <u>Transfer of Certain Protected Health Information</u>.  With respect to any Business Associate of Seller who holds Protected Health Information ("PHI") concerning Seller's patients, if such information is part of a Seller's Designated Record Set, then Seller shall use commercially reasonable efforts to cause each such Business Associate to (i) consent to the assignment of its Business Associate Agreement to Purchaser or a designated Affiliate of Purchaser, so that such Person shall become a Business Associate of Purchaser or such Affiliate; or (ii) cause such Business Associate to enter into a new Business Associate Agreement with Purchaser or a designated Affiliate of Purchaser; or (iii) cause such Business Associate to return all PHI with respect to Seller's patients to Seller, so that Seller may transfer such information to Purchaser incident to the Closing; or (iv) cause such Business Associate to transfer all such PHI directly to Purchaser or a designated Affiliate of Purchaser incident to the Closing.  Unless otherwise defined in this Agreement, all capitalized terms in this <u>Section 2.8</u> shall have the meanings given them by HIPAA.

2.9    <u>Title</u>.  At the Closing, Seller shall (i) convey good and marketable fee simple title to the Owned Property by the Deed, subject, however, only to the Permitted Exceptions, and (ii) assign its leasehold interest to the Purchased Real Property Leases by an assignment agreement, free and clear of any and all liens, encumbrances and other matters affecting title, subject, however, only to the Permitted Exceptions.

**ARTICLE III**

**CONSIDERATION**

3.1    <u>Consideration</u>.  The aggregate consideration for the sale of the Business (including the Purchased Assets) by Seller to Purchaser (the "<u>Purchase Price</u>") shall be:

(a)    an amount in cash equal to one of the following (whichever such amount is applicable as provided below is referred to as the "<u>Cash Purchase Price</u>"):

(i)    Thirty-Eight Million Dollars ($38,000,000) if the Effective Time is on or before October 1, 2011;

(ii)    Thirty Seven Million Dollars ($37,000,000) if the Effective Time is on or before November 1, 2011; or

(iii)    Thirty Five Million Dollars ($35,000,000) if the Effective Time is subsequent to November 1, 2011; and

(b)    the assumption of the Assumed Liabilities; and

(c)    Purchaser's Post-Closing Commitments described in <u>Section 8.20</u>.

22

3.2   Purchase Price Deposit. Upon the execution of this Agreement, Purchaser shall immediately deposit with First American Title Insurance Company, in its capacity as escrow agent ("Escrow Agent"), the amount of Three Million Five Hundred Thousand Dollars ($3,500,000) (the "Deposit"), by wire transfer of immediately available funds, such Deposit to be held, except as provided below, by Escrow Agent until the earlier of (a) the Closing Date and (b) the termination of this Agreement, and then delivered to either Purchaser or Seller in accordance with the terms of this Agreement. Notwithstanding the preceding sentence, the Escrow Agent shall retain from the Deposit the amount of Five Hundred Thousand Dollars ($500,000) (the "Retained Deposit") for the period commencing on the Closing Date and ending on the six (6) month anniversary of the Closing Date (said anniversary, the "Escrow Expiration Date"). The Retained Deposit shall be the sole source for payment(s) of any indemnification obligations of Seller pursuant to ARTICLE XI, as provided more fully in Sections 11.3 and 11.4. If the Closing shall occur, the Deposit and all accrued investment income thereon, other than the Retained Deposit, shall be applied towards the Cash Purchase Price payable by Purchaser to Seller under Section 3.3. If this Agreement is terminated, then the Deposit and all accrued investment income thereon shall be disbursed as provided by Section 4.6(b). Any portion of the Retained Deposit not applied to claims made against the Indemnifying Party pursuant to Section 11.2(a) as of the Escrow Expiration Date shall then be applied towards the Cash Purchase Price payable by Purchaser to Seller under Section 3.3 and promptly paid to Seller.

3.3   Payment of Cash Purchase Price. On the Closing Date, Purchaser shall (i) pay the Cash Purchase Price (less the amount of the Closing Date Extension Fee if previously paid and the credit specified in Section 2.3(f)) to Seller, which shall be paid by wire transfer of immediately available funds into an account or accounts designated by Seller, and (ii) deposit in escrow such amount (if any) as is required by Section 2.5.

3.4   Escrow Agent. Escrow Agent by executing this Agreement acknowledges receipt of the Deposit and agrees to maintain such sum in an interest-bearing, escrow account at First American Trust FSB located at 5 First American Way, Santa Ana, CA 02707, for the benefit of the party entitled thereto. Interest, if any, shall accrue and be paid on the Deposit at the times and in the amounts determined by the Escrow Agent under the terms of said account, and Escrow Agent shall be obligated to account for interest only to the extent so paid. Escrow Agent shall not be required to pay interest to the party entitled thereto until receipt of a fully executed Form W-9 from such party. The parties acknowledge that Escrow Agent is not obligated to invest the Deposit to obtain the highest possible or any particular level of return.   The Deposit and all accrued investment income thereon shall be paid to the party entitled thereto at the time and as provided by this Agreement. In the event of any dispute arising between Purchaser and Seller relating to performance under this Agreement, the Deposit shall remain in escrow and shall not be drawn upon by Seller or by anyone claiming by or through Seller until the earlier to occur of (i) the disposition of the Deposit pursuant to a written agreement between Purchaser and Seller, their successors in interest, attorneys-in-fact or legal representative with power to act on their behalf as to the disposition of the Deposit, or (ii) the disposition of the Deposit following adjudication of the dispute by the Bankruptcy Court. Purchaser and Seller acknowledge and agree that Escrow Agent is acting solely as

23