a stakeholder at their request and for their convenience; that Escrow Agent shall not be deemed to be the agent of either Seller or Purchaser for purposes of holding the Deposit; and that Escrow Agent shall not be liable to either Seller or Purchaser for any act or omission on Escrow Agent's part undertaken unless taken or suffered in bad faith, in willful disregard of this Agreement or involving gross negligence. Seller and Purchaser jointly and severally agree to indemnify and hold Escrow Agent harmless from and against all liabilities, obligations, losses, damages, suits, costs, expenses or disbursements of any kind or nature arising out of Escrow Agent's performance of its duties arising under this Section, including reasonable attorneys' fees, except to the extent that any of the foregoing shall arise out of any act or omission taken or suffered by Escrow Agent in bad faith, in willful disregard of this Agreement or involving gross negligence on the part of Escrow Agent. Notwithstanding any provision of this Agreement, the Escrow Agent shall be entitled to interplead the Deposit and interest earned thereon, if any, into the Bankruptcy Court, and disburse the same pursuant to, and in reliance upon, an order issued by the Bankruptcy Court, without liability of any kind whatsoever to Seller or Purchaser. The provisions of this <u>Section 3.4</u> governing Escrow Agent's rights, duties and obligations shall apply with equal effect to any cure amounts deposited into escrow with Escrow Agent pursuant to <u>Section 2.5</u>.

    3.5    <u>Steward Assurance</u>. Steward agrees to act as guarantor to assure the Purchaser makes proper and timely payment of the Cash Purchase Price in accordance with the provisions of this Agreement.

# ARTICLE IV

## CLOSING AND TERMINATION

    4.1    <u>Closing Date</u>. Subject to the satisfaction of the conditions set forth in <u>Sections 10.1</u>, <u>10.2</u> and <u>10.3</u> (or the waiver thereof by the party entitled to waive that condition), the closing of the Contemplated Transactions (the "<u>Closing</u>") shall take place at the offices of Edwards Angell Palmer & Dodge LLP, located at 111 Huntington Avenue, Boston, Massachusetts 02199 (or at such other place as the parties may designate in writing) at 10:00 a.m. (Eastern time) on the last Business Day of the month during which all of the conditions set forth in <u>ARTICLE X</u> have been satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) (the "<u>Satisfaction/Waiver Date</u>"), unless another time or date, or both, are agreed to in writing by the parties hereto; <u>provided that</u> if the Satisfaction/Waiver Date occurs less than seven (7) days before the end of the month during which the Closing would otherwise occur, the Closing shall occur on the last Business Day of the following month. The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>." Unless otherwise agreed by the parties in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder, and all risk of loss with respect to the Business assumed by Purchaser hereunder, shall be considered to have passed to Purchaser as of 12:01 a.m. (Eastern time) on the first day of the first calendar month following the Closing Date (the "<u>Effective Time</u>").

4.2     <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver to Purchaser:

(a)     a duly executed bill of sale in the form of <u>Exhibit A</u>;

(b)     a duly executed assignment and assumption agreement in the form of <u>Exhibit B</u>;

(c)     the officer's certificate required to be delivered pursuant to Sections <u>10.1(a)</u>, <u>10.1(b)</u> and <u>10.1(c)</u>;

(d)     an officer's certificate certifying (i) Seller's articles of incorporation, (ii) Seller's bylaws, as applicable, (iii) Seller's good standing and, if applicable, qualification to do business in Massachusetts, (iv) the incumbency and signature of the authorized individuals executing the Seller Documents, and (v) resolutions that the boards of trustees of Seller have authorized the execution, delivery and performance by Seller of the Seller Documents and have ratified the Contemplated Transactions;

(e)     the Purchased Assets, including all records, documents and instruments of conveyance and transfer related thereto, in form and substance reasonably acceptable to Purchaser as may be necessary to convey the Purchased Assets to Purchaser, including certificates of title for the Purchased Vehicles;

(f)     a quitclaim deed or deeds (the "<u>Deed</u>") conveying good and clear record and marketable fee simple title to the Owned Property, subject only to the Permitted Exceptions, which Deed shall be in the form attached hereto as <u>Exhibit C</u>, duly executed and acknowledged;

(g)     such certificates, agreements, releases, discharges and affidavits as the Title Company reasonably requires in order to issue an owner's title policy and leasehold title policy (as the case may be) without exceptions for mechanic's and materialmen's liens, broker's liens and rights of parties in possession;

(h)     evidence, reasonably satisfactory to Purchaser and the Title Company, of authority of any person or persons executing instruments for or on behalf of Seller;

(i)     a certificate of non-foreign status from each Seller satisfying the requirements of Treasury Regulations Section 1.1445-2(b) in a form reasonably acceptable to Purchaser;

(j)     a certified copy of the Sale Order, together with a certificate of Seller that no stay of the Sale Order has entered;

(k)     a copy of Seller's CMS Form 855A evidencing a change of ownership transaction ("<u>CHOW</u>") as of the Effective Time; and

(l)     DEA powers of attorney for use by Purchaser pending Purchaser's receipt of DEA approval.

4.3     <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver to Seller:

(a)     the Cash Purchase Price, in immediately available funds, as set forth in <u>Section 3.3</u>;

(b)     a duly executed assignment and assumption agreement in the form attached hereto as <u>Exhibit B</u>;

(c)     evidence reasonably acceptable to Seller of Purchaser's deposit in escrow of such amounts (if any) required by <u>Section 2.5</u>;

(d)     the officer's certificate required to be delivered pursuant to <u>Sections 10.2(a)</u> and <u>10.2(b)</u>;

(e)     an officer's certificate certifying (i) Purchaser's certificate of incorporation, (ii) Purchaser's bylaws, (iii) Purchaser's good standing under the laws of the State of Delaware and qualification to do business in the Commonwealth of Massachusetts, (iv) the incumbency and signature of the authorized individuals executing the Purchaser Documents on behalf of Purchaser, and (v) resolutions that the shareholders and directors of Purchaser have authorized the execution, delivery and performance by Purchaser of this Agreement and the Purchaser Documents and have ratified the Contemplated Transactions;

(f)     a copy of Purchaser's CMS Form 855A evidencing a CHOW; and

(g)     such other documents, instruments and certificates as Seller may reasonably request.

4.4     <u>Termination of Agreement</u>.  In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as set forth in this <u>Section 4.4</u>.

(a)     <u>Termination by Purchaser or Seller</u>.  Either Purchaser or Seller may terminate this Agreement upon the occurrence of any of the following:

(i)     the Closing shall not have occurred by 4:00 p.m. EDT on November 2, 2011 (the "<u>Termination Date</u>"); <u>provided</u>, <u>however</u>, that, if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order as set forth in <u>Section 10.3(b)</u>, and if all other conditions to the respective obligations of the parties that are capable of close hereunder that are capable of being fulfilled by the Termination Date shall have been so fulfilled or waived, then no party may terminate this Agreement prior to December 2, 2011; <u>provided</u>, <u>further</u>, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or Seller, then the breaching party may not terminate this Agreement pursuant to this <u>Section 4.4(a)(i)</u>.  Notwithstanding

the foregoing, if Purchaser has, in accordance with Section 6.3(a), submitted and pursued with due diligence the Healthcare Applications necessary to obtain the Healthcare Regulatory Consents and Permits necessary for Purchaser to consummate the Contemplated Transactions, and Purchaser is otherwise in compliance with its obligations under this Agreement, then Purchaser shall have the right to delay the Closing by thirty (30) days from the Termination Date if Purchaser delivers the following to Seller by not later than five (5) Business Days prior to the earlier of the Termination Date or the date upon which the parties have agreed the Closing is otherwise scheduled to take place: (i) written notice of Purchaser's exercise of this right, and (ii) One Hundred Thousand Dollars ($100,000) (the "Closing Date Extension Fee") by wire transfer of immediately available funds. Purchaser shall receive a credit against the Purchase Price as a result of its payment of the Closing Date Extension Fee, but the Closing Date Extension Fee shall otherwise be non-refundable;

(ii)    approval by DPH of the Contemplated Transactions is denied or DPH refuses to issue a Determination of Need to Purchaser with respect to the transfer of ownership of the Hospital, or DPH does not deem Purchaser suitable for licensure to operate the Hospital, or Purchaser fails to obtain any approval or Permit required to be obtained by Purchaser for the Contemplated Transactions; provided, however, that Purchaser must have timely applied for and pursued with due diligence the necessary approvals, Determination of Need, or Permit to be entitled to terminate this Agreement pursuant to this Section 4.4(a)(ii);

(iii)    there shall otherwise be in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining, failing to issue a required consent or approval for or otherwise prohibiting the consummation of the Contemplated Transactions;

(iv)    the Bankruptcy Court shall have dismissed the Bankruptcy Case without having entered the Sale Order; or

(v)    the Bankruptcy Court shall have entered an order approving a Competing Bid.

