8.8    Chapter 180 Review.  Section 8A(d)(2) of Chapter 180 provides that the AGO is to assess the entity proposing to receive a substantial amount of the assets or operations of a charitable hospital the reasonable costs of the review to be undertaken by the AGO pursuant to Section 8A(d) of Chapter 180 (the "8A(d) Review").  In order to expedite the 8A(d) Review, Seller has advanced to the AGO, prior to the date of this Agreement, the sum of One Hundred Thousand Dollars ($100,000) (the "8A(d) Advance").  Purchaser agrees to reimburse to Seller the 8A(d) Advance simultaneously with executing this Agreement.  Thereafter, Purchaser shall be responsible for advancing to the AGO such additional sums as the AGO concludes are reasonable to conduct the 8A(D) Review with respect to the Contemplated Transactions, on such terms and conditions as Purchaser and the AGO may agree.

8.9    Real Property Violations.  Seller shall give Purchaser prompt notice of any violations and other claims made or threatened against the Owned Properties, the Property Agreements or the Real Property Leases prior to the Closing.

8.10    Mechanics Liens.  Seller will not permit any mechanic's or other lien, charge or order for the payment of money to be filed against the Owned Property that will remain in effect following the Closing.

8.11    Hazardous Materials.  From the date hereof until the Closing, neither Seller nor, to the Knowledge of Seller, any of Seller's employees, designees, consultants, representatives, or invitees shall bring any Hazardous Material onto the Owned Property in any form, except with respect to any Hazardous Material which is used in the Ordinary Course of Business, provided that any such Hazardous Material is used and disposed of in accordance with Environmental Law.  If from the date hereof until the Closing, Seller or any of Seller's employees, designees, consultants, representatives, or invitees, brings any Hazardous Material onto the Owned Property that is (i) not for use in the Ordinary Course of Business or (ii) not used or disposed of in accordance with Environmental Law, and the presence of any such Hazardous Material causes the occurrence of a Material Adverse Effect, then in the event Seller fails to remove or remediate the same in compliance with Environmental Law to Purchaser's reasonable satisfaction at least ten (10) Business Days prior to the Closing, Purchaser shall have the option to terminate this Agreement by sending written notice of such election to Seller and the Escrow Agent, and upon such termination, the Deposit (and all accrued investment income thereon) shall be immediately refunded to Purchaser.

8.12    Operation of Real Property.  Between the date hereof and the Closing Date or earlier termination of this Agreement, Seller shall (i) continue to operate and maintain the Owned Property and the Real Property Leases in substantially the same manner as it is operating and maintaining the Owned Property and the Real Property Leases as of the date hereof, including the continuation of those improvements and capital projects in process as of the date hereof listed on Schedule 8.12; (ii) maintain and keep the Owned Property insured, as presently maintained and insured, until Closing; and (iii) maintain all equipment and systems located on the Owned Property, including, without limitation in good working order and condition, reasonable wear and tear excepted.

8.13   <u>Delivery of Financial and Other Information</u>.   After the date hereof and ending on the Closing Date, Seller shall deliver to Purchaser:

(a)   within fifteen (15) days after the end of each month, internally prepared, unaudited consolidated balance sheets and income statements for the Business for such month, in each case prepared on a basis consistent with the Seller Financial Statements, which, when delivered, will present fairly in all material respects the consolidated financial position of the Business as of the dates thereof and the consolidated results of their operations for the periods therein referred to, and will be prepared in accordance with GAAP as in effect on the date of such financial statements, applied on a basis consistent with the Seller Financial Statements, but subject to normal year-end adjustments (which, if presented, would not differ materially from those included in the Seller Financial Statements); and

(b)   as soon as practicable, but in any event within three (3) Business Days after the end of each week, (i) a statement of Seller's unrestricted cash balances and (ii) a statement of patient discharge volumes as compared with Seller's budget.

8.14   <u>Further Assurances</u>.   Each of Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions.   In addition, if Seller after the Closing receives payment on any account receivable that is a Purchased Asset it shall as soon as practicable remit such amount received to Purchaser, together will such information identifying the account to which such payment relates as is reasonably available to Seller, and, if Purchaser after the Closing receives payment on any account receivable that is an Excluded Asset it shall as soon as practicable remit such amount received to Seller, together will such information identifying the account to which such payment relates as is reasonably available to Purchaser.   Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that is an Excluded Asset, or shall receive any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give notice thereof to Seller and make available to Seller upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such gift, contribution or bequest and will cooperate with Seller in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset or a Purchased Asset. The provisions of this <u>Section 8.14</u> shall survive the Closing.

8.15   <u>Confidentiality</u>.   Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, including under <u>Section 8.2</u>, and the consummation of the Contemplated Transactions, is subject to the terms of the Non-Disclosure Agreement among Purchaser, Navigant Capital Advisors, LLC and Seller dated April 14, 2011 (the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated herein by reference and, to the extent applicable, supersede any conflicting or inconsistent provisions contained in this Agreement.   Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to

information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that Purchaser acknowledges that any and all other Confidential Information provided to it by Seller or its representatives concerning Seller shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. For purposes of this Section 8.15, "Confidential Information" shall mean any confidential information with respect to, including, methods of operation, customers, customer lists, prices, fees, costs, Technology, inventions, trade secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

8.16    Preservation of Records. Purchaser agrees that it shall preserve and keep the Documents acquired under this Agreement for a period of seven (7) years from the Closing Date or the maximum period of time required by law, whichever is longer, and shall make Documents and personnel available to Seller as may be reasonably required by Seller in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of Seller or any Affiliate, or in order to enable Seller to exercise and comply with its rights and obligations under or in connection with this Agreement or as debtor-in-possession in the Bankruptcy Case. In the event Purchaser wishes to destroy any such acquired Documents before that time, Purchaser shall first give ninety (90) days prior written notice to Seller and Seller shall have the right at its option and expense, upon prior written notice given to Purchaser within such ninety (90) day period, to take possession of such Documents within one hundred and eighty (180) days after the date of such notice. To the extent not prohibited under applicable Law, Seller contemplates that it will destroy the Documents constituting Excluded Assets incident to administration of its bankruptcy estate and closing of the Bankruptcy Case; pending such destruction Purchaser shall have the rights specified in the proviso to Section 2.2(g).

