UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| QUINCY MEDICAL CENTER, INC., | ) |
| QMC ED PHYSICIANS, INC., | ) Case No. 11-16394 |
| QUINCY PHYSICIAN CORPORATION | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

**DEBTORS' MOTION FOR AN ORDER (A) APPROVING PROCEDURES
GOVERNING PROPOSED SALE OF SUBSTANTIALLY ALL ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES (INCLUDING RELATED
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES); (B) APPROVING FORM AND MANNER
OF NOTICE OF SALE; AND (C) GRANTING RELATED RELIEF
[EMERGENCY FIRST-DAY RELIEF BY JULY 6 REQUESTED]**

Quincy Medical Center, Inc. ("QMC"), QMC ED Physicians, Inc. ("QED") and Quincy

Physician Corporation ("QPC" and, with QMC and QED, the "Debtors" or the "Company")

hereby move this Court pursuant to Sections 363 and 365 of the Bankruptcy Code, Fed. R. Bankr. P.

2002, 6004 and 6006 and MLBR 6004-1, for an order establishing certain procedures for the

Company's proposed sale of substantially all of the Company's assets utilized by the Company in

operating its business, including without limitation the Company's (i) interests in real property,

including the Company's fee interest in real property improved by its 196-bed acute care hospital

(the "Hospital"), (ii) personal property (including equipment, furniture and inventory used to

operate the Hospital), (iii) third-party payor contracts and provider numbers under which the

Company collects most of its revenue from government and third-party payors, and other unexpired

leases and executory contracts as designated by purchaser (the "Assigned Agreements"), and (iv)

accounts receivable, work in process, intellectual property (including the Quincy Medical Center

name), and other miscellaneous, specified assets (collectively, the "Assets"), to Steward Medical

Holdings Subsidiary Five, Inc. ( "Steward") or such other entity that submits the highest or otherwise best offer to acquire the Assets pursuant to the sale procedures proposed by the Company herein (the "Proposed Sale").  The Proposed Sale is to be made pursuant to the Asset Purchase Agreement between the Company and Steward (the "APA") attached as Exhibit A to the Debtor's Motion for Authority to Sell Substantially All Assets (Including Through Assumption and Assignment of Executory Contracts) Pursuant to Sections 363 and 365 of the Bankruptcy Code and Court-Approved Sale Procedures dated July 1, 2011 and filed concurrently herewith (the "Sale Motion").  Pursuant to the APA, Steward has agreed, in consideration of the Company's sale of the Assets to Steward, to pay the Cash Purchase Price to the Company in the amount of up to $38,000,000, to assume the Assumed Liabilities, and to perform the Post-Closing Commitments, all as specified in the APA and summarized in the Sale Motion.

The Proposed Sale of the Assets is to be made free and clear of all liens, claims and encumbrances except as otherwise provided for by the APA.  The sale of the Assets is also subject to the approval of (i) the Massachusetts Department of Public Health through its issuance of a Determination of Need with respect to Steward's post-Closing operation of the Hospital and (ii) the Office of the Attorney General of Massachusetts (the "Mass. AGO") on account of the Company's status as nonprofit corporations and the necessity of ensuring that Steward's proposed acquisition of substantially all of the Company's assets complies with Massachusetts law governing the Company and its mission as nonprofit corporations.

Notwithstanding Steward's submission of the APA and the offer contained therein to acquire the Assets, the Company intends to sell the Assets to whichever entity submits the highest or otherwise best offer to acquire the Assets as determined through the sale procedures proposed herein (the "Sale Procedures").  **The requested Sale Procedures will govern the solicitation of competing bids to acquire the Company's Hospital and related assets.  In order that the**

2

winning bidder can quickly be identified and the regulatory process completed by the

desired closing date of October 1, 2011, it is essential that the procedures that will govern the

sale process be promptly approved.  The proposed cash collateral order negotiated with the

Company's bondholders requires that the Company obtain approval of the proposed Sale

Procedures by July 6 as a condition to the continued consensual use of cash collateral.  For

these reasons, the Company requests that this Court schedule a hearing on this Motion with

the other first-day motions for which a hearing has been requested by no later than July 6,

2011.

As grounds for this Motion and for approval of the proposed Sale Procedures, the

Company states as follows:

## I.    Background

**A.    Introduction**

1.      On June 30, 2011 (the "Petition Date"), each of QMC, QED and QPC filed a

voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court

for the District of Massachusetts.  Pursuant to their respective motions for joint administration and

by operation of MLBR 1015-1(c), their Chapter 11 cases are being jointly administered for

procedural purposes only.

2.      Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Company

continues to manage its businesses and financial affairs as debtors-in-possession.  No creditors'

committee has yet been appointed in these cases.

3.      The Company is a non-profit corporation formed to provide quality medical care,

including emergency care, to the Quincy, Massachusetts community and surrounding communities.

QMC's signature asset is its 196-bed acute care hospital (the "Hospital") located in Quincy,

Massachusetts.  QMC operates the Hospital, and related medical and health care facilities.  QED

and QPC are captive entities as to QMC.  Their sole purpose is to own certain third-party payor

contracts and provider numbers under which QMC services are billed to third-party payers, and

neither QED nor QPC owns any assets other than these provider numbers and contracts, nor do

they have any other business relationships.  All of the revenues generated under the provider

numbers and contracts are remitted to QMC.  QMC, QED and QPC operate as a single business

enterprise—Quincy Medical Center—and to that end have administered their business and financial

affairs on a consolidated basis; the Company accounts for all operations and financial matters on a

consolidated basis and maintains no separate accounting of QED or QPC revenues or expenses.