(b)    Termination by Mutual Written Consent. This Agreement may be terminated by mutual written consent of Seller and Purchaser.

(c)    Termination by Purchaser.    Purchaser may terminate this Agreement upon the occurrence of any of the following:

(i)    if any of the conditions to the obligations of Purchaser set forth in Sections 10.1 and 10.3 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser; or

(ii)    if there shall be a material breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Section 10.1 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (x) twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such breach and (y) the Termination Date;

Purchaser may also terminate this Agreement as provided in Section 8.11.

(d)    Termination by Seller.  Seller may terminate this Agreement upon the occurrence of any of the following:

(i)    in the event Purchaser fails to submit to DPH its Determination of Need application for approval of the Contemplated Transactions by July 20, 2011, and to submit to any other Governmental Body any applications required thereby for any approval thereof required for the Contemplated Transactions in due course and in sufficient time to assure Purchaser's ability to operate the Hospital at the Effective Time;

(ii)    if any condition to the obligations of Seller set forth in Section 10.2 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

(iii)    if any condition to the obligations of Seller set forth in Section 10.3 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; or

(iv)    if there shall be a material breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10.2 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (x) twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach and (y) the Termination Date.

4.5    Procedure For Termination.  In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 4.4, written notice thereof shall forthwith be given to the other party or parties, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 4.6, without further action by Purchaser or Seller.

4.6    Effect of Termination.

(a)    Release of Future Obligations.  In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its

duties and obligations arising under this Agreement after the date of such termination; provided, however, that the obligations of the parties set forth in the Confidentiality Agreement and Sections 4.6(b), 4.6(c) and 7.1 and, to the extent necessary to effectuate the foregoing enumerated provisions, ARTICLE XI and ARTICLE XIII of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms; provided, further, that if this Agreement is terminated pursuant to Section 4.4(a)(v), and Purchaser has not materially breached any representations, warranties, covenants or agreements contained in this Agreement, then Purchaser will be entitled to payment of the Break-Up Fee to the extent and at the time provided by this Agreement and the Bidding Procedures Order.  In addition, if this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material of any other party relating to its business or affairs or the Contemplated Transactions, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.

     (b)   Disposition of Deposit.  If this Agreement is terminated by Purchaser as permitted under Sections 4.4 or 8.11, and Purchaser has not materially breached any representations, warranties, covenants, agreements or obligations contained in this Agreement (including without limitation Purchaser's agreements and obligations set forth in Sections 4.4(a)(ii) (but only Purchaser's obligation to timely apply for and pursue with due diligence the necessary approvals, Determination of Need or Permits contemplated by said Section 4.4(a)(ii)), 4.4(d)(i) and 8.7), then the Deposit and all accrued investment income thereon shall be returned to Purchaser.  If this Agreement is terminated by Seller as permitted under Section 4.4 other than pursuant to Sections 4.4(d)(i), 4.4(d)(ii) or 4.4(d)(iv), then the Deposit and all accrued investment income thereon shall be returned to Purchaser.  If this Agreement is terminated by Seller pursuant to Sections 4.4(d)(i), 4.4(d)(ii) or 4.4(d)(iv), then (i) Seller shall receive 50% of the Deposit and 50% of the accrued investment income earned in respect of the Deposit as its sole and exclusive remedy hereunder, as liquidated damages, and Seller shall have no other recourse (including, without limitation, no right to specific performance notwithstanding Section 11.10) against Purchaser or any of its Affiliates under or on account of this Agreement, and (ii) the remaining 50% of the Deposit and 50% of the accrued investment income earned in respect of the Deposit shall be returned to Purchaser. If, notwithstanding Seller's right to terminate this Agreement, Seller elects to seek and thereafter obtains specific performance of Purchaser's obligation to consummate the Contemplated Transactions, and the Closing occurs in accordance with this Agreement, the Deposit shall be applied to the Cash Purchase Price payable by Purchaser at the Closing. If the Agreement is terminated by mutual agreement pursuant to Section 4.4(b), then the Deposit and all accrued investment income thereon shall be disbursed as Purchaser and Seller mutually direct Escrow Agent in writing.

     (c)   Survival of Confidentiality Agreement; Non-Solicitation.  The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.6 shall relieve Purchaser or Seller of their obligations under the Confidentiality Agreement. If this Agreement is terminated in accordance with Section 4.4, Purchaser agrees that it shall not, directly or indirectly, solicit any senior

management employee of Seller, which positions are identified on <u>Schedule 4.6</u>, to join the employ of Purchaser or any if its Affiliates for a period of two (2) years from the date of this Agreement.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser that, except as set forth in the disclosure schedule delivered by Seller to Purchaser (the "<u>Seller Disclosure Schedule</u>"), the statements contained in this <u>ARTICLE V</u> are complete and accurate as of the date hereof and as of the Closing Date. The representations and warranties set forth in this <u>ARTICLE V</u> shall be additive to, and not mutually exclusive or in derogation of, one another.

5.1    <u>Organization and Good Standing</u>. Seller is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. Each jurisdiction in which Seller is qualified or otherwise authorized to transact business is listed in Section 5.1 of the Seller Disclosure Schedule. Seller has previously delivered to Purchaser complete and accurate copies of its articles of organization and bylaws, or other organizational documents, as presently in effect (collectively, its "<u>Organizational Documents</u>"), and, to the Knowledge of Seller, Seller has at all times operated in material compliance with, and is not in default under, or in violation of, any provision of its Organizational Documents.

5.2    <u>Authorization of Agreement</u>. Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for) pursuant to the Sale Order or otherwise and subject to the satisfaction of the conditions referred to in clauses (ii) through (iv) of <u>Section 5.3(b)</u>, Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be executed by Seller in connection with the consummation of the Contemplated Transactions (the "<u>Seller Documents</u>") and to perform its obligations hereunder and thereunder and to consummate the Contemplated Transactions. This Agreement and each of the Seller Documents contemplated to be executed and delivered in connection with Seller entering into this Agreement has been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order, and, with respect to Seller's obligations under <u>Section 7.1</u>, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms and the terms of the Sale Order and Bidding Procedures Order.

5.3 Contravention; Consents of Third Parties; Contractual Consents.

(a) To the Knowledge of Seller, neither the execution, delivery and performance by Seller of this Agreement and the Seller Documents, nor the consummation by Seller of the transactions contemplated hereby and thereby will (i) violate or constitute a breach of any provision of Seller's Organizational Documents, (ii) result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party the right to terminate, modify or cancel, or require any notice, consent or waiver under, any Contract, including without limitation any Purchased Contract, (iii) result in the imposition of any Liens (other than Permitted Exceptions) upon any assets or properties of Seller, including without limitation the Purchased Assets or (iv) violate any Order, Permit or Law applicable to the Business, Seller or any of their respective properties or assets, including the Purchased Assets.