8.17    Publicity. Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the judgment of Purchaser or Seller upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock market on which Purchaser's securities are listed, provided that the party intending to make such release shall use commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

8.18    Use of Name. From and after the Closing, except as may be required under the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") Seller agrees not to use the name "Quincy Medical Center" or any other Marks included in the Purchased Assets (or any derivation or any name likely to be confused therewith) in connection with any business, and, at Purchaser's written request, shall promptly change the corporate name of Seller and shall cease using the name

"Quincy Medical Center" in the Bankruptcy Case, except as may be required under the Bankruptcy Code and the Bankruptcy Rules.

8.19  Supplementation and Amendment of Schedules; Disclosure of Contracts.

(a)  Seller may, at its option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in the Schedules shall constitute a disclosure for all sections reasonably related to the section referenced in a specific section in a Schedule. From time to time prior to the Closing (but no later than five Business Days before the Closing), Seller shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement subject to Purchaser's reasonable approval of such supplement or amendment. No such supplement or amendment shall have any effect on the satisfaction of the condition to closing set forth in Sections 10.1(a) and 10.1(b); provided, however, if the Closing shall occur, then Purchaser shall not be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise, including pursuant to ARTICLE XI hereof, with respect to any and all matters disclosed pursuant to any such supplement or amendment at or prior to the Closing.

(b)  Prior to the Closing, Seller shall promptly make available to Seller any Contracts that were required to be, but were not, listed in Section 5.11(a) of the Seller Disclosure Schedule on the date hereof. Each such Contract shall be deemed to be an Excluded Contract unless Purchaser upon written notice to Seller, delivered at or prior to the Closing, designates the Contract to be a Purchased Contract (in which case Seller shall seek Bankruptcy Court authority, pursuant to the Sale Order or other Order, to assume and assign such Contract to Purchaser at Closing or as soon thereafter as feasible), or a Transitional Contract (in which case such Contract shall be subject to the provisions of Section 8.21).

8.20  Post-Closing Obligations.  Following the Closing, Purchaser shall fulfill the following obligations (the "Post-Closing Commitments"):

(a)  From the Closing Date until the tenth (10th) anniversary of the Closing Date, Purchaser shall maintain an acute care hospital in Quincy, Massachusetts, providing at least the same scope of services as Seller currently provides and maintaining at least the same level of community benefits and charity care as Seller currently provides, and using the name "Quincy Medical Center" or some reasonably similar words in its name (hereinafter the "Successor Hospital"). Schedule 8.20(a) sets forth Seller's current community benefit and charity care policies.

(b)  From the Closing Date until the fifth (5th) anniversary of the Closing Date, and subject to Section 8.20(e), Purchaser shall expend or commit to expend (i) no less than Thirty-Four Million Dollars ($34,000,000) in the aggregate for capital

expenditures and investments to improve, furnish, equip and expand the services of the Successor Hospital, including no less than Fifteen Million Dollars ($15,000,000) to be expended or committed to be expended in the aggregate within the first twelve (12) months post-Closing and another Ten Million Dollars ($10,000,000) in the subsequent twelve (12) month period following the Closing (which amounts for both of said twelve (12)-month periods shall include Five Million Dollars ($5,000,000) in investment in information technology); provided that all such amounts shall qualify as capital expenditures under GAAP; and provided, further, that, with respect to the commitment of amounts with the time periods specified above, the amounts so committed shall be expended as soon as feasible following such commitment being made consistent with the nature of the project for which such committed funds are to be expended.

(c)    Beginning on the fifth (5th) anniversary of the Closing Date and until the tenth (10th) anniversary of the Closing Date, and subject to Section 8.20(e), Purchaser shall, in addition to capital investment for program expansions and service line developments, expend or commit to expend an average of between 110% and 125% of the annual depreciation expense of the Successor Hospital for the routine needs of such Hospital, such amount currently estimated to be no less than approximately $4,000,000 annually and approximately $20,000,000 over said five (5)-year period.

(d)    From the Closing Date until the fifth (5th) anniversary of the Closing Date, Purchaser shall not close or limit the services provided at the Successor Hospital immediately prior to the Closing Date. From the fifth (5th) through the tenth (10th) anniversaries of the Closing Date, Purchaser shall not close or limit the services provided at the Successor Hospital immediately prior to the Closing Date unless said Hospital has experienced negative operating margins in two (2) consecutive fiscal years, not taking into account the first three (3) fiscal years immediately following the Closing Date. For purposes of calculating operating margin under this Section 8.20(d): (i) GAAP will be applied to determine expenses and revenue; (ii) only expenses and revenues directly ascribed to the Successor Hospital will be used in such calculation, provided that general reasonable and necessary Steward corporate overhead may be allocated to the Successor Hospital for such purpose as long as such allocation is reasonable and proportional to the allocation of such overhead throughout the Steward system; and (iii) no debt service amounts, whether of principal or interest, will be included in such calculation. Notwithstanding the prior provisions of this Section 8.20(d), neither Purchaser nor any Affiliate or successor of Purchaser will close nor limit any services of the Successor Hospital, to the extent same is permitted under the terms of this Section 8.20(d), unless DPH has been provided with at least eighteen (18) months' prior written notice of any such intended closure or limitation. The provisions of this Section 8.20(d) are also subject to any applicable restrictions and covenants contained in the Deed.