    4.    The Company has filed for Chapter 11 for the purpose of consummating a sale of its

assets on a going concern basis to Steward pursuant to the APA.  The Company selected Steward as

the best-qualified acquirer of the Company's business after conducting, with the assistance of its

financial and legal advisors, an extensive solicitation process directed toward identifying the potential

acquirer best able to promote the interests of the Company and its stakeholders, taking into account

such factors as financial considerations, and commitments to improve the Hospital's physical plant

and to promote the Company's non-profit mission to provide quality medical care to the Quincy

community.  A more detailed explication of the Company's mission as a non-profit hospital, the

circumstances leading to its decision to solicit an acquiring partner, and its selection of Steward as its

preferred partner are set forth in the Sale Motion.

**B.**    <u>**Necessity for Prompt Sale Process**</u>

    5.    The Company has entered Chapter 11 with the hope and expectation that the

Proposed Sale can be consummated by no later than the end of October 2011.  This time-frame

reflects the Company's belief that a prolonged stay in Chapter 11 would adversely impact the

Company's business, particularly due to a decreased ability to attract patients while in Chapter 11,

including as a result of physicians' possible reluctance to refer  patients to the Hospital while it

operates in Chapter 11, and because of foreseeable cash flow issues if closing of the Proposed Sale

were delayed past that time.  As noted, the Proposed Sale is subject to certain regulatory approvals

that the Company is hopeful of obtaining as soon as mid-September 2011.  In order that the

Proposed Sale may of close promptly after regulatory approval is obtained, the Company desires to

initiate the sale process quickly, with the hope of soliciting competing bids during July, conducting

an auction among qualified bidder as soon as possible consistent with the requirements of the

Bankruptcy Code and Rules and the calendar of the Bankruptcy Court, and obtaining regulatory, and

thereafter Bankruptcy Court approval of the Proposed Sale by mid-September at the latest.  The Sale

Procedures proposed herein are intended to provide the greatest opportunity for a successful sale of

the Assets within that time frame.

**C.**     **Sale Effort to Date**

        6.      The Proposed Sale and Steward's offer to acquire the Assets embodied in the APA

resulted from an extensive prepetition sale effort conducted by the Company.  After deciding to

explore strategic alternatives, the Company on March 1, 2011 engaged Navigant Capital Advisors,

LLC and Navigant Consulting, Inc. (together, "Navigant"), a specialty investment banking and

consulting firm with substantial expertise in mergers and acquisitions in the hospital and medical

services industry, to serve as the Company's financial advisor.  Navigant's engagement was directed

to two principal tasks:  one, to assist the Company in assessing potential strategic initiatives,

including potential merger or sale of the Company, and to help the Company implement any chosen

course of action; and two, to provide operational and financial advice and  support services to

promote the more efficient operation of the Company as it pursued its strategic alternatives.

        7.      Upon its engagement, Navigant assisted the Company in assessing various strategic

and operational initiatives.  These efforts were directed to positioning the Company to prosper in an

increasingly competitive and regulated industry while protecting the Company's nonprofit,

community-oriented mission.  Recognizing the consolidation underway in the hospital industry, the

Company under Navigant's guidance determined that remaining an independent hospital was

unlikely to promote the Hospital's survival as a viable business enterprise.  Consequently, the

Company decided to explore the level of interest for acquisition of the Hospital, focusing on

potential acquirers best-suited to promote the Company's nonprofit, community-oriented mission.

8.      Navigant spearheaded the Company's sale solicitation effort.  It worked with

Company management to position the Company for potential sale, including through preparation

and review of marketing materials and other due diligence items contained in a virtual data room,

compiling a list of potential acquirers, working with the Company and its counsel to prepare for the

planned sale, and providing sale-related advice to the Company.  Commencing in early April, 2011,

Navigant solicited 23 potential buyers, including significant national or regional health care

companies such as HCA, Inc., Community Health Systems, Inc., Partners Healthcare System, and

Vanguard Health Systems, as well as local institutions such as Atrius Health, Beth Israel Deaconess

Medical Center, and Tufts Medical Center.  Ten companies executed a confidentiality and non-

disclosure agreement that entitled them to conduct due diligence about the Company.  Only two

companies submitted a formal, written proposal to acquire the Company by the late May deadline

established by the Company—Steward Health Care System LLC ("Steward"), a Boston-based owner

of eight hospitals in eastern Massachusetts and Rhode Island (with two additional hospitals under

agreement) that is actively engaged in expanding its network of community-based hospitals, and

Vanguard Health Systems ("Vanguard"), headquartered in Nashville, Tennessee, which owns over

20 hospitals in various locations around the United States.

9.      During June 2010, Navigant and the Company continued discussions and

negotiations toward refined acquisition offers from each of Steward and Vanguard, and with the

Company's legal advisors worked toward definitive asset purchase agreements with each suitor.

These continued negotiations led to the Company's decision on June 27, 2011 to accept (subject to Bankruptcy Court approval after conclusion of the Court-authorized sale process) Steward's offer embodied in the APA. The Company then filed its Chapter 11 case and the Sale Motion in order to effectuate the Proposed Sale and thereafter provide for the distribution of sale proceeds (and other estate assets) in accordance with the priority scheme set forth in the Bankruptcy Code. The Company anticipates that it will soon file a plan of liquidation addressing the distribution of sale proceeds, and that it will seek confirmation of the plan contemporaneously with, or shortly after, approval of the Proposed Sale.