(b) Except as described in Section 5.3 of the Seller Disclosure Schedule, Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the Contemplated Transactions or the taking by Seller of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements, if any, of the HSR Act, (ii) the entry of the Sale Order, (iii) the entry of the Bidding Procedures Order with respect to Seller's obligations under Section 7.1 and (iv) the Healthcare Regulatory Consents required by Chapter 180 of the Massachusetts General Laws ("Chapter 180").

5.4 Financial Statements.

(a) Section 5.4 of the Seller Disclosure Schedule includes complete and accurate copies of (i) the audited balance sheet of Seller (the "Seller Balance Sheet") at September 30, 2010 and the related statements of operations and statements of cash flows for the fiscal year then ended (the date of such balance sheet is the "Seller Balance Sheet Date"), and (ii) the unaudited balance sheet of Seller (the "Seller Interim Balance Sheet") at March 31, 2011 (the date of such balance sheet is the "Seller Interim Balance Sheet Date"), and the related statements of operations and statements of cash flows for the six-month period then ended, and (iii) a reasonably detailed statement of all debts and liabilities, including any accruals or accounts payable known to Seller as of May 31, 2011. The financial statements of Seller in clauses (i) and (ii) are sometimes herein called the "Seller Financial Statements." Except as disclosed in Section 5.4 of the Seller Disclosure Schedule, the Seller Financial Statements have been prepared in accordance with GAAP in all material respects, applied on a consistent basis throughout the periods indicated, and Seller has not changed any accounting policy or methodology in determining the obsolescence of inventory throughout all periods presented. Except as set forth in Section 5.4 of the Seller Disclosure Schedule, the Seller Financial Statements present fairly, in all material respects, Seller's financial condition and the results of operations for the periods covered. The books and records of Seller have been provided

to Purchaser and accurately reflect the assets, liabilities, business, financial condition and results of operations of Seller, are complete and correct, and have been maintained in accordance with good business and bookkeeping practices.

(b)    Except as set forth in Section 5.4 of the Seller Disclosure Schedule, or as set forth in a writing delivered by Seller to Purchaser that specifically makes reference to this Section 5.4, and except for liabilities incurred after the periods covered by the Seller Financial Statements in the Ordinary Course of Business, as of the date hereof there are no material liabilities of any nature relating to the Purchased Assets or the Assumed Liabilities that are required in accordance with GAAP to be disclosed on any of Seller's financial statements.

5.5    Title to Purchased Assets.

(a)    Section 5.5(a) of the Seller Disclosure Schedule contains a complete and correct list of all personal properties, assets and rights, owned or used in the operation of the Business.

(b)    Except as set forth in Section 5.5(b) of the Seller Disclosure Schedule, and other than the real property subject to the Real Property Leases, intellectual property licensed to Seller and the personal property subject to the Personal Property Leases, Seller owns each of the Purchased Assets and Seller shall convey (i) the Owned Property and the Purchased Real Property Leases to Purchaser as provided in Section 2.9 and (ii) title to all other Purchased Assets to Purchaser by bill of sale, in each case free and clear of all Liens, claims, encumbrances and other interests (to the fullest extent permitted under applicable law), other than Permitted Exceptions, to the extent provided by the Sale Order. The Purchased Assets represent all of the assets used by Seller in the operation of the Business, other than the Excluded Assets.

5.6    Taxes.

(a)    Each of Quincy Medical Center, Inc. and QMC ED Physicians, Inc. is and has been since the date of its formation an entity exempt from federal income tax as an organization described in Section 501(c)(3) of the Code and exempt from Commonwealth of Massachusetts business income tax under the comparable provisions of the General Laws of the Commonwealth of Massachusetts, and has not in the past, and does not now, carry on its activities in such a manner that has required (or would require) the filing of any Tax Return and the payment of any Taxes under Section 511 of the Code and the comparable provision of Massachusetts law (or any similar provision of state, local or non-U.S. Tax law).

(b)    Except as set forth in Section 5.6 of the Seller Disclosure Schedule, there are no Liens for Taxes upon the Purchased Assets, there is no basis for such Liens and Quincy Physician Corporation has, as of the date hereof, paid all Taxes owed by it and filed all Tax Returns required to be filed by it.

5.7    Real Property.

(a)    Owned and Leased Real Property. Section 5.7(a) of the Seller Disclosure Schedule sets forth a list of (i) all real property and interests in real property owned in fee by Seller and used in any degree in the Business (the "Owned Properties"), (ii) all real property and interests in real property leased or licensed by Seller and used in the Business by Seller as lessee or licensee (the "Real Property Tenant Leases") and (iii) all real property and interests in real property leased or licensed by Seller and used in the Business by Seller as lessor or licensor (the "Real Property Landlord Leases," and together with the Real Property Tenant Leases, the "Real Property Leases"). To the Knowledge of Seller, each Real Property Lease with a physician or other referral source is in material compliance with applicable Law.

(b)    Property Agreements. The agreements identified in Section 5.7(b) of the Seller Disclosure Schedule (the "Property Agreements") are all of the contracts or agreements, such as maintenance, service, or utility contracts relating to or affecting Seller's operation of the Owned Properties and the Real Property Leases. To the Knowledge of Seller, there are no unrecorded outstanding options, rights of first offer or rights of first refusal with respect to the Owned Properties and the Real Property Leases. To the Knowledge of Seller, each Property Agreement is in full force and effect according to its terms, and no breach or default, or, to the Knowledge of Seller, alleged breach or default or event which would (with the passage of time, notice or both) constitute a breach or default by Seller thereunder, or to the Knowledge of Seller, any other party or obligor with respect thereto, has occurred and is continuing.

(c)    Real Property Leases. The rent roll (the "Rent Roll") and the list of security deposits under any Real Property Lease provided in Section 5.7(c) of the Seller Disclosure Schedule is complete and accurate in all material respects. To the Knowledge of Seller, each Real Property Lease is in full force and effect according to its terms, and no breach or default, or, to the Knowledge of Seller, alleged breach or default or event which would (with the passage of time, notice or both) constitute a breach or default by Seller thereunder, or to the Knowledge of Seller, any other party or obligor with respect thereto, has occurred and is continuing. To the Knowledge of Seller, except for those tenants in possession of Real Property Landlord Leases described in Section 5.7(c) of the Seller Disclosure Schedule, no Person other than Seller possesses or claims possession of, adverse or not, any Owned Property or Real Property Landlord Lease, whether as lessee, tenant at sufferance, trespasser or otherwise.

(d)    Eminent Domain. Seller has not received written notice of condemnation, eminent domain or similar proceeding relating to the Owned Properties or Real Property Leases or any part thereof.

5.8    Litigation. Section 5.8 of the Seller Disclosure Schedule contains a complete and accurate list and summary description of all Legal Proceedings and material audits, material compliance reports and material information requests pending and, to the Knowledge of Seller, threatened against or affecting Seller, the Business or the Purchased Assets. Other than as set forth in Section 5.8 of the Seller Disclosure Schedule, Seller is

not subject to any outstanding judgment, order or decree with respect to the Purchased Assets.  There is no Legal Proceeding pending or, to the Knowledge of Seller, threatened against or affecting Seller, the Business or the Purchased Assets that has or would reasonably be expected to have a Material Adverse Effect, or a material adverse effect on Seller's ability to perform this Agreement or any aspect of the Contemplated Transactions.

    5.9    Tangible Leased Personal Property.  Section 5.9 of the Seller Disclosure Schedule sets forth a list of all leases of personal property, including, without limitation, Furniture and Equipment ("Personal Property Leases"), relating to personal property used by Seller in the Business.