(e)    As soon as practicable following the Effective Time, Purchaser shall form a local governing board at the Successor Hospital comprised of medical staff members, Quincy community leaders and appropriate executive officers. The local governing board shall be subject to the authority of Purchaser's board of directors and the terms of Purchaser's certificate of incorporation and bylaws and, subject to such authority, in accordance with 105 CMR 100.602(A) as applicable, shall be responsible

for the following decisions with respect to the Successor Hospital: (i) approval of borrowings in excess of Five Hundred Thousand Dollars ($500,000); (ii) additions or conversions which constitute substantial changes in service; (iii) approval of capital and operating budgets, including prioritization of capital investments; (iv) approval of the filing of any application for Determination of Need; (v) development of strategic plans for the community served by the Successor Hospital; (vi) medical staff credentialing; and (vii) community benefit planning. Seller shall, after having consulted with Purchaser, nominate the individuals to be appointed to the initial local governing board as of the Effective Time and Purchaser's board of directors shall appoint such individuals to the local governing board as of the Effective Time. Subsequent to the Effective Time, the members of the local governing board shall have the sole responsibility for nominating individuals for appointment to the local governing board from time to time, with Purchaser's board of directors appointing such individuals to the local governing board who are approved by the Chairman of Steward Health Care System LLC, which approval shall not be unreasonably withheld or delayed.

(f)     In connection with Purchaser's obligations under Section 8.20(b), (i) Purchaser shall ensure, subject to the availability and capabilities of third party vendors, the full deployment of Meditech 6.0 and Advance Clinical Systems and computerized physician order entry (CPOE) throughout the Successor Hospital over the first twelve (12) to eighteen (18) months following the Effective Time and (ii) Purchaser shall wire community-based physicians with medical staff privileges at the Successor Hospital who become a part of Steward Network Services, Inc. with electronic medical records in a manner compliant with applicable Law. Physicians providing services at the Successor Hospital who choose to contract through Steward Network Services, Inc. will have access to Purchaser's managed care contracts and medical management/care management ACO infrastructure, and medical malpractice insurance through TRACO (Steward's offshore captive insurance company), as well as Steward Quality and Safety Group's medical management systems. Physicians in leadership positions within the Successor Hospital's medical staff will have an opportunity to take leadership positions on Steward system-wide committees for quality and safety. The Successor Hospital's ICU beds will be included in Steward's electronic ICU monitoring system (eICU), providing 24/7 remote intensivist coverage.

(g)     As of the Effective Time, and for that period of time required by Law, Purchaser shall keep and preserve in their original form or in an electronic format all of Seller's Patient Records relating to services provided prior to the Effective Time ("Transferred Patient Records"). Purchaser shall maintain the Transferred Patient Records following the Effective Time in accordance with applicable Law and requirements of Medicare, Medicaid and third party payor programs. Upon reasonable notice, during normal business hours and upon Purchaser's receipt of appropriate consents and authorizations, as needed, Purchaser shall afford to representatives of Seller or its Affiliates, including their counsel, consultants and accountants, full and complete access to, and the right to make copies of, the Transferred Patient Records. In addition, Seller and its Affiliates shall be entitled to remove Transferred Patient Records from the premises at which Purchaser maintains such Records, but only for purposes of pending litigation involving a patient to whom such Records relate, as certified in writing prior to

removal by counsel retained by Seller or its Affiliate in connection with such litigation. Any Transferred Patient Records so removed from such premises shall be promptly returned to Purchaser following their use by Seller or its Affiliates. Before removal of any such Records, Seller and/or its Affiliates will provide a copy of the removed Transferred Patient Records to Purchaser.

(h)     Purchaser and Seller acknowledge the terms of Chapter 94 of the Acts of 1999, an Act Relative To Quincy Hospital.

8.21   Treatment of Transitional Contracts.   Listed on Schedule 1.1(d) are Transitional Contracts, which shall be treated as set forth in this Section 8.21. Purchaser may designate additional Transitional Contracts pursuant to Section 8.19. From and after the Closing, for a period not to exceed thirty (30) days, Purchaser shall be entitled to continue the benefit of such Transitional Contracts, which shall be neither assumed nor rejected by Seller prior to the time of the Closing. Purchaser shall be responsible for the payment of all obligations as well as otherwise honoring other then-current obligations of Seller under and with respect to such Transitional Contracts from and after the Closing, subject to the limitations provided hereinbelow. Not later than thirty (30) days after the Closing, Purchaser shall transmit to Seller one or more written designations of which Transitional Contracts Purchaser wishes to have Seller assign to it (the "Designated Contracts"), and Seller shall promptly after expiration of such 30-day period apply to the Bankruptcy Court for authority to assume and assign the Designated Contracts to Purchaser pursuant to Section 365 of the Bankruptcy Code. Any Transitional Contract not so designated by Purchaser shall be deemed to be an Excluded Contract and Seller may promptly seek an Order approving its rejection of such Contract pursuant to Section 365 of the Bankruptcy Code. Purchaser shall provide assurances for future performance of Designated Contracts and upon Seller's authorized assumption of such Contracts pay all cure amounts with respect thereto in accordance with Section 2.5 as if such Designated Contracts were Purchased Contracts. Purchaser's responsibility to pay or otherwise honor other post-Closing and then-current obligations of Seller under any Transitional Contract that is not a Designated Contract shall terminate with respect to any such obligations allocable to the period after the earlier of (i) the forty-fifth day after the Closing and (ii) the date of Seller's authorized rejection of such Transition Contract.