## II.   Sale Process

10.     By this motion, the Company seeks approval of the prospective solicitation program intended to attract competing bids for the Assets, and of the sale procedures proposed to govern the submission, and the Company's and its creditors consideration, of competing offers to acquire the Assets. The solicitation program contemplated herein is intended to inform,[1] in a cost-effective manner, a wide audience of prospective purchasers of the opportunity to acquire or invest in the Company's business, and the proposed Sale Procedures are intended to ensure the means for prospective purchasers and investors to fairly assess the Company's business prospects, and whether and on what terms they might like to acquire the Assets.

### A.     Sale Solicitation Program

11.     As noted, the Company and Navigant ran a thorough and rigorous process to attract interest among prospective acquirers of the Company's business. It is believed that these efforts have already induced the best offer that will be received for the Assets. Nevertheless, the Company and Navigant intend to seek competing bids for the Assets that would provide an even better recovery for the Company and its creditors, consistent with the regulatory requirements to which the

---

[1] Or remind, as many of the prospective purchasers have been previously solicited.

Company and the sale process are subject, though a renewed solicitation of prospective purchasers

of the Hospital and related Assets.  The key components of the renewed solicitation will include:

- Direct Mailing.  Commencing the week of July 4, 2011, Navigant will mail and/or email a sale announcement that will summarize the Proposed Sale and invite prospective acquirers and investors to contact Navigant with any interest in pursuing a transaction.  Navigant will transmit the sale announcement to those entities known to Navigant that might reasonably be expected to have a strategic or financial interest in acquiring the Company's business, whether identified by the Company, Navigant, the Creditors' Committee, or other party in interest.

- Telephone Follow-Up.  Upon transmittal of the sale announcement, Navigant will telephone recipients that Navigant believes would or should have the highest level of interest in acquiring or investing in the Company, to gauge their interest in such acquisition or investment and to pursue promising leads.

- Due Diligence Management.  Through the efforts of the Company and Navigant incident to the prepetition sale effort, and in response to the specific due diligence requests of Bidder incident to its negotiation and entry into the APA, the Company and Navigant have assembled into an on-line virtual data room a comprehensive database of documents and information concerning the Company, its operations and financial performance, and its Assets, including copies of the Assigned Agreements.  Subject to appropriate confidentiality restrictions, prospective bidders will be provided access to the on-line deal room for efficient and cost-effective due diligence.

- Formal Bid Solicitation.  The Company, working through its counsel and Navigant, will negotiate with interested bidders toward definitive asset purchase agreements by which any formal competing bid would be submitted.

The Company and Navigant believe that the foregoing sale solicitation program is the best means

available to the Company to attract competing bids for the Assets.

**B.**     **Due Diligence; Access to Management**

12.     As noted, Navigant has created an on-line virtual data room that includes such

information about the Company, its operations, finances, and contractual relationships that the

Company and Navigant believe prospective bidders would consider relevant to an evaluation of

whether to acquire the Company's business.  In order to obtain access to such data room,

prospective bidders must execute and deliver to the Company an appropriate confidentiality

agreement. Additional due diligence will be provided through meetings with the Company's

management team and information provided incident thereto.

13.     The Company's senior management will make themselves available to meet with

and speak to potential acquirers and their legal and financial representatives at reasonable times,

consonant with their duties to administer the Company's business operations. The Company

and Navigant will meet with the Bond Trustee and the Creditors' Committee (the "Committee")

and their respective legal and financial advisors to discuss the Proposed Sale and the potential

development of competing bids, and otherwise will keep the Bond Trustee and the Committee

informed about the prosecution of the sale process.

## C.     Procedures Governing Submission and Consideration of Purchase Offers

14.     By this Motion, the Company seeks entry of an order, in substantially the form

attached hereto as Exhibit A (the "Sale Procedures Order"), establishing the procedures for

conducting the Proposed Sale, specifically, the submission of competing offers to acquire the Assets,

the Company's consideration of offers, and, if more than one offer is obtained, the auction process

to determine the highest or otherwise best offer for the Assets. The Sale Procedures are designed to

provide both specific guidelines and appropriate flexibility for the conduct of the sale process, and

also contain detailed procedures for the assertion and resolution of any claims of non-Company

parties to the Assigned Agreements, as more specifically described below.

15.     In order to obtain the highest or otherwise best bid for the Assets, the Company

proposes that bid solicitation and any auction among qualified bidders will be governed by the

following sale procedures (the "Sale Procedures"):

> Bidding Process. The Company shall have the sole right to (i) determine, in consultation
> with the Bond Trustee and the Committee, whether any person is a Qualified Bidder, (ii)
> coordinate the efforts of Qualified Bidders in conducting their respective due diligence
> reviews, (iii) receive offers from Qualified Bidders, (iv) give notice to all parties with
> respect to the Sale Procedures and the Auction relating to the Assets, and (v) in

consultation with the Bond Trustee and the Committee evaluate and negotiate any bid (collectively, the "Bidding Process").