    5.10    Intellectual Property.

        (a)    To the Knowledge of Seller, the conduct of the Business as presently conducted and as previously conducted prior to the Closing does not infringe, violate, or misappropriate, and has not infringed, violated, or misappropriated, any Intellectual Property Rights of any Person.  There are no suits, actions or proceedings pending or, to the Knowledge of Seller, threatened with respect to the Hospital, or the conduct of the Business, infringing, violating or misappropriating the Intellectual Property Rights of any Person, nor, to the Knowledge of Seller, has any Person made any claims of such infringement, violation, or misappropriation.  All Purchased Intellectual Property is owned by the Seller free and clear of all Liens (except for Permitted Exceptions).  Except in agreements listed in Section 5.10(a) or Section 5.11 of the Seller Disclosure Schedule, no licenses or other rights to such Purchased Intellectual Property have been granted to any other Person.

        (b)    The Seller, its Affiliates and the Hospital are not in breach of any Purchased Intellectual Property License; nor, to the knowledge of the Seller, is any other party thereto in breach of a Purchased Intellectual Property License.  Each such Purchased Intellectual Property License is in full force and effect.  The execution, delivery and performance of this Agreement will not give rise to a termination of, or have a material adverse effect on, the right of Purchaser or the Hospital to use and enjoy the Software or any other Purchased Intellectual Property License under the terms of the applicable Purchased Intellectual Property License agreements nor give rise to any termination right by licensor or right to increase fees or charge additional fees due to the consummation of the Contemplated Transactions.

        (c)    The Purchased Intellectual Property and the Purchased Intellectual Property Licenses comprise all Intellectual Property Rights owned or licensed by Seller that are necessary for the conduct of the Business as presently conducted.  To the Knowledge of Seller, no third party is infringing, violating, or misappropriating any of the Purchased Intellectual Property Rights.

    5.11    Contracts.  Section 5.11(a) of the Seller Disclosure Schedule sets forth a list of all Contracts to which Seller is a party or by which it is bound and that are related to the Business or by which the Purchased Assets or the Business may be bound or

affected in any material way.  Each such Contract is in full force and effect and, to the
Knowledge of Seller, complies in all material respects with applicable Laws.  Seller has
delivered to Purchaser or its representative true and complete copies of all such written
Contracts and accurate summaries of all such oral Contracts (and all written amendments
or other modifications thereto and accurate summaries of all oral amendments or
modifications thereto).  Except as set out in Section 5.11(b) of the Seller Disclosure
Schedule or as may be disclosed in the Sale Motion (including any amendment,
supplement or objection thereto), to the Knowledge of Seller (i) all of such Contracts are
valid, in full force and effect and binding against Seller and the other parties thereto in
accordance with their respective terms; (ii) Seller has paid in full all amounts now due
from it under all such Contracts and has satisfied in full or provided for all of its
Liabilities thereunder that are presently required to be satisfied or provided for;
(iii) neither Seller nor any other party thereto is in default of any of its obligations under
any such Contract; and (iv) there does not exist any condition that with notice or lapse of
time or both would constitute a default thereunder.

        5.12    Insurance.  Section 5.12 of the Seller Disclosure Schedule sets forth a true
and complete list of all policies or binders of fire, theft, casualty, comprehensive general
liability, workers compensation and employers liability, directors' and officers' liability,
business interruption, environmental, products and professional liability and automobile
insurance relating to the Business, together with the coverage amounts thereunder.  Such
policies and binders are in full force and effect and with reputable insurers, are adequate
for the Business and are in conformity with the requirements of all leases or agreements
to which Seller is a party and are valid and enforceable in accordance with their terms.
To the Knowledge of Seller, Seller is not in default with respect to any provision
contained in such policy or binder nor has Seller failed to give any notice or present any
claim under any such policy or binder in due and timely fashion.  Except as set forth in
Section 5.12 of the Seller Disclosure Schedule, there are no outstanding unpaid claims
under any such policy or binder.  Seller has not received any (i) written notice of
cancellation or non-renewal of any such policy or binder or (ii) proposal for renewal, the
terms of which are materially worse from the perspective of Seller than the preexisting
terms.  To the Knowledge of Seller, there has been no threatened termination or non-
renewal of, or material premium increase with respect to, any such policy.  None of such
policies shall be suspended, terminated, impaired, adversely modified or become
terminable, in whole or in part, as a result of any of the Contemplated Transactions.

        5.13    Employee Benefits.

            (a)    Section 5.13(a) of the Seller Disclosure Schedule sets forth a true
and complete list of each "employee benefit plan" as defined in Section 3(3) of ERISA
(including each "employee pension benefit plan" as defined in Section 3(2) of ERISA
and each "employee welfare benefit plan" as defined in Section 3(1) of ERISA) (the
"Employee Benefit Plans").  With respect to each Employee Benefit Plan, true, correct
and complete copies of the following documents (if applicable) have been delivered or
made available to Purchaser:    (i) the most recent plan document constituting the
Employee Benefit Plan and all amendments thereto, and any related trust documents,
(ii) the most recent summary plan description and all related summaries of material

modifications, (iii) the Form 5500 and attached schedules filed with the IRS for the past three (3) fiscal years, (iv) the financial statements and actuarial valuations for the past three (3) fiscal years, (v) the most recent IRS determination letter, and (vi) a description of any non-written Employee Benefit Plan.

(b)     Each Employee Benefit Plan has been established and administered in material compliance with its terms and the applicable provisions of ERISA, the Code and other applicable Laws and Seller has performed and complied in all material respects with all of its obligations under or with respect to each Employee Benefit Plan.

(c)     None of the Employee Benefit Plans is subject to Title IV of ERISA or the minimum funding requirements of Section 412 of the Code or Section 302 of ERISA, and neither Seller nor any ERISA Affiliates has ever had any obligations to or liability for (contingent or otherwise) with respect to any such Employee Benefit Plan. None of the Employee Benefit Plans is a "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA and Seller has not maintained, been required to contribute to, or been required to pay any amount with respect to a "multiemployer plan" at any time in the past six (6) years.

(d)     Except for health care continuation requirements under Section 4980B of the Code and Part 6 of Subtitle I of ERISA ("COBRA") or applicable state law, Seller does not have any obligations for retiree health or retiree life benefits (whether or not insured) to any current or former employee or director after his or her termination of employment or service with such Seller. All group health plans of Seller and any ERISA Affiliate have been operated in compliance in all material respects with the applicable requirements of COBRA.

(e)     All contributions and payments (including all employer contributions and employee salary reduction contributions) that are due with respect to any Employee Benefit Plan have been made within the time periods prescribed by ERISA and the Code to the respective Employee Benefit Plan. There is no pending or, to the Knowledge of Seller, threatened litigation, liability, claim, action, audit, examination, investigation or administrative proceeding relating to the Employee Benefit Plans, other than routine claims for benefits. To the Knowledge of Seller, neither Seller, any ERISA Affiliate, any of its directors, officers or employees, nor any other "disqualified person" or "party in interest" (as defined in Section 4975(e)(2) of the Code and Section 3(14) of ERISA, respectively) has engaged in a transaction, act or omission to act, with respect to any Employee Benefit Plan that, assuming the taxable period of such transaction expired as of the date hereof, could subject the Company to a tax, damages or penalty imposed by Section 4975 of the Code or Section 409 or 502(l) of ERISA or any other civil penalty, tax, fine, lien, or other liability assessed pursuant to ERISA or the Code that would have a Material Adverse Effect.

(f)     Each Employee Benefit Plan that is a "nonqualified deferred compensation plan" (as defined in Section 409A(d)(1) of the Code) that is subject to Section 409A of the Code has been operated in material compliance with Section 409A

of the Code. The Seller has no obligations to any employee or other service provider to make any reimbursement or other payment with respect to any tax imposed under Section 409A of the Code.