8.22   Treatment of Collective Bargaining Agreements.   Purchaser shall recognize as a bargaining unit each bargaining unit provided for under existing Collective Bargaining Agreements of Seller. Purchaser will negotiate with each union for entry of each bargaining unit into a new agreement under the terms and conditions of the so-called master agreement which exists as to the three unions and Purchaser's affiliated entities. As to any union not agreeing to the foregoing or not entering a new agreement under the so-called master agreement, the rights of the union, Seller and Purchaser shall be preserved.

# ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

9.1     Offers of Employment.  Not later than ten (10) Business Days prior to the Closing, Purchaser shall offer employment by Purchaser to each of the Employees who remain employed by Seller as of a recent date, as specified by Seller to Purchaser at least three Business Days in advance of Purchaser commencing delivery of such offers of employment, such employment to commence immediately following the Closing.  Seller shall deliver to Purchaser with such listing of Employees as of such date a reconciliation of such list with the list of Employees delivered to Purchaser pursuant to Section 5.14.  Purchaser shall likewise deliver as soon as practicable such an offer to any individual not included on such list but who is an Employee as of the Closing Date.  Each such offer of employment shall be at the same salary or hourly wage rate and position in effect immediately prior to the Closing.  Such individuals who accept such offer of employment are hereinafter referred to as the "Transferred Employees."  Pursuant to the "Standard Procedure" provided in Section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, (i) Purchaser and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees, and (iii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employees are employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by Seller.  Purchaser shall enter into an employment agreement with each Employee who is a physician that, subject to compliance review, contains substantially similar compensation terms as such Employee's employment agreement with Seller.

9.2     Employment Terms; Employee Benefits.

(a)     Purchaser shall provide, or cause to be provided, for a period ending not earlier than the end of the third month following the Closing Date or such longer period of time required by applicable Law, to each of the Transferred Employees, base wage and salary levels provided to such Employees immediately prior to Closing.  Purchaser shall provide each Transferred Employee with employee benefits consistent with similarly-situated employees of Purchaser (provided that nothing in this Section 9.2 shall require Purchaser to pay severance to any Transferred Employee).

(b)     For purposes of eligibility and vesting (but not benefit accrual) under the employee benefit plans of Purchaser providing benefits to Transferred Employees (the "Purchaser Plans"), Purchaser shall credit each such Transferred Employee with his or her years of service with Seller or any ERISA Affiliate and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan provided that the foregoing shall not apply to the extent it would result in any duplication of benefits for the same period of service.  Purchaser shall (i) cause to be waived any applicable pre-existing condition exclusions and waiting periods with respect to participation and coverage requirements in any welfare benefit plan of Purchaser that a

Transferred Employee is eligible to participate in following the Closing Date to the extent such exclusions or waiting periods were inapplicable to, or had been satisfied by, such Employee immediately prior to the Closing Date under the analogous Employee Benefit Plan in which such Employee participated or was eligible to participate and (ii) provide each such Transferred Employee with credit for any co-payments and deductible amounts paid prior to the Closing Date (to the same extent such credit was given under the analogous Employee Benefit Plan prior to the Closing Date) in satisfying any applicable deductible or out-of-pocket requirements.

(c)    Effective as of the Closing Date, Purchaser shall have, or shall cause one of its Affiliates to have, in effect flexible spending reimbursement accounts under a cafeteria plan qualified under Section 125 of the Code (the "Purchaser Cafeteria Plan") in which the Transferred Employees can participate. Purchaser shall, or shall cause one of its Affiliates to, allow Transferred Employees who participated as of the Closing Date (collectively, the "Cafeteria Plan Participants") in a Seller employee benefit plan that is qualified under Section 125 of the Code (a "Seller Cafeteria Plan") to participate in the Purchaser Cafeteria Plan effective as of the Closing Date. During the period from the Closing Date until the last day of the plan year of the Seller Cafeteria Plan that commenced immediately prior to the Closing Date, Purchaser shall, or shall cause one of its Affiliates to, continue the salary reduction elections made by the Cafeteria Plan Participants as in effect as of the Closing Date, and to allow each Cafeteria Plan Participant to receive reimbursement from such participant's flexible spending reimbursement account under the Purchaser Cafeteria Plan on the same terms and conditions as would have been applicable to such participant had such participant continued to be employed by Seller during such period. As soon as practicable following the Closing Date, Seller shall transfer to Purchaser the excess, if any, of the aggregate accumulated contributions to the flexible spending reimbursement accounts made by Cafeteria Plan Participants prior to the Closing during the plan year in which the Closing occurs over the aggregate reimbursement payouts paid to the Cafeteria Plan Participants for such plan year from such accounts prior to the Closing.

(d)    Subject to Seller's compliance with Section 9.1 and except as provided in Section 9.2(a), nothing contained in this Agreement shall be construed (i) to prevent the termination of employment of any individual Employee or Transferred Employee, (ii) to grant any Employee a right to continued employment with Purchaser or (iii) to limit the ability of Purchaser to amend or terminate any benefit or compensation program, and nothing contained herein shall be construed as an amendment to or modification of any such plan.

# ARTICLE X

## CONDITIONS TO CLOSING

10.1   <u>Conditions Precedent to Obligations of Purchaser</u>.   The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)   The representations and warranties of Seller set forth in <u>Sections 5.1</u> (Organization and Good Standing), <u>5.2</u> (Authorization of Agreement), <u>5.3</u> (Contravention; Consents of Third Parties; Contractual Consents), <u>5.4</u> (Financial Statements) and <u>5.15</u> (Compliance with Laws) (collectively, the "<u>Fundamental Representations and Warranties</u>"), as they are qualified by materiality and by Knowledge of Seller, shall be true and correct at and as of the date hereof and at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect.