<u>Reservation of Rights</u>.  The Company, in consultation with the Bond Trustee and the Committee, may (i) determine, in its business judgment, which Qualified Bid, if any, is the highest or otherwise best offer and (ii) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that, in the Company's sole discretion exercised in consultation with the Bond Trustee and the Committee, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or the Sale Procedures, or (c) contrary to the best interests of the Company, its estate and creditors.  The Company reserves the right to withdraw this Motion at any time prior to Bankruptcy Court approval of the Proposed Sale without liability to the Company.

<u>Due Diligence</u>.  Unless a specific exception is granted by the Company, in consultation with the Committee, each bidder must complete all required due diligence prior to the submission of its bid.  The Company will continue to provide due diligence information to potential bidders who so request by contacting Greg Hagood of Navigant, Telephone: (404) 504-2017, Fax: (404) 504-2023.  The Company shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined herein) or to any person that the Company, in consultation with the Bond Trustee and the Committee, determines is not reasonably likely to be a Qualified Bidder.  The Company may condition due diligence disclosures upon a bidder's execution of a confidentiality agreement in a form satisfactory to the Company.

<u>Minimum Amount of Competing Bids</u>.  The Company has agreed with Steward that any competing bids for the Assets must have a value not less than the amount of the Cash Purchase Price plus the Break-Up Fee (discussed below) in the amount of $875,000, and the Company hereby proposes that any competing offer to acquire the Assets must include a cash purchase price component not less than $1,000,000 more than the Cash Purchase Price (up to $38,000,000 depending on timing of closing) component of the consideration payable by Steward under the APA.  The Company believes that this minimum overbid amount is commercially reasonable in the context of the up to $38 million cash purchase price offered by Steward, and because the Company anticipates that any competing bid not valued at least $1,000,000 more than Steward's cash offer is likely (after accounting for the $875,000 Break-Up Fee payable to Steward discussed above, and the additional transaction costs of actually closing a transaction with any such competing bidder) to provide little, if any, net value to the Company's estates.  The Company will take into account any assumed liabilities and any adjustments to nominal cash purchase price components of competing bids to compare competing bids on their economic terms and their value to the Company and its creditors.

<u>Required Bid Documents</u>.  Unless otherwise indicated below, all bids must include the following information/documents (the "Required Bid Documents"):

- A legally-binding offer to purchase the Assets (or portion thereof) pursuant to a proposed asset purchase agreement (an "Asset Purchase Agreement")

- A certified check or wire transfer representing a good faith deposit (the "Deposit"), in the amount of 10 percent of any cash consideration component of the offer, payable to the order of First American Title Insurance Company as escrow agent for the Company.

- Written evidence of a commitment for financing sufficient to consummate, or other evidence satisfactory to the Company of the bidder's ability to consummate, its proposed purchase of the Assets.

- Full disclosure of the identity of each entity that will be participating in such bid, including any proposed designee(s).  Further, each bid must provide sufficient financial and other information regarding both the bidder and all other parties participating in the bid to satisfy the Company with respect to the requirements enumerated in Section 363(m) of the Bankruptcy Code or as otherwise provided for elsewhere herein.

- Written evidence that the bidder has obtained authorization and approval from its Board of Directors (or comparable governing body) with respect to the submission of its offer, or a representation that no such authorization and approval is required.

Evidence of the qualifications and capacity of the bidder to obtain the regulatory approvals necessary to proceed to a Closing if designated as the bidder approved by the Bankruptcy Court as having submitted the highest or otherwise best offer to acquire the Assets (the "Winning Bidder"), including specifically the requirements of licensure and Certificate of Need from the Massachusetts Department of Public Health, and of the Office of the Attorney General with respect to matters of Public Charities and otherwise.

Bid Deadline.  To be considered a timely bid, the bid containing the Required Bid Documents **must be delivered so as to be received not later than 4:00 p.m. (prevailing Eastern time) on July __, 2011 (the "Bid Deadline")** by the following advisors to the Company and the Committee (the "Bid Recipients"):

**Casner & Edwards, LLP**                    **[Original Bid and Deposit]**
Attn:  John T. Morrier, Esq.
303 Congress Street
Boston, MA 02210
Fax:  (617) 426-8810
E-mail:  morrier@casneredwards.com


**Navigant Capital Advisors, LLC**           [copy of Bid]
Attn:  Greg Hagood
1180 Peachtree Street
Suite 1900
Atlanta, GA  30309
Fax:  (404) 504-2023
E-mail:  GHagood@ncacf.com


**[Bond Trustee Counsel]**                   [copy of Bid]


**[Bond Trustee Financial Advisor]**         [copy of Bid]


**[Committee Counsel]**                      [copy of Bid]


**[Committee Financial Advisor]**            [copy of Bid]


**Edwards Angell Palmer & Dodge LLP**
Attn:  James D. McGinley, Esq.
111 Huntington Avenue
Boston, MA  02199
Fax:  (888) 325-9119
E-mail:  jmcginley@eapdlaw.com           [copy of Bid]

The Company may, in consultation with the Bond Trustee and the Committee, extend the Bid Deadline once or successively without further notice, but cumulatively not longer than seven days from the initial Bid Deadline save upon further order of the Bankruptcy Court without further notice, but is not obligated to do so.

Qualified Bids.  To constitute a "Qualified Bid" the proposal must include each of the Required Bid Documents listed above and:

- Be timely received by the Bid Recipients.

- Provide information satisfactory to the Company that the bidder is reasonably likely to be able to consummate the proposed transaction if selected as the Successful Bidder.

- Not be subject to or conditioned upon any financing contingencies, except as otherwise permitted by the Company in consultation with the Bond Trustee and the Committee.