5.14    Employee Relations; Medical Staff; Labor.

(a)    Prior to the date hereof, Seller has delivered to Purchaser a list of all its Employees and consultants as of June 1, 2011, indicating their position, current annual rate of compensation or current hourly wage rate or other basis of compensation, date of hire by Seller, job title or other short summary of responsibilities, whether the Employee or consultant is part-time, full-time, or on an approved leave of absence and the type of leave, and whether the Employee or consultant is a party to any individual agreements between the individual and the Seller.

(b)    Prior to the date hereof, Seller has delivered to Purchaser a complete listing of all physicians and other clinicians with medical staff privileges at the Business and copies of the Business's current medical staff bylaws and regulations. Except as set forth in Section 5.14(b) of the Seller Disclosure Schedule, no member of the Business' medical staff is subject to any sanction, monitoring program, internal investigation, or peer review proceeding, and each member of the medical staff of the Business has been appropriately credentialed as required by Law, to the Knowledge of Seller. No appeals of any medical staff disciplinary action or denial or reduction of privileges regarding services provided through the Business currently is pending, or to the Knowledge of Seller, threatened against Seller or the Business. To the extent any such information is discovered, it will be disclosed to Purchaser subject to the Confidentiality Agreement.

(c)    Except as set forth in Section 5.14(c) of the Seller Disclosure Schedule, no Employee has given as of the date hereof notice of an intention to leave Seller's employ before or after the Closing, and upon Purchaser's termination of the employment or engagement of any employees or consultants of Seller at or following the Closing, Purchaser shall be liable to any of such persons for severance or retention pay or any other payments otherwise due them as employees of or consultants for Seller (including accrued salary or vacation in accordance with normal policies).

(d)    To the Knowledge of Seller, Seller (i) is in compliance with all applicable Laws including, without limitation, Laws with respect to immigration, employment, employment practices, terms and conditions of employment and wages and hours, in each case, with respect to employees, (ii) has withheld all amounts required by law or by agreement to be withheld from the wages, salaries and other payments to employees, (iii) is not delinquent in payments to any of its employees or consultants for wages, salaries, commissions, bonuses or other direct compensation for any services performed by them or amounts required to be reimbursed to any employees or consultants or any Taxes or any penalty for failure to comply with any of the foregoing, (iv) is not liable for any payment to any trust or other fund or to any Governmental Body, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the Ordinary

Course of Business and consistent with past practice), and (v) is not a party to any ongoing or threatened Litigation regarding the classification of any workers.

(e)     Except as set forth in Section 5.14(e) of the Seller Disclosure Schedule, no work stoppage or labor strike against Seller is pending or, to the Knowledge of Seller, threatened. To the Knowledge of Seller, Seller is not involved in or threatened with any labor dispute, grievance or litigation relating to labor, safety, or discrimination matters involving any employee, including without limitation charges of unfair labor practices or discrimination complaints filed with the United States Equal Employment Opportunity Commission and/or the Massachusetts Commission Against Discrimination, that, if adversely determined, could reasonably be expected to result in material liability to Seller. No union organizing campaign or activity with respect to non-union employees of Seller is ongoing, pending or, to the knowledge of Seller, threatened.

(f)     Except as set forth in Section 5.14(f) of the Seller Disclosure Schedule, (i) Seller is not a party to any labor or collective bargaining agreement and (ii) to the Knowledge of Seller, no labor union or employee association has been certified as exclusive bargaining agent for any group of Employees.

5.15   <u>Compliance with Laws.</u>

(a)     Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with the Medicare and MassHealth programs (collectively, the "<u>Healthcare Programs</u>") through, in the case of Medicare, the applicable intermediary. Except as described in Section 5.15(a) of the Seller Disclosure Schedule, the Hospital is duly accredited by the Joint Commission (the "<u>Joint Commission</u>"). Seller has delivered to Purchaser a true and complete copy of Seller's most recent Joint Commission accreditation survey reports pertaining to the Hospital.

(b)     Except as set forth in Section 5.15(b) of the Seller Disclosure Schedule, Seller is in material compliance with all Laws applicable to the conduct of the Business and the Purchased Assets. Seller is not in receipt of notice of or subject to any citation, fine or penalty imposed or asserted against Seller for any violation or alleged violation of such Laws. To the Knowledge of Seller, its submissions or reports to any Governmental Body would not reasonably be expected to cause investigation, corrective action or enforcement action. There is no civil, criminal or administrative action, suit, demand, claim, complaint, hearing, investigation, demand letter, notice, warning letter, inspection, recall, safety alert, enforcement proceeding or request for information pending or, to the Knowledge of Seller, threatened relating to the Business or the Purchased Assets.

(c)     Seller is not in receipt of any written notice from the United States federal government, the Commonwealth of Massachusetts or the City of Quincy that the Owned Properties are currently in violation of any building, fire, zoning and other laws, rules ordinances and regulations applicable thereto.

5.16   Environmental Matters.

(a)   Except as provided in Section 8.11, the representations and warranties made in this Section 5.16 are the exclusive representations and warranties of the Seller relating to environmental matters.

(b)   Seller is in material compliance with Environmental Law. Except as set forth in Section 5.16(b) of the Seller Disclosure Schedule, Seller has not (nor to the Knowledge of Seller has any predecessor in interest in connection with the Business, including the City of Quincy) generated, used, handled, transported or stored any Hazardous Materials or shipped any Hazardous Materials for recycling, treatment, storage or disposal at any site or facility except in material compliance with Environmental Law. Section 5.16(b) of the Seller Disclosure Schedule sets forth a true, complete and accurate list of all Hazardous Materials generated, used, handled, transported from or stored at any site owned, used, operated or leased by Seller and all carriers and recipients of Hazardous Materials transported from any such site. Except as set forth in Section 5.16(b) of the Seller Disclosure Schedule, there has been no generation, use, handling, storage or disposal of any Hazardous Materials in violation of Environmental Law at any site owned, used or operated by, or premises leased by, Seller (or to the Knowledge of Seller by any predecessor in interest in connection with the Business) during the prior ten (10) years. Except as set forth in Section 5.16(b) of the Seller Disclosure Schedule, to the Knowledge of Seller there has not been nor is there threatened any Release of any Hazardous Materials into, on, at or from any such site or premises, including, without limitation, into the ambient air, groundwater, surface water, soils or subsurface strata, during such period or, to the Knowledge of Seller, prior thereto in violation of Environmental Law or which created or will create an obligation under Environmental Law to report or respond in any way to such Release. Except as set forth in Section 5.16(b) of the Seller Disclosure Schedule, there is no aboveground or to the Knowledge of Seller underground storage tank or other containment structure for the storage of Hazardous Materials at any site currently owned, used or operated by, or premises leased by Seller.

(c)   No (i) site currently owned, (ii) site currently used or operated by, or premises currently leased by, Seller, or (iii) site or property to which Seller has arranged for the transportation and offsite recycling or disposal of Hazardous Materials, is, to the Knowledge of Seller the subject of any federal, state or local civil, criminal or administrative investigation or proceeding evaluating whether, or alleging that, any action is necessary to respond to a Release or a threatened Release of any Hazardous Materials. No such site or premises is listed or, to the Knowledge of Seller, proposed for listing on the National Priorities List or the Comprehensive Environmental Response, Compensation, and Liability Information System, both as provided under the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), or any comparable state or local governmental lists. Seller has not received written notification of any potential responsibility of Seller, and Seller has no knowledge of any threatened potential responsibility, pursuant to the provisions of (i) CERCLA, or (ii) any similar federal, state, local or other Environmental Law.

(d)     Seller has obtained and maintained in full force and effect all Permits required by Environmental Law for the conduct of the Business and is in material compliance with such Permits. To the Knowledge of Seller, there is no environmental or health and safety matter that reasonably could be expected to have a Material Adverse Effect. Seller previously has delivered to Purchaser copies of any and all environmental audits or risk assessments, site assessments, and documentation within its possession regarding off-site disposal or release of Hazardous Materials, spill control plans and all other material correspondence, documents or communications with any Governmental Body regarding the foregoing.