(b)   The representations and warranties of Seller set forth in this Agreement other than the Fundamental Representations and Warranties (the "<u>Non-Fundamental Representations and Warranties</u>") that are qualified as to materiality shall be true and correct, and the Non-Fundamental Representations and Warranties not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect; provided, however, that this condition shall be deemed to be satisfied unless any breaches of such representations or warranties individually or in the aggregate have had or are reasonably likely to have a Material Adverse Effect.

(c)   Seller shall have performed and complied in all respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect.

(d)   Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 4.2</u>.

(e)   There shall have been no Material Adverse Effect since the Seller Balance Sheet Date, nor shall any event have occurred which would reasonably be expected to result in a Material Adverse Effect.

(f)     Purchaser shall have received issued title policies in the form of the title insurance commitment, dated May 31, 2011, issued by First American Title Insurance Company, subject only to Permitted Exceptions.

10.2     Conditions Precedent to Obligations of Seller. The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3; and

(d)     At or prior to the Closing, Purchaser shall have cured, or made arrangements reasonably satisfactory to Seller, to promptly cure, any and all defaults under the Purchased Contracts, Personal Property Leases, Purchased Real Property Leases, Purchased Permits or Purchased Intellectual Property that are required to be cured under the Bankruptcy Code, so that they may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code.

10.3     Conditions Precedent to Obligations of Purchaser and Seller. The respective obligations of Purchaser and Seller to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived jointly by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(b)     the Bankruptcy Court shall have entered the Sale Order;

(c)     the waiting period applicable to the Contemplated Transactions by this Agreement under the HSR Act, if any, shall have expired or early termination in respect thereof shall have been granted; and

(d)     the parties shall have received the consents or approvals required by Section 5.3, if applicable, and the consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies identified in Schedule 10.3(d) and shall have given the notices required by Schedule 10.3(d), and none of the Healthcare Regulatory Consents shall contain any extraordinary restrictions on Purchaser's operation of the Business not contemplated by this Agreement.

10.4    Frustration of Closing Conditions.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, to excuse it from consummating the Contemplated Transactions if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## INDEMNIFICATION; REMEDIES

11.1    Survival.  Notwithstanding any right of any party to fully investigate the affairs of another party and notwithstanding any knowledge of facts determined or determinable by such party pursuant to such investigation or right of investigation, each party has the right to rely fully upon the representations, warranties, covenants and agreements of each other party in this Agreement, the Seller Documents or the Purchaser Documents, as applicable, the Seller Disclosure Schedule, the Purchaser Disclosure Schedule or in any certificate, financial statement, instrument or other document delivered by any party pursuant hereto.  All such representations, warranties, covenants and agreements shall survive the execution and delivery hereof and the Closing hereunder, subject to the limitations set forth in Section 11.4.

11.2    Indemnification.

(a)     Obligation of Seller to Indemnify.  After the Closing Date, Seller shall indemnify, defend and hold harmless Purchaser (and its directors, officers, stockholders, employees, agents, Affiliates and assigns, and Cerberus Capital Management and its directors, officers, stockholders, employees, agents, Affiliates and assigns) (collectively, the "Purchaser Parties") from and against all losses, liabilities, damages, deficiencies, costs or expenses, including interest and penalties imposed or assessed by any judicial or administrative body and reasonable attorneys' fees, whether or not arising out of third-party claims and including all amounts paid in investigation, defense or settlement of the foregoing pursuant to ARTICLE XI ("Losses") resulting from, based upon or relating to:

(i)     any misrepresentation or breach, as of the date of this Agreement or as of the Closing Date, of any representation or warranty of Seller contained in this Agreement, the Seller Disclosure Schedule, the Seller

Documents or any certificate, financial statement, instrument or other document furnished by Seller to Purchaser pursuant to this Agreement or the Seller Documents;

(ii)    any failure to perform any covenant or agreement of Seller contained in this Agreement, the Seller Documents or any certificate, financial statement, instrument or other document furnished by Seller to Purchaser pursuant to this Agreement or the Seller Documents; and

(iii)    any Excluded Asset or Excluded Liability, including, without limitation, any and all liabilities and obligations for Taxes arising from or with respect to the Purchased Assets or the Business which are included in or attributable to a Pre-Closing Tax Period, subject to the limitations set forth in Section 2.3(d) and ARTICLE XII hereof.

(b)    Obligation of Purchaser to Indemnify.  After the Closing Date, Purchaser shall indemnify, defend and hold harmless Seller (and its directors, officers, employees, agents, Affiliates and assigns) (collectively, the "Seller Parties") from and against all Losses (as defined in Section 11.2(a)), resulting from, based upon or relating to:

(i)    any misrepresentation or breach, as of the date of this Agreement or as of the Closing Date, of any representation or warranty of Purchaser contained in this Agreement, the Purchaser Documents or any certificate, instrument or other document furnished by Purchaser to Seller pursuant to this Agreement or the Purchaser Documents; and

(ii)    any failure to perform any covenant or agreement of Purchaser contained in this Agreement, the Purchaser Documents or any certificate, instrument or other document furnished by Purchaser to Seller pursuant to this Agreement or the Purchaser Documents.

11.3    Satisfaction of Indemnification Claims.  Subject to Section 11.4, any claim against Seller Parties for Losses under Section 11.2(a) shall be payable solely from the Retained Deposit prior to the payment thereof as provided for in Section 3.2.  Subject to Section 11.4, any claim against Purchaser Parties for Losses under Section 11.2(b) shall be payable by Purchaser in cash, by wire transfer, check or other method acceptable to Seller.