- Not be conditioned on the outcome of due diligence, except as otherwise permitted by the Company in consultation with the Bond Trustee and the Committee.

- Be binding on each entity or partner participating in the bid.

- Not request or entitle the bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment.

- Provide for the closing of such transaction within the same time frame as provided for by the APA, except as may otherwise be agreed to by the Company in consultation with the Bond Trustee and the Committee.

- Written evidence of the qualifications and capacity of the bidder to obtain the regulatory approvals necessary to proceed to a closing if designated as the Winning Bidder, including specifically the requirements of licensure and Certificate of Need from the Massachusetts Department of Public Health, and of the Office of the Attorney General with respect to matters of Public Charities.

A bidder that submits a bid meeting the above criteria will, subject to the Company's determination exercised in consultation with the Bond Trustee and the Committee, be a "Qualified Bidder." The offer of Steward set forth in the APA shall be deemed to constitute a Qualified Bid and Steward is deemed to be a Qualified Bidder with respect to any Auction (as defined below).

Irrevocability of Bids. Bids shall be deemed irrevocable offers to acquire the Assets and shall remain irrevocable and subject to acceptance by the Company until the Company, in consultation with the Bond Trustee and the Committee, has designated the Successful Bid and the Bankruptcy Court has approved the Company's acceptance of the Successful Bid, at which time any other bids shall be deemed rejected and such rejected bidders' Deposits returned.

Auction. After the Bid Deadline, the Company in consultation with the Bond Trustee and the Committee shall review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the transaction process, including those factors affecting the speed and certainty of consummating the proposed transaction, and may negotiate with the Qualified Bidders regarding improvements or alterations of their bids. If at least two Qualified Bids are submitted, then, after all such bids have been so reviewed and negotiated, the Company shall conduct a public auction (the "Auction") with respect to the Proposed Sale. **The Auction shall take place beginning at 10:00 a.m. (prevailing Eastern Time) on August ___, 2011 at [SPECIFY AUCTION LOCATION], or such other time or place as the Company shall notify all Qualified Bidders who have submitted**

**Qualified Bids.** Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction. At the Auction, each Qualified Bidder's auction bid(s) shall be deemed to be on the same terms and conditions as such bidder's Qualified Bid as set forth in its Asset Purchase Agreement or term sheet, except for the offer price and otherwise as expressly agreed upon by the Company in consultation with the Bond Trustee and the Committee. The Auction may be conducted as an open bid auction or by sealed-bid, and on such other terms and conditions, as specified by the Company at the Auction after consultation with the Bond Trustee and the Committee. At the conclusion of the bidding, the Company, in consultation with the Bond Trustee and the Committee, will determine, and then announce, the highest or best bid for the Assets (the "Successful Bid") and the Qualified Bidder submitting such bid (the "Successful Bidder"), subject only to entry by the Bankruptcy Court of an order approving the Successful Bid and authorizing the Company to consummate the sale following the conclusion of the hearing to consider approval of the Sale Motion and the Proposed Sale (the "Sale Hearing"), upon which the Proposed Sale shall proceed to closing as provided by and pursuant to the terms and conditions of the APA (as it may be modified to reflect the Successful Bid and any related agreements between the offeror and the Company approved by, or as otherwise directed by, order of the Bankruptcy Court).

Acceptance of Qualified Bid. The Company intends to seek approval of the highest or otherwise best Qualified Bid received. The Company's presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute the Company's acceptance of the bid. The Company will have accepted a bid only when the bid has been approved by the Bankruptcy Court and the Company has executed the final form of the APA embodying the sale of the Assets as approved by the Bankruptcy Court.

Break-Up Fee. The Company has agreed with Steward that, if another entity submits a higher or better counteroffer for the Assets and the Assets ultimately are sold to a purchaser other than Steward, then Steward will be entitled to receive a break-up fee (the "Break-Up Fee") in the amount of $875,000 (representing approximately two and one-half percent (2.5%) of the Cash Purchase Price component of the consideration to be provided by Steward to acquire the Assets). The Company believes that the amount of the Break-Up Fee is reasonable in these circumstances, both as a fair measure of compensation to Steward for the time, effort, and money expended by Steward in pursuing the proposed purchase of the Assets, and because the Break-Up Fee is an advantageous price to pay for the additional value to the estate in the form of a higher ultimate sale price for the Assets that would likely be attributable to Steward's "stalking horse" bid if a higher or better offer were to be accepted. In accordance with the APA, the Break-Up Fee will only be paid out of sale proceeds received upon closing of an alternative transaction that will provide better value to the Company and its estate than the APA, by an increment greater than the amount of the $875,000 Break-Up Fee, by virtue of the minimum overbid protection discussed above, requiring competing bids to provide a cash purchase price value of at least $1,000,000 more than provided by Steward under the APA.

D.     **Procedures for Cure Objections**

16.     The Sale Motion seeks approval of the Company's assumption and assignment of the

Assigned Agreements incident to sale of the Assets.  To facilitate a prompt resolution of cure

disputes (if any) relating to the Assigned Agreements that are sought to be assumed and assigned to

the purchaser of the Company's business, the Company proposes the following deadlines and

procedures:

>     Notice of Objection Deadline.  Within three (3) business days after designation of the
>     Assigned Agreements pursuant to the terms of the APA (anticipated to be no later than July
>     ___, 2011), the Company shall serve a copy of the Sale Notice (as defined herein) by regular
>     mail to all non-Company parties (the "Agreement Parties") to the Assigned Agreements,
>     notifying them of the requirement to file a Cure Objection (as defined herein) by the Cure
>     Objection Deadline (as defined herein) set forth below.