5.17    Permits. Section 5.17 of the Seller Disclosure Schedule sets forth a true and complete list of all Permits material to the operation of the Business. Seller has all Permits necessary for the operation of the Business, including, without limitation, all such Permits required by or relating to employment and all other licenses, permits, franchises, orders or approvals of any Governmental Body relating to the delivery of hospital services, and all of such Permits are in full force and effect. Seller is operating in material compliance with all applicable Permits; any applications for renewal necessary to maintain any Permit in effect have been filed; and no proceeding is pending or threatened to revoke, suspend, limit or adversely modify any Permit. None of such Permits shall be suspended, terminated, impaired, adversely modified or become terminable, in whole or in part, as a result of any of the Contemplated Transactions.

5.18    Privacy Laws; Health Information Laws.

(a)     Seller is currently and has been at all times in substantial compliance with all applicable Foreign Privacy Laws and US Privacy Laws; and Seller has not received notice (in writing or otherwise) regarding violation of such Foreign Privacy Laws or US Privacy Laws.

(b)     Except as set forth in Section 5.18(b) of the Seller Disclosure Schedule, to the Knowledge of Seller, no action, suit, proceeding, investigation, charge, complaint, claim, demand, or notice has been filed, commenced or threatened against Seller relating to Foreign Privacy Laws and US Privacy Laws; nor has Seller incurred any Liabilities under any Foreign Privacy Laws or US Privacy Laws.

(c)     Seller (i) has assessed the applicability of HIPAA and its implementing regulations to Seller, including any fully insured and self-insured health plans that Seller sponsors or has sponsored or contributes to or has contributed to and in view of any health care provider activities, if any, in which Seller engages and (ii) except as listed in Section 5.18(c) of the Seller Disclosure Schedule, has not entered into any business associate, data use or other agreement with a HIPAA-covered entity under which it has agreed to safeguard or otherwise restrict the use or disclosure of any protected health information of such a HIPAA-covered entity.

(d)     Seller is currently, and has been at all times since its formation, in substantial compliance with all applicable health information security, health information privacy, and health information transaction format Laws (each a "Health Information

Law"), including, without limitation, any rules, regulations, codes, orders, decrees, and rulings thereunder of any federal, state, regional, county, city, municipal or local government, whether foreign or domestic, or any department, agency, bureau or other administrative or regulatory body obtaining authority from any of the foregoing.

5.19   Relationships With Affiliates. No Affiliate of Seller (i) owns any property or right, tangible or intangible, that is used in the Business or (ii) has any claim or cause of action against Seller or any of the Purchased Assets. Except as set forth in Section 5.19 of the Seller Disclosure Schedule, none of the directors, managers or officers of Seller, or any of their respective immediate family members, is (a) a partner, member or stockholder or has any other material economic interest in any Affiliate of Seller; (b) a party to any transaction or contract with Seller or any Affiliate of Seller; or (c) indebted to Seller or any Affiliate of Seller. To the knowledge of Seller, Seller has not paid, or incurred any obligation to pay, any fees, commissions or other amounts to, and is not a party to any agreement, business arrangement or course of dealing with, any firm of or in which any directors, managers or officers of Seller, or any of their respective immediate family members, is a partner, member or stockholder or has any other material economic interest.

5.20   Financial Advisors. Except as set forth in Section 5.20 of the Seller Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

5.21   Full Disclosure. No representation or warranty by Seller contained in this Agreement, and no statement contained in the Seller Disclosure Schedule, any notice given pursuant to Section 8.3(b), or any other document, certificate or other instrument delivered by or on behalf of Seller pursuant to this Agreement, contains any untrue statement of a material fact or omits to state any material fact necessary, in light of the circumstances under which it was made, in order to make the statements herein or therein not misleading. There is no fact or circumstance known to Seller that has specific application to the Business, the Purchased Assets or the Assumed Liabilities (other than general economic or industry conditions) that would reasonably be expected to result in a Material Adverse Effect and that is not set forth in this Agreement or in the Seller Disclosure Schedule.

5.22   No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this ARTICLE V, neither Seller nor any other Person makes any express or implied representation or warranty with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in this ARTICLE V, Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or

fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller that, except as set forth in the disclosure schedule delivered by Purchaser to Seller (the "Purchaser Disclosure Schedule"), the statements contained in this ARTICLE VI are complete and accurate as of the date hereof and as of the Closing Date. The representations and warranties set forth in this ARTICLE VI shall be additive to, and not mutually exclusive or in derogation of, one another.

6.1     Organization and Good Standing. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. Purchaser is qualified or otherwise authorized to transact business as a foreign corporation in all jurisdictions in which such qualification or authorization is required by law, except for jurisdictions in which the failure to be so qualified or authorized could not reasonably be expected to have a material adverse effect on Purchaser.

6.2     Authorization of Agreement. Purchaser has full corporate power, legal capacity and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the Contemplated Transactions (the "Purchaser Documents"), and to consummate the Contemplated Transactions. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms.

6.3    Consents of Third Parties; Conflicts.

(a)    Except as described in Section 6.3(a) of the Purchaser Disclosure Schedule, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order, license or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the Contemplated Transactions or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act and (ii) the Healthcare Regulatory Consents.

(b)    Except as set forth in Section 6.3(b) of the Purchaser Disclosure Schedule, to the Knowledge of Purchaser, none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

6.4    Litigation.    There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the Contemplated Transactions. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the Contemplated Transactions.

6.5    Financial Advisors.    No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

6.6    Financial Capability.    Purchaser and its Affiliates, including Steward, (i) have, and at the Closing will have, and will make available, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) to pay the Purchase Price and any expenses incurred by Purchaser in connection with the Contemplated Transactions, (ii) have, and at the Closing will have, and will make available, the resources and capabilities (financial or otherwise) necessary for Purchaser to perform its obligations hereunder, (iii) have not incurred any obligation, commitment, restriction or Liability of any kind, which would materially

impair or adversely affect such resources and capabilities and (iv) will have, and will make available, the resources and capabilities (financial and otherwise) to fulfill Purchaser's covenants under Section 8.20.

6.7     Healthcare Regulatory Compliance Status.

(a)     To the Knowledge of Purchaser, except as described in Section 6.7 of the Purchaser Disclosure Schedule, neither Purchaser nor any of its Affiliates is involved in any litigation, proceeding, or investigation by or with any Governmental Body which, if determined or resolved adversely, would have a material adverse impact on the ability of Purchaser to obtain or maintain any governmental qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations necessary for Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where the failure to have such qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions or the performance by Purchaser of any of its obligations under this Agreement.

(b)     Purchaser and, to the Knowledge of Purchaser, its officers, directors, employees, shareholders and providers, have not knowingly engaged in any activities that are prohibited under 42 U.S. Code Section 1320a-7a and 7b, or the regulations promulgated pursuant to such statutes, or similar or related state statutes or regulations or that otherwise constitute fraud, including the following: (i) knowingly and intentionally making or causing to be made a false statement or misrepresentation of a material fact in any application for any benefit or payment; (ii) knowingly and intentionally making or causing to be made any false statement or misrepresentation of a material fact for use in determining rights to any benefit or payment; (iii) knowingly and intentionally failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; and (iv) knowingly and intentionally soliciting, paying or receiving any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by the Health Care Programs or any private payor source or (B) in return for purchasing, leasing, or ordering or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part by the Healthcare Programs or any private payor source.  Purchaser does not know of any reason why the approvals or Permits required for Purchaser to consummate the Contemplated Transactions would be delayed or rejected.  Neither Purchaser nor any of its owners, directors, officers or managers has been indicted or convicted of a crime, been suspended or excluded from the Healthcare Programs, has had a professional license suspended or revoked, or has had a Certificate of Need or Determination of Need application denied or failed to pass a character and competency or suitability review by any Governmental Body.  Purchaser has no knowledge of any fact that could reasonably be expected to cause any

Governmental Body to question the character and competency or suitability of any of Purchaser's officers or directors.