11.4    Limitation on Indemnification.  The indemnification obligations of the parties under this ARTICLE XI shall be subject to the following limitations:

(a)    Time Limitations on Claims.  No indemnification shall be payable pursuant to Section 11.2 with respect to claims made following the Escrow Expiration Date.

(b)    Threshold on Losses.  No Losses shall be paid pursuant to Section 11.2 unless and until the aggregate claims for Losses exceed $100,000, after which the

Seller Parties or the Purchaser Parties, as the case may be, shall, subject to Section 11.4(c), be entitled to all Losses in excess of $100,000.

(c)    Ceiling on Claims for Purchaser Parties' Losses.  The maximum aggregate liability of Seller for indemnification to Purchaser Parties under Section 11.2(a) shall not exceed $500,000.

11.5    Indemnification Procedures.

(a)    Notice of Claim.  Promptly after receipt of notice of any Losses for which a Seller Party or a Purchaser Party seeks indemnification hereunder (any such Party for purposes of this Section 11.5, an "Indemnified Party") , such Party shall give written notice thereof to the Purchaser or the Seller, as the case may be (either being the "Indemnifying Party" for purposes of this Section 11.5), demanding payment of an indemnification claim arising under Section 11.2(a) or 11.2(b), as the case may be (a "Demand"), and, if the Escrow Expiration Date has not elapsed and the claim is made by an Indemnified Party that is a Purchaser Party, copying the Escrow Agent.  Such Demand shall describe in reasonable detail the nature of the claim, an estimate of the amount of Losses attributable to such claim and the basis of the Indemnified Party's request for indemnification under this Agreement.  No delay on the part of an Indemnified Party in notifying the Indemnifying Party under this Section 11.5 shall relieve any party from any obligation hereunder, except to the extent that an Indemnified Party shall have been adversely affected by such delay.

(b)    Response to a Demand.  The Indemnifying Party may reply to a Demand made under Section 11.5(a) hereof by written notice given to the Indemnified Party and, if the Escrow Expiration Date has not elapsed and a Purchaser Party is the Indemnified Party, the Escrow Agent, which notice shall state (i) whether the Indemnifying Party agrees or disagrees that the claim asserted is a valid claim under this Agreement and agrees or disagrees with respect to the amount of the Losses in such Demand and (ii) if the Indemnifying Party disagrees with either the validity of such claim or the amount of such Losses, the basis for such disagreement.

(i)    If the Indemnified Party is a Purchaser Party, the Escrow Expiration Date has not elapsed, and if Seller does not give such Indemnified Party and the Escrow Agent a notice disputing such Demand specifying the nature and amount of such dispute within thirty (30) days after receipt of the Demand (the "Indemnity Notice Period") or if Seller gives notice that such Demand is uncontested, then the Escrow Agent shall release from the Deposit and deliver to Purchaser the amount of the Losses stated in the Demand (to the extent that such Losses do not exceed the Retained Deposit).  If the notice from Seller admits that a portion of the Demand is a valid claim under Section 11.2(a) of this Agreement and the remaining portion of the Demand is disputed, the Escrow Agent shall disburse to Purchaser only such amounts from the Retained Deposit as are allocable to mutually agreed Losses (to the extent that such agreed Losses do not exceed the Retained Deposit) and the disputed portion of such Demand shall be resolved in accordance with Section 11.5(c).

(ii)    If the Indemnified Party is a Seller Party, and the Indemnifying Party does not give the Indemnified Party a notice disputing such Demand and specifying the nature and amount of such dispute within the Indemnity Notice Period or the Indemnifying Party gives notice that such Demand is uncontested, then the Indemnifying Party shall deliver payment to the Indemnified Party in cash an amount equal to the value of the Losses stated in the Demand within the fifteen (15) days of the earlier of expiration of such Indemnity Notice Period or notice that the Demand is uncontested.  If the notice from the Indemnifying Party admits that a portion of the Demand is a valid claim under Section 11.2(b), and the remaining portion of the Demand is disputed, the Indemnifying Party shall pay to the Indemnified Party in cash an amount equal to the value of the Losses as are allocable to mutually agreed upon Losses within the fifteen (15) days of delivery of such notice from the Indemnifying Party and the disputed portion of such Demand shall be resolved in accordance with Section 11.5(c).

(c)    Disputed Claims.  If the notice given by the Indemnifying Party as provided in Section 11.5(b) hereof disputes all or part of the claim or claims asserted in the Demand by the Indemnified Party or the amount of Losses thereof, within the Indemnity Notice Period (a "Disputed Claim"), then, to the extent of the disputed portion of the Demand, the Demand shall be treated as a Disputed Claim and, if a Purchaser Party is the Indemnified Party and the Escrow Expiration Date has not elapsed, the amount of such claim shall be held by the Escrow Agent.  The Parties hereto shall make a reasonable good faith effort to resolve their differences for a period of thirty (30) days following the Indemnity Notice Period asserting a Disputed Claim.  Subject to the provisions of Sections 11.3 and 11.4, the Escrow Agent shall not disburse any Escrow Funds as to a Disputed Claim until the final adjudication of Seller's liability to a Purchaser Party.