>     Cure Objections.  Any Agreement Party seeking to assert that any defaults, conditions or
>     pecuniary losses under any of the Assigned Agreements must be cured or satisfied in order
>     for such contract to be assumed and/or assigned (collectively, the "Cure Obligations") or
>     who otherwise objects to the proposed assumption and assignment of such Assigned
>     Agreement for any reason, shall be required to file and serve an objection ("Cure
>     Objection") setting forth with specificity any and all Cure Obligations which such party
>     asserts must be cured or satisfied with respect to such Assigned Agreement and any and all
>     objections to the proposed assumption and assignment of such Assigned Agreement.

>     Cure Objection Deadline.  To be considered a timely Cure Objection, the Agreement Party
>     interposing the Cure Objection must file it with the Bankruptcy Court, and serve a copy of
>     such Cure Objection upon each of the Notice Parties (as defined in Paragraph 22 below), so
>     as to be filed and received not later than 4:00 p.m. (prevailing Eastern Time) on September
>     ___, 2011 (the "Cure Objection Deadline").  The Company may, in its sole discretion,
>     extend the Cure Objection Deadline once or successively without further notice, but is not
>     obligated to do so.

>     Failure to File Cure Objection.  Unless a Cure Objection is filed and served by a party to an
>     Assigned Agreement by the Cure Objection Deadline, the Bankruptcy Court may enter an
>     order authorizing or effecting the assumption and assignment of such Assigned Agreement
>     at the Sale Hearing without regard to any objection such party may have.

>     Waiver of Cure Objection.  Parties who fail to file and serve Cure Objections as provided
>     above shall be deemed to have waived and released any Cure Obligation and shall be forever
>     barred and estopped from objecting to the validity or enforceability of the assumption and
>     assignment of the Assigned Agreement, and from asserting or claiming against the
>     Company, the purchaser, or any other assignee of the relevant Assigned Agreement that any
>     additional amounts are due or defaults exist, or conditions to assignment must be satisfied,
>     under such Assigned Agreement for the period prior to the Cure Objection Deadline.

Contents of Cure Objection. The Cure Objections shall set forth the cure amount the objector asserts is due, the period(s) to which such amounts relate, the specific types and dates of any alleged defaults, pecuniary losses and conditions to assignment, and the support therefor, and any other information necessary to establish the basis for the Cure Objection. All claims or writings establishing the claim must be attached to the Cure Objection, provided, however, that although the underlying obligation itself must be asserted in detail, specific dollar amounts for unliquidated claims or adjustments not yet known (collectively, the "Unliquidated Charges"), as set forth in the relevant Assigned Agreement, need not be included in the Cure Obligations. A statement indicating the nature of the Unliquidated Charges and the period(s) in which they accrued must be included. The amount of any Unliquidated Charges asserted in compliance with these procedures shall be determined by further order of the Bankruptcy Court or by stipulation between the Company and the affected non-Company party to the Assigned Agreement.

Cure Objection Hearings. Hearings to resolve Cure Objections, if any, shall be held concurrently with the Sale Hearing (or at such other earlier or later date as the Bankruptcy Court may designate). If any Assigned Agreement is assumed and assigned prior to resolution of a Cure Objection, appropriate means for assuring payment of a liquidated Cure Obligation timely asserted by the Agreement Party (or such lower amount as may be fixed by the Bankruptcy Court) shall be established by order of the Bankruptcy Court or mutual agreement of the parties.

Reservation of Rights. The Company reserves the right to remove any Assigned Agreement from the Proposed Sale and to withdraw the request to assume and assign any Assigned Agreement, as directed by the Winning Bidder, in which event an appropriate adjustment may be made to the purchase price for the Assets to reflect the exclusion of the Assigned Agreement from the sale.

Limitation of Objection. A timely filed and served Cure Objection shall reserve the objecting party's rights respecting its Cure Obligation but shall not be deemed to constitute an objection to the relief generally requested in the Sale Motion.

Further Assigned Agreements. Pursuant to the terms of the APA, the Company proposes to defer the decision to assume, or to reject, certain executory contracts and leases to which it is a party until a later point in time, and in no event later than the date specified for doing so in the APA, whether or not the Closing (as defined in the APA) shall have taken place by that date. As to such executory contracts and assigned leases, Transitional Contracts under the APA, the Company proposes to continue current post-petition payments to the non-Company parties to such agreements pending designation of such agreements for assumption or rejection. As to such contracts designated for assumption and assignment by the Winning Bidder, such contracts ("Further Assigned Agreements") shall be subject to further notices and hearings upon terms and conditions substantially similar to the provisions provided in this Paragraph 16.

17.     The Company submits that the foregoing procedures will help facilitate the resolution of any issues concerning cure amounts under and/or assumability of the Assigned Agreements.  Moreover, the Company submits that the foregoing notice of the Proposed Sale, the sale solicitation process, the competing bid, sale objection, and cure objection deadlines, and the scheduling of the Auction, will provide ample time for prospective competing bidders to conduct due diligence and formulate purchase offers, for non-Company parties to the Assigned Agreements to protect their rights under such leases and contracts, and for parties in interest to submit any objections to the Proposed Sale, and satisfies the requirements of applicable bankruptcy laws and procedures governing sales of assets of the nature involved here.