6.8    Acknowledgement Regarding Condition of the Business. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in ARTICLE V (as modified by the Seller Disclosure Schedule and the other schedules hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to and accepted by Purchaser in an "as is," "where is" and "with all faults" condition, fee of any warranties or representations whatsoever, and SELLER EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, LATENT OR PATENT, WITH RESPECT THERETO. Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in ARTICLE V (as modified by the Seller Disclosure Schedule and the other schedules hereto as supplemented or amended). Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement and the schedules hereto, and none of Seller, any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business and the Contemplated Transactions. Purchaser acknowledges that it has conducted, to its satisfaction, its own independent investigation of the Business, and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT SELLER HAS NOT MADE ANY REPRESENTATION RELATING TO THE OWNED PROPERTY OR ANY PROPERTY THAT IS THE SUBJECT OF A REAL PROPERTY LEASE REGARDING SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, COMPLIANCE WITH ZONING LAWS, ENVIRONMENTAL LAWS, OR ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES, REGULATIONS OR ORDINANCES RELATING TO THE USE THEREOF, EXCEPT AS EXPRESSLY STATED HEREIN. PURCHASER ALSO ACKNOWLEDGES AND AGREES THAT THE INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS BY PURCHASER AND ITS REPRESENTATIVES HAS BEEN ADEQUATE TO ENABLE PURCHASER TO MAKE PURCHASER'S OWN DETERMINATION WITH RESPECT TO THE SUITABILITY OR FITNESS OF THE LAND, INCLUDING WITH RESPECT TO SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, ZONING LAWS, ENVIRONMENTAL LAWS, AND ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES REGULATIONS OR ORDINANCES. PURCHASER ACKNOWLEDGES THAT THE DISCLAIMERS,

AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS PARAGRAPH ARE AN INTEGRAL PORTION OF THIS AGREEMENT.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

7.1     Approval of Break-Up Fee and Overbid Protection.  In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller shall pay Purchaser a break-up fee in the amount of Eight Hundred Seventy-Five Thousand Dollars ($875,000) (the "Break-Up Fee") on the first Business Day following the date of consummation of a transaction pursuant to a Competing Bid if no material breach by Purchaser of this Agreement has occurred.  In addition, Seller shall seek inclusion in the Bidding Procedures Order of a provision requiring initial Competing Bids to be in an amount not less Eight Hundred Seventy-Five Thousand Dollars ($875,000) greater than the Purchase Price (the "Overbid Protection").

7.2     Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "Competing Bid").  From the date hereof (and any prior time) and until the Contemplated Transactions are consummated, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets, alone or in connection with the sale or other disposition of any other asset of Seller.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required by the Bidding Procedures Order or under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and the assets of Seller to prospective purchasers.

7.3     Bankruptcy Court Filings.  As promptly as practicable following the execution of this Agreement, Seller shall file with the Bankruptcy Court the Sale Motion seeking entry of the Sale Order and a motion seeking approval of the Bidding Procedures Order and, incident thereto, approval of the Break-Up Fee and the Overbid Protection.

7.4     Purchaser's Assurance.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts

46

to defend against such appeal. With respect to each Purchased Contract, Purchased Personal Property Lease, Purchased Real Property Lease, Purchased Permit or Purchased Intellectual Property License, Purchaser shall provide adequate assurance of future performance of each such agreement as required by section 365 of the Bankruptcy Code.

## ARTICLE VIII

## CERTAIN COVENANTS AND AGREEMENTS

8.1    Negative Covenants Pending Closing. Except as contemplated by this Agreement, during the period from the date of this Agreement to the Closing, Seller shall not, without the written consent of Purchaser, take any of the following actions:

(a)    Acquisition or Disposition of Assets. Acquire, sell, lease, license or otherwise dispose of any assets or property, other than arm's length purchases and sales of assets in the Ordinary Course of Business consistent with past practice;

(b)    Indebtedness. Create, incur or assume any Indebtedness (including obligations in respect of capital leases); assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other Person; or make any loans, advances or capital contributions to, or investments in, any other Person;

(c)    Liens. Sell, license, transfer or otherwise dispose of, or create, incur, assume or permit to suffer to exist or remain in effect any Liens (other than Liens existing as of the date of this Agreement or Permitted Exceptions) on any of its assets, including without limitation the Purchased Assets;

(d)    Liabilities. Pay, discharge or satisfy any Liabilities, other than the payment, discharge or satisfaction, in the Ordinary Course of Business and consistent with past practice, of Liabilities reflected or reserved against in the Seller Interim Balance Sheet or incurred in the Ordinary Course of Business;

(e)    Employee Matters. Increase the compensation payable to any director, officer, employee, agent or consultant of Seller, except in accordance with existing agreements; enter into, adopt or amend any employment, severance or other agreement with any director, officer, employee, consultant or agent of Seller; adopt, amend or increase the benefits under any employee benefit plan, except, in each case, as required by law or in accordance with existing agreements; hire any new employees except in the Ordinary Course of Business consistent with past practice or hire any new officers or senior executives;

(f)    Contracts. Amend, terminate, cancel, take or omit to take any action that would constitute a violation of or default under, or waive any rights under, any of the Purchased Contracts or Transitional Contracts;

(g)    Real Property. Enter into, renew, replace, modify, cancel, extend or otherwise change in any material manner any Property Agreement or Real Property

Lease or any contract, insurance policies, easement or other agreement affecting the Owned Properties or any other agreement or contract affecting the Owned Property or the use, title, occupancy or development thereof. Seller shall not knowingly default under any Real Property Lease or Property Agreement.

(h)    New Agreements. Enter into contracts or commitments involving potential payments by Seller in any single instance of $10,000 or more or in the aggregate of $50,000 or more, except for contracts or commitments for the purchase of services, supplies or materials in the Ordinary Course of Business consistent with past practices, provided that Purchaser's consent shall not be unreasonably withheld, conditioned or delayed;

(i)    Capital Expenditures. Authorize capital expenditures which in any single instance exceeds $10,000 or in the aggregate exceed $150,000, except for (i) capital expenditures reflected in an annual budget provided by Seller to Purchaser, (ii) those capital expenditures relating to current and on-going renovations and capital improvements to the Owned Properties that have been identified on Schedule 8.12 and (iii) capital items to be entirely funded out of donor-restricted funds;

(j)    Accounting Policies. Change any of the accounting methods, principles or practices used by it, or restate any of the Seller Financial Statements, in each case except as may be appropriate to conform to changes in GAAP implemented following the date hereof;

(k)    Legal Matters. Settle or compromise any pending or threatened Litigation that is or may be material to the Business or the assets (including the Purchased Assets), properties, results of operations or financial condition of Seller or either Physician Subsidiary or that relates to the Contemplated Transactions;

(l)    Extraordinary Transactions. Adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of Seller or either Physician Subsidiary, other than in connection with the Bankruptcy Case, or make, or permit to be made, any material acquisition of property or assets outside the Ordinary Course of Business;

(m)    WARN Act. Effectuate a "plant closing" or "mass layoff," as those terms are defined in the Worker Adjustment and Retraining Notification Act of 1988; or

(n)    Obligations. Obligate itself to do any of the foregoing; or take any action or fail to take any action permitted by this Agreement with the knowledge that such action or failure to take action would result in (i) any of the representations and warranties of Seller set forth in ARTICLE V becoming untrue or (ii) any of the conditions to the purchase of the Purchased Assets set forth in ARTICLE X not being satisfied.

Nothing contained in this Agreement shall give Purchaser, directly or indirectly, the right to control or direct Seller's operations prior to the Closing Date. Prior to the

Closing Date, Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its operations.