(d)    Third Party Claims.  In the event that any Legal Proceedings shall be instituted by any third party in respect of Losses for which payment may be sought under Section 11.2 hereof (a "Third Party Claim"), the Indemnified Party shall reasonably and promptly cause written notice of the assertion of any Third Party Claim of which it has knowledge which is covered by this indemnity to be forwarded to the Indemnifying Party.  The Indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the Indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Third Party Claim which relates to any Losses indemnified against hereunder.  An election to assume the defense of such claim or demand shall be an admission that such claim is within the scope of the indemnification obligations hereunder of the Indemnifying Party.  If the Indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Third Party Claim which relates to any Losses indemnified against hereunder, it shall within thirty (30) days (or sooner, if the nature of the Third Party Claim so requires) notify the Indemnified Party of its intent to do so.  If the Indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Third Party Claim which relates to any Losses indemnified against hereunder, the Indemnified Party may defend against, negotiate, settle or otherwise deal with such

Third Party Claim. If the Indemnifying Party has assumed the defense of any Third Party Claim, the Indemnified Party may participate, at his or its own expense, in the defense of such Third Party Claim; provided, however, that the Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the Indemnifying Party if (i) so requested by the Indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the Indemnified Party a conflict or potential conflict exists between the Indemnified Party and the Indemnifying Party that would make such separate representation advisable; and provided, further, that the Indemnifying Party shall not be required to pay for more than one such counsel for all Indemnified Parties in connection with any Third Party Claim. The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Third Party Claim. Notwithstanding anything in this Section 11.5 to the contrary, neither the Indemnifying Party nor the Indemnified Party shall, without the written consent of the other party, settle or compromise any Third Party Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the Third Party Claim. Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant, and the Indemnifying Party notifies the Indemnified Party in writing of the Indemnifying Party's willingness to accept the settlement offer and pay the amount called for by such offer, and the Indemnified Party declines to accept such offer, the Indemnified Party may continue to contest such Third Party Claim, free of any participation by the Indemnifying Party, and the amount of any ultimate liability with respect to such Third Party Claim that the Indemnifying Party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the Indemnified Party declined to accept plus the Losses of the Indemnified Party relating to such Third Party Claim through the date of its rejection of the settlement offer or (B) the aggregate Losses of the indemnified party with respect to such Third Party Claim. If the Indemnifying Party makes any payment on any Third Party Claim, the Indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Indemnified Party to any insurance benefits or other claims of the Indemnified Party with respect to such Third Party Claim. After any final decision, judgment or award shall have been rendered by a Governmental Body of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement with respect to a Third Party Claim hereunder, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by the Indemnifying Party pursuant to this Agreement with respect to such matter.

　　11.6　Calculation of Losses. The amount of any Losses for which indemnification is provided under this ARTICLE XI shall be net of any amounts actually recovered or recoverable by the Indemnified Party under insurance policies or otherwise with respect to such Losses (net of any Tax or expenses incurred in connection with such recovery).

　　11.7　Tax Treatment of Indemnity Payments. Seller and Purchaser agree to treat any indemnity payment made pursuant to this ARTICLE XI as an adjustment to the Purchase Price solely for federal, state, local and foreign income tax purposes.

11.8    Exclusivity.    Except for claims for fraud, fraudulent concealment, intentional misrepresentation or willful misconduct, and subject to Section 11.10, the indemnities set forth in this ARTICLE XI shall be the exclusive remedies of the parties from and after the Closing for any misrepresentation, breach of warranty or nonfulfillment or failure to perform any covenant or agreement contained in this Agreement, and the parties shall not be entitled to any further indemnification rights or claims of any nature whatsoever in respect thereof.

11.9    No Consequential Damages.    Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

11.10    Specific Performance.

(a)    The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms (including failing to take such actions as are required of them hereunder to consummate the Contemplated Transactions) or were otherwise breached. In the event of any breach or threatened breach by any other party of any covenant or obligation contained in this Agreement, the non-breaching party shall be entitled to specific performance of the observance and performance of such covenant or obligation.

(b)    Each party acknowledges and agrees that (i) it will not oppose any relief or remedy referred to in this Section 11.10 on the grounds that any other remedy is available at law or in equity, and (ii) no party hereto will be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 11.10 (and it hereby irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument). A party that obtains specific performance of any covenant or obligation also shall be entitled to receive an award of reasonable attorneys' fees and costs incurred in obtaining specific performance.

(c)    If Seller or Purchaser terminates this Agreement as permitted by this Agreement, then the party so terminating this Agreement may not thereafter seek specific performance of this Agreement or any covenant or obligation hereunder.

## ARTICLE XII

## TAXES

12.1    Transfer Taxes.    Purchaser shall be responsible for (and shall indemnify and hold harmless Seller and its directors, officers, employees, Affiliates, agents, successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions

("Transfer Taxes"). To the extent that any Transfer Taxes are required to be paid by Seller (or such Transfer Taxes are assessed against Seller), Purchaser shall promptly reimburse Seller, as applicable, for such Transfer Taxes. Seller and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes. Seller and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds to Transfer Taxes.

12.2    Taxes. Purchaser shall be responsible for all real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date. If any Taxes subject to this Section 12.2 are paid prospectively by Seller, the amount of such Taxes paid shall be paid promptly by Purchaser to Seller.

12.3    Purchase Price Allocation. Purchaser shall prepare or cause to be prepared a statement (the "Allocation Statement") allocating among the Purchased Assets the Purchase Price (including, without limitation, all Assumed Liabilities) for the Purchased Assets as set forth in this Agreement. Such statement shall be prepared in accordance with the provisions of Section 1060 of the Code and the Treasury Regulations thereunder. Purchaser shall provide a copy of such Allocation Statement to Seller. Purchaser and, if applicable, Seller, shall file or cause to be filed IRS Form 8594 for its taxable year that includes the Closing Date in a manner consistent with the allocation set forth on the Allocation Statement. Purchaser and Seller shall not take any position on any Tax Return or in the course of any Tax audit, review, or litigation inconsistent with the allocation provided in the Allocation Statement. In the event that any adjustment is required to be made to the Allocation Statement as a result of the payment of any additional purchase price for the Purchased Assets or otherwise, Purchaser shall prepare or cause to be prepared, and shall provide to the Seller, a revised Allocation Statement reflecting such adjustment. Purchaser and, if applicable, Seller, shall file or cause to be filed a revised IRS Form 8594 reflecting such adjustment for its taxable year that includes the event or events giving rise to such adjustment. Purchaser and Seller shall not take any position on any Tax Return or in the course of any Tax audit, review, or litigation inconsistent with the allocation provided in the revised Allocation Statement.