### III.     Form and Manner of Notice of Proposed Sale and Sale Procedures

18.     In accordance with Fed. R. Bankr. P. 2002, 6004 and 6006, the Company proposes to provide notice of the Proposed Sale in the following manner:

> A.     The Company will serve a copy of each of the Sale Motion, the Sale Procedures Order, and notice of the Proposed Sale substantially in the form annexed hereto as Exhibit B (the "Sale Notice"), upon (i) the United States Trustee for the District of Massachusetts, (ii) counsel to the Bond Trustee, (iii) the Creditors' Committee, (iv) any entities known to hold a lien or security interest in any of the Assets, (v) those parties having expressed an interest or whom the Company believes may be interested in purchasing the Assets, and any entities known to Navigant or identified by the Creditors' Committee or other parties in interest that may possess an interest in making a bid, and (vi) all parties on the regular service list including all parties that have requested notice and service of pleadings in the Company's Chapter 11 case.

17

B.    The Company will serve a copy of the Sale Notice by regular mail upon (i) the Internal Revenue Service, (ii) the United States Attorney for the District of Massachusetts, (iii) each of the Company's federal, state and local taxing authorities, and any federal, state or local governmental agency who has or exercises any licensing, registration or permitting authority over the Company or any of the Assets, (iv) all non-Company parties to the Assigned Agreements, (v) all relevant environmental regulatory agencies, and (vi) all other known creditors of the Company.  The Sale Notice will inform such parties that a copy of the Sale Motion and the Sale Procedures Order may be obtained from the Office of the Clerk of the Bankruptcy Court, or by making a written request to counsel to the Company.

C.    The Company or Navigant will promptly post a copy of the Sale Notice and Sale Procedures Order on the website where the Company is maintaining its virtual data room, and otherwise make the Sale Notice and Sale Procedures Order available upon request to prospective purchasers of the Assets.

### IV.    The Break-Up Fee Is Reasonable And Appropriate

19.    The Company and Steward have invested substantial time and effort in negotiating the APA.  Steward has also invested time and effort in connection with its investigation of the Company and its due diligence review.  It has incurred various legal and other professional costs and expenses, and will incur still further substantial additional fees and costs to pursue the Proposed Sale.

20.    In the event the Assets are sold to a party other than Steward, and Steward has not breached or wrongfully terminated the APA, the Company has agreed, subject to Court approval, to pay Steward from the proceeds of sale the Break-Up Fee (described above) in the amount of

$875,000, representing approximately two and one-half percent (2.5%) of the aggregate cash

payments by Steward under the APA.  The Break-Up Fee was necessary to induce Steward  to

submit a good faith, fair and reasonable offer and to negotiate the APA that will be used as the

benchmark for solicitation of higher or otherwise better competing bids.

21.     Sellers of assets often employ bidding protections in order to encourage the making

of bids.  A break-up fee is a fee paid by a seller to a potential acquirer of assets in the event the

transaction is not consummated or certain conditions in the purchase agreement are not met.

Break-up fees are "important tools to encourage bidding and to maximize the value of the debtor's

assets."  The Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re

Integrated Resources, Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992).

22.     Bidding protections take many different forms, including paying the out-of-pocket

expenses incurred by a bidder in arranging the deal, due diligence expenses, or compensating a

bidder for its lost opportunity costs.  See In re Hupp Industries, Inc., 140 B.R. 191, 194 (Bankr.

N.D. Ohio 1992).

23.     Outside the bankruptcy arena, courts commonly approve break-up fees.  Such fees

are presumptively appropriate under the business judgment rule and nonbankruptcy courts rarely

rule on their propriety.  See, e.g., Cottle v. Storer Communications, Inc., 849 F.2d 570 (11th Cir.

1988); CRTF Corp. v. Federated Dep't Stores, 683 F. Supp. 422, 440 (S.D.N.Y. 1988).

24.     Bankruptcy courts will generally authorize bidding protections such as expense

reimbursement or break-up fees as long as they "enhance" the bidding and are reasonable in relation

to the bidder's efforts and the size of the transaction. See, e.g., In re S.N.A. Nut Co., 186 B.R. 98

102 (Bankr. N.D. Ill. 1995)  One such situation is where the bidder is a "stalking horse" – an initial

interested acquirer whose binding offer provides a baseline of value to the estate, promotes

competition, and encourages other bidders to come forward and submit competitive offers that can

be measured against the benchmark established by the stalking horse bid.  See In re Marrose Corp.,

Nos. 89 B 12171-12180 (CB), 1992 WL 33848 at 5 (Bankr. S.D.N.Y. 1991).

25.     Through its execution of the APA and delivery of its deposit of $3.5 million, Steward

is a stalking horse for competitive bids.  Its offer establishes a baseline against which higher and

better offers can be measured, and creates the springboard for potential competitive bidding.  The

Break-Up Fee is an appropriate protection to Steward for submitting the "stalking horse" bid for the

Assets.

26.     The negotiations between the Company and Steward regarding the terms of sale,

including negotiation of the existence and amount of the Break-Up Fee, were lengthy and intensive.

The Bidder, in addition to the expenses attended on prospective acquisitions of any operating

business of the size and complexity of the Hospital, has needed to prepare itself with respect to the

complications of the regulatory processes applicable to the Proposed Sale.  The APA is the product

of arms' length negotiations between the Company and Steward.