8.2    Access to Information.   Subject to this Section 8.2, and subject to compliance with the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other applicable United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"), Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the assets, properties and operations of the Business (including environmental testing) and such examination of the books and records of Seller pertaining to the Business (including work papers of Seller's independent accountant), the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records at Purchaser's sole expense; it being understood, however, that the foregoing shall not entitle Purchaser to access (i) the books, records and documents referred to in Section 2.2(e) or (ii) any books, records or documents the disclosure of which by Seller to Purchaser would (A) violate any patient confidentiality obligation of Seller or (B) any other agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (C) any obligation of confidentiality by which Seller is bound under applicable Law.   Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to any restrictions on disclosure by Seller to Purchaser or use of the information contained therein by Purchaser applicable pursuant to any agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law.   Seller shall cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to Seller's business and operations, including the Business.   Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller.   No investigation by Purchaser shall diminish or obviate any of the representations, warranties, covenants or agreements of Seller or of Purchaser contained in this Agreement.   Prior to the Closing Date, Purchaser shall be entitled, through its employees and representatives, to discuss the Contemplated Transactions with significant suppliers and customers of Seller and the status of such suppliers' and customers' relationships with Seller (in accordance with arrangements made by Seller and reasonably acceptable to Purchaser).

8.3    Conduct of the Business Pending the Closing.

(a)    Prior to the Closing, except (i) as set forth on Schedule 8.3, (ii) as required by applicable Law, (iii) as otherwise expressly contemplated by this Agreement or the Sale Order, or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall conduct the Business only in the Ordinary Course of Business and in compliance with all applicable Laws.

(b)    Between the date hereof and the Closing Date, each party shall give prompt notice to the other party of (i) the occurrence or non-occurrence of any event or circumstance which would be likely to cause any representation or warranty contained in this Agreement, the Seller Disclosure Schedule or the Purchaser Disclosure Schedule to be untrue or inaccurate if made at such time and (ii) any failure to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied hereunder. In the event such violation or breach of this Agreement shall occur on or prior to the Closing Date, each party shall promptly use commercially reasonable efforts to remedy the same. No such information shall be deemed to avoid or cure any misrepresentation or breach of warranty or constitute an amendment of any representation, warranty or statement in this Agreement, the Seller Disclosure Schedule or the Purchaser Disclosure Schedule for the purpose of determining the accuracy of any of the representations and warranties made by Seller or Purchaser in this Agreement or determining whether any of the conditions in Sections 10.1, 10.2 and 10.3 have been satisfied.

(c)    Seller covenants with Purchaser that from the date hereof until Closing, if Seller has knowledge of any material change in (i) the information with respect to the Owned Properties or the Real Property Leases furnished to Purchaser pursuant to this Agreement or (ii) any condition or state of the Owned Properties or the Real Property Leases, or (iii) any Property Agreement, Seller shall promptly notify Purchaser in writing of such change.

(d)    Prior to the Closing, if requested by Seller, Purchaser agrees to enter into an agreement or agreements with Seller for the provision of certain medical services for patients of Seller at the Owned Properties that, as of the date hereof, are being provided by clinical affiliates of Seller. Purchaser shall arrange to have such services provided on substantially the same financial terms as they are currently provided for Seller. Such services will include at least the provision of psychologists for Seller's Gero-Psychiatry unit and hospitalists to support Seller's current Business. The Medical Services Agreement, a copy of which is attached hereto as Exhibit D, relates to those services that Purchaser will provide or arrange to provide to Seller under this Section 8.3(d) effective upon execution of this Agreement.

8.4    Consents.

(a)    Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including by taking the actions referred to in Section 8.7, to obtain at the earliest practicable date all consents, approvals, authorizations, waivers and Orders required to be obtained by Seller, including the Healthcare Regulatory Consents,

and to give at the earliest practicable date any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such item except as otherwise provided by Section 8.7.

(b)    Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in Section 8.7, to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; provided, however, that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Authority) or to initiate any litigation or legal proceedings to obtain any such consent or approval except as otherwise provided by Section 8.7.

(c)    Purchaser shall obtain at the earliest practicable date all consents, waivers, approvals and authorizations, if any, required under any Purchased Real Property Lease and the Property Agreements in connection with the assignment of the Purchased Real Property Leases from Seller to Purchaser.

8.5    Insurance. As of the Closing, Purchaser shall have appropriate insurance coverage in place for the Business consistent with what would be maintained under good industry business practices.

8.6    Permits. Seller shall deliver to Purchaser copies of all of the Purchased Permits within two (2) days after the execution and delivery of this Agreement.

8.7    Regulatory Approvals.

(a)    Purchaser, at its own cost and expense, shall, on or before July 20, 2011, submit to DPH a Determination of Need application with respect transfer of ownership of the Hospital and shall seek from DPH any other Governmental Body any Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with Law and shall also, as soon as practicable, seek any other Healthcare Regulatory Consents necessary in order for Purchaser to consummate the Contemplated Transactions and to operate the Business (collectively, the "Healthcare Applications"). Seller promptly shall provide to Purchaser all relevant information and documents that are in Seller's possession and that are reasonably required by Purchaser in order to timely file the Healthcare Applications. Purchaser shall not be liable for any delay caused by Seller's failure to provide such information or documents timely. Purchaser shall provide Seller with an opportunity to review the Healthcare Applications in advance of filing. Purchaser shall diligently

pursue the Healthcare Applications and shall timely submit all information and documents requested in connection therewith by any Governmental Body. Without limiting the generality of the foregoing, Purchaser shall take such actions as may be reasonably necessary to cure any character or competency objection that may be raised to the Determination of Need application, excluding removing or replacing any officer or director that fails to obtain character and competency approval. Purchaser shall provide Seller with prompt written notice of Purchaser's submission of a Healthcare Application. Within five (5) Business Days of its submission or receipt, Purchaser shall deliver to Seller a complete copy of all correspondence to or from any applicable Governmental Body having jurisdiction concerning a Healthcare Application. Purchaser shall provide Seller with monthly reports of Purchaser's efforts to obtain all Healthcare Regulatory Approvals, which may be oral reports. In addition, Purchaser shall provide Seller with immediate notice of its receipt of acceptance for review when deemed complete, approval, contingent approval or a rejection of Purchaser's application for a Determination of Need, along with a copy of any documentation related thereto. Purchaser shall not take any action prior to the Closing that might disqualify Purchaser as an established and licensed operator of the Hospital, except as may be required by law. Purchaser shall not be obligated to accept any conditions associated with regulatory approvals required to consummate the Contemplated Transactions that are not routinely imposed on similarly situated applicants or reflected in this Agreement.

(b)     If necessary, Purchaser and Seller shall (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Antitrust Laws with respect to the Contemplated Transactions, within five (5) Business Days after the date of this Agreement; (ii) comply at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division") or any other Governmental Body in respect of such filings or the Contemplated Transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable law, providing copies of all such documents to the non-filing party prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or any other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction.

(c)     If necessary, Purchaser and Seller shall (a) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, including without limitation Chapter 180, other than those referred to in Sections 8.7(a) or 8.7(b), including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Section 5.3 of the Seller Disclosure Schedule, as promptly as practicable, (b) comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the Contemplated Transactions, and (c) cooperate with each

other in connection with any such filing (including, to the extent permitted by applicable law, providing copies of all such documents to the non-filing party prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d)     Each such party shall use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such party shall promptly inform the other parties hereto of any material oral communication with one another of, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other party hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(e)     Subject to applicable law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.7 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Purchaser, as the case may be).

(f)     Each of Purchaser and Seller shall use commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the Contemplated Transactions under the Antitrust Laws. In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging the Contemplated Transactions is in violation of any Antitrust Law, each of Purchaser and Seller shall cooperate and use commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the Contemplated Transactions, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective best interests. Each of Purchaser and Seller shall use commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement. Notwithstanding the foregoing, Purchaser shall not be obligated to divest itself of any business or assets pursuant to this Section 8.7