12.4    Cooperation. Purchaser, Seller and the Subsidiaries of Seller shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to ARTICLE XII and any audit, litigation or other proceeding with respect to Taxes. Subject to Section 8.16 regarding the retention period for Seller's records, such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

# ARTICLE XIII

# MISCELLANEOUS

13.1    <u>Expenses</u>. Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

13.2    <u>Submission to Jurisdiction; Consent to Service of Process</u>.    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 13.6</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state court of competent jurisdiction sitting in Norfolk or Suffolk County (Massachusetts) and any appellate court from any thereof, for the resolution of any such claim or dispute.    The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.    Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 13.6</u>.

13.3    <u>Waiver of Right to Trial by Jury</u>. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.4    <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the schedules and exhibits hereto) and the Confidentiality Agreement represent the entire understanding and agreement among the parties hereto with respect to the subject matter hereof.    This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.    No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.    The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or

subsequent breach.   No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.5   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts applicable to contracts made and performed in such Commonwealth, without regard to the conflict of laws provisions thereof.

13.6   Notices.  All notices required and other communications provided for by this Agreement will be in writing, will be addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder, and will be either (i) delivered by hand (ii) made by facsimile transmission, (iii) sent by overnight courier, or (iv) sent by certified mail, return receipt requested, postage prepaid:

| | |
|---|---|
| If to Seller, to: | Quincy Medical Center, Inc.<br>114 Whitwell Street<br>Quincy, MA  02169<br>Attn:  Interim CEO<br>Fax: |
| With a copy not constituting notice to: | Mintz Levin<br>One Financial Center<br>Boston, MA  02111<br>Attn:  Stephen M. Weiner, Esq.<br>Fax: (617) 542-2241 |
| If to Purchaser, to: | Steward Medical Holdings Subsidiary Five, Inc.<br>c/o Steward Health Care System LLC<br>500 Boylston Street, 5th Floor<br>Boston, MA  02116<br>Attn:  Joseph Maher, Esq.<br>Fax: (617) 419-4800 |
| With a copy not constituting notice to: | Edwards Angell Palmer & Dodge LLP<br>111 Huntington Avenue<br>Boston, MA  02199<br>Attn:  Gerald Hendrick, Esq.<br>Fax:  (888) 325-9111 |

or such other address as either party will advise the other party by notice delivered in accordance with the foregoing.

All notices and other communications hereunder will be deemed to have been given (i) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (ii) if made by facsimile transmission, at the time that receipt thereof has been acknowledged by electronic confirmation or otherwise, (iii) if sent by courier, on the next business day; or (iv) if sent by certified mail, on the fifth business day following the day such mailing is made.

13.7    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Contemplated Transactions is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Contemplated Transactions are consummated as originally contemplated to the greatest extent possible.

13.8    Binding Effect; No Third-Party Beneficiaries; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, provided however that Purchaser's obligations and performance under this Agreement are subject to the approval of the Bankruptcy Court as contemplated by ARTICLE VII.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other party hereto and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may assign its right to acquire any or all of the Purchased Assets and its other rights hereunder to an entity wholly owned by it that also assumes all of Purchaser's obligations hereunder (but such assumption shall not relieve Purchaser of its obligations hereunder), with the consent of Seller, which shall not be unreasonably withheld.  No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

13.9    No Personal Liability.  In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant

hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the liability of any person for his or her fraudulent acts).

13.10  Estate Representative.    For purposes of Seller's enforcement of this Agreement, Seller shall be deemed to include any successor or assign of Seller or any authorized representative of Seller's bankruptcy estate, including without limitation any chapter 7 or chapter 11 trustee appointed in the Bankruptcy Case or any estate representative appointed under a chapter 11 plan of Seller.

13.11  Counterparts.    This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as a sealed instrument by their respective officers thereunto duly authorized, as of the date first written above.

SELLER:

Quincy Medical Center, Inc.

By: _Grace Murphy McAuliffe_    6/30/11
Name: _Grace Murphy McAuliffe_
Its: _Chair, Board of Trustees_

QMC ED Physicians, Inc.

By: _John N. Kastanis_
Name: _John N. Kastanis_
Its: _President_

Quincy Physician Corporation

By: _John N. Kastanis_
Name: _John N. Kastanis_
Its: _President_

[Signature Page to Asset Purchase Agreement]

PURCHASER:

Steward Medical Holdings Subsidiary Five, Inc.

By: _____
Name: Joseph C. Maher, Jr., Esq.
Its:     Secretary

STEWARD:

Steward Medical Holdings LLC

By: Steward Health Care System LLC, its
Managing Member

By: _____
Name: Joseph C. Maher, Jr., Esq.
Its:     Secretary

[Signature Page to Asset Purchase Agreement]

Solely for purposes of <u>Sections 3.2</u>, <u>3.4</u> and <u>11.5</u>:

ESCROW AGENT:

First American Title Insurance Company

By: _John Allen_
Name: _Jo-Ann Allen_
Its: _Underwriting Counsel_

EXHIBIT A

BILL OF SALE

**(To be completed prior to Closing)**

# EXHIBIT B

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**(To be completed prior to Closing)**

## EXHIBIT C

## FORM OF DEED

## (To be completed prior to Closing)

# EXHIBIT D

## MEDICAL SERVICES AGREEMENT

**(In process)**