27.     Moreover, the amount of the Break-Up Fee, calculated at approximately two and

one-half percent (2.5%) of the cash portion of the purchase price, is reasonable.  See In re

Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992) (break-up fee calculated at 1.6% of

purchase price was reasonable based on industry norm of 3.3%); see also In re HHL Financial

Services, Inc., Case No. 97-398 (SLR), Order 3/31/97 (D. Del.) (approximately 5.5% to 5.9% break-

up fee approved); In re American White Cross, Inc., Case No. 96-1109 (PJW), Order 3/31/97

(Bankr. D. Del.) (approximately 5.8% break-up fee approved); In re MobileMedia Communications,

Inc., 97-174 (PJW) (Bankr. D. Del.) (fees of 2.9% and 3.2% approved).  The Bidder has not sought

separate and additional reimbursement of expenses, a feature frequently accompanying a break-up

fee request.

28.     The Company submits that the proposed Break-Up Fee will not hamper or deter competitive bidding for the Assets.  Rather, it has encouraged bidding by providing Steward with an incentive to bid for the Assets notwithstanding that its offer will be subject to potential competing bids, and may well serve as a magnet for other bids.  That the payment of the Break-Up Fee would only be made out of sale proceeds of an alternative transaction addresses the notion that approval a break-up should be made "in reference to general administrative expense jurisprudence."  See In re O'Brien Environmental Energy, Inc., 181 F.3d 527 (3d Cir. 1999).  Here, payment of the Break-Up Fee will only be made to the extent that Steward's having served as stalking horse bidder benefits the Company and its estate.  If the Break-Up Fee is payable—by  definition, because the Company has received a higher or otherwise better offer—Steward's bid will have benefited the estate, particularly in the context of the total consideration received.  Here, the Break-Up Fee was a necessary component of the negotiations and ultimate agreement embodied in the APA, and its amount is reasonable both in relation to Steward's efforts and to the size of the Proposed Sale transaction. Payment of the Break-Up Fee correlates with a maximization of value to the Company's estate, as it will only be paid out of increased sale proceeds for the Assets, and accordingly will not result in any diminished value to the Company and its creditors.  For all of these reasons, the Company believes that approval of the proposed Break-Up Fee, and of the related minimum overbid amount of competing bids, is appropriate under the circumstances presented.

## V.     Objection Deadline for Proposed Sale; Notice Parties for Objections; Sale Hearing

29.     The Company requests that the Court fix September 9, 2011 at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline") as the date and time by which objections to the Sale Motion must be filed with the Bankruptcy Court and copies served upon the following parties (the "Notice Parties") so as to be received by the Objection Deadline:

(a)     attorneys for the Company, Casner & Edwards, LLP, 303 Congress Street, Boston, MA 02210, Attn: John T. Morrier, Fax (617) 426-8810, email: morrier@casneredwards.com;

(b)     attorneys for the Creditors' Committee, _____; and

(c)     attorneys for the Bond Trustee, Kaye Scholer LLP, 70 West Madison Street, 41st Floor, Chicago, IL 60602, Attn: Matthew Micheli, Fax (312) 583-2588, email: mmicheli@kayescholer.com; and

(d)     the Office of the United States Trustee, John McCormack Federal Building, 5 Courthouse Square, Suite 1150, Boston, MA 02109, Attn: _____, Esq., Fax (617) 565-_____, email: _____@usdoj.gov.

(e)     attorneys for the Bidder, Edwards Angell Palmer & Dodge LLP, 111 Huntington Avenue, Boston, MA, Attn.: James D. McGinley, Fax (888) 325-9119, email: jmcginley@eapdlaw.com

The Company also requests that this Court schedule the hearing to consider approval of the Sale Motion (the "Sale Hearing") for September 13, 2011 or as soon thereafter as this Court's calendar permits.

## VI.     Notice

30.     The Company has served this Motion on (i) the Office of the United States Trustee, (ii) the Bond Trustee, (iii) the 20 largest creditors of the Company as set forth on the list filed by the Company pursuant to Fed. R. Bankr. P. 1007(d), and (iv) all entities who have filed and served requests for notices in this Chapter 11 case. The Company requests that this Court find such notice to be appropriate and sufficient in the particular circumstances to satisfy applicable notice requirements of the Bankruptcy Code and associated rules.

## VI.     Conclusion

WHEREFORE, the Company respectfully request the entry of the Sale Procedures Order, in the form submitted herewith, (i) approving the Sale Procedures, (ii) authorizing and approving the solicitation of competing bids to acquire the Assets in the manner described herein, (iii) approving the manner of notice of the Proposed Sale (including notice of the proposed assumption and

assignment of the Assigned Agreements and procedures relating thereto), (iv) scheduling the Sale

Hearing, and (vi) granting such other and further relief as may be just and proper.

Dated:  July 1, 2011

>QUINCY MEDICAL CENTER, INC.
>QMC ED PHYSICIANS, INC.
>QUINCY PHYSICIAN CORPORATION
>By their attorneys,
>
>
>*/s/ John T. Morrier*
>John T. Morrier (BBO #628624)
>Michael J. Goldberg (BBO #551869)
>A. Davis Whitesell (BBO #551462)
>Andrew T. Imbriglio (BBO #676049)
>Casner & Edwards, LLP
>303 Congress Street
>Boston, MA  02210
>Tel: 617-426-5900
>Fax: 617-426-8810
>Email: morrier@casneredwards.com