UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| QUINCY MEDICAL CENTER, INC., | ) | |
| QMC ED PHYSICIANS, INC., | ) | Case No. 11-16394-MSH |
| QUINCY PHYSICIAN CORPORATION, | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

## DISCLOSURE STATEMENT REGARDING DEBTORS' CHAPTER 11 PLAN

Submitted herewith for approval by this Court is the Proposed Disclosure Statement With

Respect to Debtors' Joint Plan of Liquidation Pursuant to Chapter 11 of the United States

Bankruptcy Code dated September 8, 2011.


Dated: September 8, 2011

QUINCY MEDICAL CENTER, INC.
QMC ED PHYSICIANS, INC.
QUINCY PHYSICIAN CORPORATION
By their attorneys,


*/s/ John T. Morrier*
John T. Morrier (BBO #628624)
Michael J. Goldberg (BBO #551869)
A. Davis Whitesell (BBO #551462)
Andrew T. Imbriglio (BBO #676049)
Casner & Edwards, LLP
303 Congress Street
Boston, MA 02210
Tel: 617-426-5900
Fax: 617-426-8810
Email: morrier@casneredwards.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| QUINCY MEDICAL CENTER, INC., | ) | |
| QMC ED PHYSICIANS, INC., | ) | Case No. 11-16394-MSH |
| QUINCY PHYSICIAN CORPORATION, | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**[Proposed] DISCLOSURE STATEMENT WITH RESPECT TO
DEBTORS' JOINT PLAN OF LIQUIDATION PURSUANT TO
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**Dated:  September 8, 2011**

- **Voting Record Date: _____, 2011**

- **Voting Deadline by which Ballots must be received: ____, 2011 at __ p.m., ET**

- **Voting Deadline by which Master Ballots must be received: ___, 2011 at __ p.m., ET**

- **Deadline by which to file and serve objections to Confirmation of the Plan: ____, 2011 at __p.m., ET**

- **Hearing on Confirmation of the Plan: ____, 2011, at ___ _.m., ET**

---

**THE PLAN IS SPONSORED BY THE DEBTORS.**

**THE PREPETITION INDENTURE TRUSTEE SUPPORTS CONFIRMATION OF THE PLAN [AND HAS PROVIDED A SEPARATE LETTER SUPPORTING THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT __].**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS SUPPORTS CONFIRMATION OF THE PLAN [AND HAS PROVIDED A SEPARATE LETTER SUPPORTING THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT __].**

**THE DEBTORS URGE HOLDERS OF ALLOWED CLAIMS IN CLASSES 2 (BONDOWNER SECURED CLAIMS) AND 4 (GENERAL UNSECURED CLAIMS) TO VOTE TO ACCEPT THE PLAN.**

---

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AND IS NOT A SOLICITATION OF ACCEPTANCE OF THE JOINT PLAN OF LIQUIDATION ANNEXED HERETO.  ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT IS APPROVED BY THE BANKRUPTCY COURT.

## I.    Introduction

Quincy Medical Center, Inc. ("QMC"), QMC ED Physicians, Inc. ("QED") and Quincy Physician Corporation ("QPC" and, with QMC and QED, the "Debtors" or the "Company") provide this Disclosure Statement to all of the Company's known creditors in order to supply the information you will need in exercising your right to vote upon the Debtor's Joint Plan of Liquidation Pursuant to Chapter 11 of the United States Bankruptcy Code dated September 8, 2011 (the "Plan").  A copy of the Plan is attached to this Disclosure Statement as Exhibit A.  All terms defined in the Plan have the same meaning herein unless otherwise noted.

If you hold a Claim in Class 2 or Class 4 (described below), a ballot for your use in voting to accept or reject the Plan is enclosed.  Instructions for completing and returning the Ballot are printed on the Ballot itself.  IN ORDER FOR YOUR VOTE TO COUNT, THE BALLOT REFLECTING SUCH VOTE MUST BE RECEIVED BY THE CLAIMS AGENT, AT THE ADDRESS DESCRIBED IN SECTION XII.B, "VOTING PROCEDURES," AT PAGE ___, NO LATER THAN _____ P.M. PREVAILING EASTERN TIME ON _____, 2011.

Except where specifically stated otherwise, the information contained in this Disclosure Statement is based upon information supplied by the Debtors.  The Debtors have done their best to ensure that the information is correct and complete, but it is impossible to represent that the information contained in this Disclosure Statement is without error.

No representations concerning the Debtors or the Plan are authorized other than as set forth in this Disclosure Statement.  Although this Disclosure Statement describes the Plan in summary and in detail, it is recommended that you review the Plan itself for a definitive understanding of its terms.

The approval by the Court of this Disclosure Statement does not constitute an endorsement by the Court of the Plan, or a guarantee of the accuracy or completeness of the information contained in this Disclosure Statement.  The Debtors have prepared this Disclosure Statement to disclose that information which, in their opinion, is material, important, and necessary to evaluate the Plan.  The material contained in this Disclosure Statement is intended solely for that purpose and solely for the use of known creditors of the Debtors.  This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan.  This Disclosure Statement summarizes the terms of the Plan but the Plan itself qualifies all summaries.  If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.  Without limiting the generality of the foregoing, nothing in this Disclosure Statement or the Plan shall be deemed an estoppel or waiver of any right or remedy of the Debtors or their bankruptcy estates.

When and if confirmed by the Bankruptcy Court, the Plan will bind all holders of claims against and interests in the debtors whether or not they are entitled to vote or did vote on the Plan and whether or not they receive or retain any distributions or property under the Plan. Thus, all holders of claims against the Debtors are encouraged to read this Disclosure Statement and its appendices carefully and in their entirety before deciding to vote either to accept or to reject the Plan.

With respect to contested matters, adversary proceedings, and other pending, threatened, or potential actions (whether or not pending), this Disclosure Statement and the information contained herein shall not be construed as an admission or stipulation by any entity, but rather as statements made in settlement negotiations governed by Rule 408 of the Federal Rules of Evidence and any other rule or statute of similar import. Furthermore, the absence of a pending litigation and/or the absence of disclosure or notice of any cause of action, affirmative claim, counterclaim or avoidance action by this Disclosure Statement or otherwise should not and may not be relied upon by any creditor or as an indication, representation, or acknowledgement that such cause of action, affirmative claim, counterclaim, or avoidance action does not exist or that such claims will not be pursued following confirmation of the Plan. Moreover, nothing in the Plan or this Disclosure Statement may be used or relied upon by any party as a basis to assert that the Debtors, their bankruptcy estates, the Official Committee of Unsecured Creditors of the Company (the "Creditors' Committee"), or the Liquidation Trustee have waived any causes of action, affirmative claims, counterclaims, or avoidance actions.

**The Debtors recommend that you vote to ACCEPT the Plan.**

## II.   Summary of the Plan and Means of Implementation of the Plan

The Plan is a liquidation plan and does not contemplate the financial rehabilitation of the Debtors or the continuation of their businesses. The Debtors are selling substantially all of their assets contemporaneously with their pursuit of the Plan. The Company proposes to sell substantially all of the Company's assets utilized by the Company in operating its business, including without limitation the Company's (i) interests in real property, including the Company's fee interest in real property improved by its 196-bed acute care hospital (the "Hospital"), (ii) personal property (including equipment, furniture and inventory used to operate the Hospital), (iii) third-party payor contracts and provider numbers under which the Company collects most of its revenue from government and third-party payors, and other unexpired leases and executory contracts as designated by purchaser (the "Assigned Agreements"), and (iv) accounts receivable, work in process, intellectual property (including the Quincy Medical Center name), and other miscellaneous, specified assets (collectively, the "Assets"), to Steward Medical Holdings Subsidiary Five, Inc. ( "Steward") which submitted the highest or otherwise best offer to acquire the Assets pursuant to the sale procedures established by order of the Bankruptcy Court. The Plan contemplates that such assets will be sold by the Company (the "Sale") in connection with the Plan, and pursuant to an order of the Bankruptcy Court (the "Sale Order").

The means for implementing the Plan is the consummation of the Sale, the closing of which is a prerequisite to the Effective Date of the Plan. The Debtors anticipate that the Sale transaction will be consummated prior to or in connection with confirmation of the Plan. The Debtors are seeking Bankruptcy Court approval, as a provision of the Sale Order, that certain proceeds of the Sale Transaction be used to pay a portion of the Allowed claim of the Prepetition Indenture Trustee at

4

the time of the Sale Closing (should the Sale transaction close prior to the Effective Date of the Plan), and to establish at that time escrows of amounts distributable to other creditors and parties in interest under the Plan. As required by bankruptcy law, proceeds of the Sale will be first used to pay secured and priority claims, however, under the Plan, a fixed amount of cash proceeds of the Sale, plus certain unliquidated causes of action, will be transferred to a Liquidation Trust for the benefit of general unsecured creditors of the Debtors. Once liquidated, the proceeds of these assets will be used to pay one or more *pro rata* distributions to general unsecured creditors. The Plan provides for substantive consolidation of all of the Debtors, meaning that they are treated as a single entity so that all General Unsecured Claims will be paid the same percentage regardless of which one or more of the Debtor(s) is liable for the Claim.

The Debtors project that General Unsecured Claims will be Allowed (determined to be valid) in the total amount of between $6 and $7 million.

The process of determining which Claims should be Allowed takes time. During the period when any Claim is Disputed, a reserve equal to the amount that would be paid if the Claim were Allowed in full must be set aside. In order to distribute as much Cash as quickly as possible, the Plan provides for interim distributions to creditors whose Claims have been Allowed. The initial distribution under the Plan is projected to take place on the Effective Date and will provide distributions to Priority Claims, Prepetition Bondowner Claims and Other Secured Claims. There is no current estimate for an initial distribution to Allowed General Unsecured Claims. Any such distributions will be made by the Liquidation Trustee subject to review and approval of the Oversight Committee.

Allowed Priority Claims, Allowed Prepetition Bondowner Claims and Allowed Other Secured Claims are expected to be paid in full on the Effective Date, which is anticipated as early as November 2011.

The following table summarizes the classification and treatment of creditors and shareholders under the Plan. For a complete explanation, please refer to the discussion in Section V, "Classification of Claims and Their Treatment Under the Plan," at page ___ of this Disclosure Statement, and to the Plan itself.

## III.    Description of the Debtors

### A.    The Debtors' Businesses

QMC was originally founded in 1890 as Quincy City Hospital. In 1999, QMC was incorporated in conjunction with a Home Rule petition approved by the City of Quincy and the legislature of the Commonwealth of Massachusetts. With these approvals, QMC completed its transformation from a municipal medical center under the City of Quincy to a new nonprofit organization. QMC's mission as a nonprofit corporation is to provide quality medical care, including emergency care, to the residents of Quincy, Massachusetts and adjoining communities.

QMC's signature asset is its 196-bed acute care hospital (the "Hospital") located in Quincy, Massachusetts. QMC operates the Hospital, and related medical and health care facilities. QED and QPC are captive entities as to QMC. Their sole purpose is to own certain third-party payor

contracts and numbers under which certain QMC services are billed to third-party payors. Neither QED nor QPC own any assets other than these provider numbers and contracts, nor do they have any other business relationships. All of the revenues generated under the provider numbers and contracts are remitted to QMC. QMC, QED and QPC operate as a single business enterprise—Quincy Medical Center—and to that end have administered their business and financial affairs on a consolidated basis; the Company accounts for all operations and financial matters on a consolidated basis and maintains no separate accounting of QED or QPC revenues or expenses.

The Hospital is located on an approximately 15-acre site and consists of two major buildings comprising 418,309 gross square feet and several smaller buildings, all of which were constructed or renovated between 1920 and 1990. The Company operates as a full-service medical facility, and currently staffs 93 of the Hospital's 196 licensed beds. The variance between licensed and staffed beds reflects current patient volume resulting in part from industry reorientation toward more outpatient services.

### Community Focus

The Company prides itself on its commitment to the local community. The Company's purpose, embodied in its written mission statement, is "*To provide the highest quality health care services in a personal, warm and compassionate manner for all residents of our community.*" In its role as Quincy's community hospital and one of the largest employers in the surrounding area, the Company is a leader in public health initiatives in the City of Quincy and surrounding communities. The Company supports local health education programs for children and elders to promote good health and to encourage younger groups to become familiar with health care as a career. The Company also partners with local community agencies and organizations, schools and colleges to prepare students for their chosen careers by serving as a clinical training site. The Company promotes community outreach programs such as its *Women, Infants and Children Nutrition (WIC) Program* that has provided nutrition counseling and food vouchers to thousands of women and children through seven offices and additional screening events throughout Norfolk and Plymouth counties. The WIC Program collaborates with numerous health and social service agencies to help improve the health and well being of women and children in the communities it serves.

### Workforce

As of the Petition Date, QMC employs 17 physicians and approximately 1,045 non-physician employees (the "Employees"). Approximately 45 percent of the Company's employees work full time, and the remaining 55 percent of employees work part-time or on a "per diem" basis. The Company's employees are responsible for much of the medical care provided to hospital patients, as well as for maintenance of the Company's physical plant and management and administration of its business operations and financial affairs. The majority—approximately 85 percent—of employees belong to one of three unions and are subject to collective bargaining agreements with QMC. These three unions include: Massachusetts Nurses Association ("MNA") (approximately 270 employees); Service Employees International Union ("SEIU") 1199 SEIU (United Healthcare Workers East) (approximately 440 employees); and Laborers' International Union of North America ("LIUNA") Local 367 (approximately 170 employees). The Company's gross payroll obligations to its employees total approximately $1 million per week.

The Company provides a good portion of its medical services through non-employee physicians, nurses, and technicians who provide essential services to the Company in such areas as radiology, obstetrics/gynecology, pediatrics, family practice, cardiology, nephrology, oncology, orthopedics and emergency care (the "Medical Providers"). The Medical Providers are employed by or are otherwise made available to the Company through third-party agencies who contract with the Company to provide the Medical Providers. For example, the Hospital's emergency room physicians are all non-employee Medical Providers whose services are obtained through a contract with Quincy Emergency Care, PC, a medical services agency. The Company normally spends about $1 million per month for the services of the Medical Providers.

### Scope of Services

The Company provides a full spectrum of high quality, state-of-the-art medical and surgical services on both an inpatient and outpatient basis, focused on patient-centered care and clinical excellence furnished in a community-oriented setting. The core services offered by QMC in furtherance of its community health mission include: Emergency Medicine, a full range of surgical care, cardiovascular care, oncology, neurology, intensive and critical care, primary, geriatric and women's health, a Center for Healthy Aging, pain management, rehabilitation services, a sleep disorders center, occupational health, hospitalist services, and nutritional services. In addition, through a lease and purchased service agreement with Radius Specialty Hospital, the Company provides a 38-bed long term acute care hospital (under Radius's license) comprising approximately 20,700 square feet located within QMC.

### Payor Mix

QMC receives payments for services rendered to patients from the Medicare and Medicaid programs, commercial insurers, and patients directly. Generally, the Company's revenues are determined by a number of factors, including the payor mix, the number and nature of procedures performed, and the rate of payment for the procedures. During the fiscal year ended September 30, 2010, the Company derived approximately 62 percent of its revenues from Medicare and Medicaid, approximately 35 percent from Blue Cross and commercial insurance payors, and approximately 3 percent from patient payments. The Company maintains relationships with all of the significant commercial/third-party payors in its market, and continually assesses its third-party payor contracts in order to negotiate favorable reimbursement rates for the services it provides.

### Recent Operational Initiatives

In 2010, the Company commenced a clinical affiliation with Tufts Medical Center. This affiliation provided the Company and its patients access to certain services otherwise unavailable at the Hospital, both through referral of patients to Tufts facilities, and through use of Tufts medical staff to provide expanded services at the Hospital.

Another principal initiative of the Company has been outreach efforts to inform the surrounding community about the Hospital's services and to increase the community's utilization of those services. This effort has focused on outreach to the significant concentrations of elderly and Asian individuals in the Quincy community. The Company has also undertaken ongoing efforts to streamline operations and minimize the costs of providing services while continuing efforts to enhance the quality of patient care.

**B.      The Company's Decision to Consider Strategic Alternatives**

The Company operates in a competitive, saturated market for health care services. The delivery of medical services is becoming increasingly regulated, and there is pressure from both national and state constituencies to rein in what appear to be inexorably rising health care costs. One approach intended to promote more rational, cost-effective delivery of medical services is consolidation of hospitals into corporate groups that can obtain the benefits of a bigger patient base, a broader insurance pool, and resulting increased leverage in negotiating payment rates with insurers and government payors. Consolidation can also reap the benefits of more efficient use of corporate overhead, infrastructure, and information technology.

In Massachusetts, consolidation of hospitals is further affected by two additional factors. One is Governor Patrick's proposed health care payment overhaul that would restrict provider payments to annual budgets for delivered care instead of payment for individual visits and procedures. A second is a push by state and federal officials to create so-called accountable care organizations—groups of doctors and hospitals that would band together to provide medical care under new global payment systems. The push for consolidation is reflected by Steward's campaign to build a chain of for-profit community hospitals in eastern Massachusetts and beyond; Steward's entry into the APA is but one of a number of Steward's planned acquisitions of struggling community hospitals into a more efficient management structure.

Due largely to the competitive pressures of its marketplace and the push toward delivery of more medical services on an outpatient basis, the Company in 2009 began to experience a decline in operating performance. As a result, in late 2009 the Hospital did not meet a minimum cash days on hand bond covenant, triggering an operational assessment of the Hospital by a third party industry consultant, Alvarez & Marsal. Under the direction of the Company's Board of Trustees, Company management has guided the Company's implementation of certain operational improvements to effect cost savings and improve revenue realization identified in the Alvarez assessment. In addition, the Hospital consolidated or eliminated certain services to improve operating performance. While these efforts generated significant savings and improved efficiency in many areas, the fundamental issue facing the Company remained—how to prosper and survive in an increasingly competitive and consolidated industry and marketplace.

The pressures on the Company's business operations resulted in deteriorating financial performance. The Company's earnings before interest, depreciation and amortization, or EBIDA (before restructuring fees), decreased approximately $1.6 million (exclusive of $2.0 million in Grant Income in FY 2009) from 2009 to 2010 (fiscal years ended September 30) primarily due to a drop in net patient service revenue of approximately $4.4 million. Net patient service revenue decreased mainly as a result of lower inpatient volume, patient days, and outpatient surgeries during 2010. This trend has continued in 2011 to date; EBIDA (before restructuring fees) for the year-to-date period through June 30, 2011 decreased approximately $460,934 as compared to the same period in 2010. The lower EBIDA (before restructuring fees) was primarily a result of lower admissions and outpatient surgeries, though an increase in uncollectable receivables also contributed. Total Net Revenues totaled approximately $76.0 million for the year-to-date period through June 30, 2011, a decrease of approximately 1.6 percent from the previous year. Year-to-date patient discharges through June 30, 2011 totaled 4499, a 3.8 percent decrease for the same period in 2010.

Faced with continued deterioration in operating and financial performance, lack of capital reinvestment, and in order to strengthen the long term operating viability of the Hospital and enhance its access to capital, the Company's Board of Trustees decided to explore strategic partnership opportunities with other hospital systems, including an affiliation with a larger not-for-profit hospital system or a sale of the Hospital's assets to a for-profit hospital system. The Company hoped to partner with a well-capitalized, growth-oriented hospital system that would accommodate the Company's continued focus on providing high-quality health care in a patient-centered, community-oriented setting. The Company believes that there is substantial opportunity for a larger hospital operator to realize significant synergies by integrating the Company's operations into a larger system, including through such areas as managed care contracting, physician recruitment, business development, and cost structure efficiencies; in addition, any acquirer would be able to reap the benefits of the Hospital's high profile and strong reputation in Quincy and surrounding communities, its strategic location (only minutes from downtown Boston), and its recognized history as a highly rated, cost-efficient provider of high quality medical services.

C.    **Retention of Financial Advisor; Sale Effort to Date**

After deciding to explore strategic alternatives, on March 1, 2011 the Company engaged Navigant Capital Advisors, LLC and Navigant Consulting, Inc. (together, "Navigant"), a specialty investment banking and consulting firm with substantial expertise in mergers and acquisitions in the hospital and medical services industry, to serve as the Company's financial advisor. Navigant's engagement was directed to two principal tasks: one, to assist the Company in assessing potential strategic initiatives, including a potential merger or sale of the Company, and to help the Company implement its chosen course of action; and two, to provide operational and financial advice and support services to promote the more efficient operation of the Company as it pursued its strategic alternatives.

Upon its engagement, Navigant assisted the Company in assessing various strategic and operational initiatives. These efforts were directed to positioning the Company to prosper in an increasingly competitive and regulated industry while protecting the Company's nonprofit, community-oriented mission. Recognizing the consolidation underway in the hospital industry, the Company under Navigant's guidance determined that remaining an independent hospital was unlikely to promote the Hospital's survival as a viable business enterprise. Consequently, the Company decided to explore the level of interest for acquisition of the Hospital, focusing on potential acquirors best-suited to promote the Company's nonprofit, community-oriented mission.

Navigant spearheaded the Company's sale solicitation effort. It worked with Company management to position the Company for potential sale, including through preparation and review of marketing materials and other due diligence items contained in a virtual data room, compiling a list of potential acquirers, working with the Company and its counsel to prepare for the planned sale, and providing sale-related advice to the Company. Commencing in early April, 2011, Navigant solicited 23 potential buyers, including many significant national or regional for profit hospital companies and all local market strategic players. Ten of these companies executed a confidentiality and non-disclosure agreement that entitled them to conduct due diligence about the Company. Only two companies submitted a formal, written proposal to acquire the Company by the late May deadline established by the Company, one of which was Steward, a Boston-based owner of eight hospitals in eastern Massachusetts and Rhode Island (with two additional hospitals under agreement)

9

that is actively engaged in expanding its network of community-based hospitals in the Company's market.

During June 2010, Navigant and the Company continued discussions and negotiations toward refined acquisition offers from each of Steward and the competing bidder, and with the Company's legal advisors worked toward definitive asset purchase agreements with each suitor. These continued negotiations led to the Company's decision on June 27, 2011 to accept (subject to Bankruptcy Court approval after conclusion of the Court-authorized sale process) Steward's offer embodied in the APA. The Company then filed its Chapter 11 case, and filed its Sale Motion, in order to effectuate the planned sale to Steward and thereafter provide for the distribution of sale proceeds (and other estate assets) in accordance with the Plan.

### D.    Summary of Company's Assets and Liabilities

As of June 30, 2011, the Company had approximately $71.2 million of assets at book value. This total includes $3.1 million of cash and cash equivalents (inclusive of $707,879 held by non-Debtor affiliate Quincy Medical Center Foundation, Inc.) and approximately $13.3 million of patient accounts receivable, allowing for uncollectible amounts. The mix of receivables from patients and third party payors is primarily comprised of Medicare, Medicaid, commercial payors such as Blue-Cross Blue Shield, and patient self-pay.

Assets whose use is limited totaled approximately $15.975 million as of June 30, 2011 and includes the following:

> debt service and interest reserves established in connection with the Bonds, in the amount of approximately [$6.3 million] (in two funds in the approximate amount of [$4.75 million] and [$1.55 million]) held by the Prepetition Indenture Trustee;

> a Project Fund established in connection with the Bonds, used to finance specified projects, in the amount of approximately [$3.85 million], held by Mass Development;

> Massachusetts state grant funds of approximately $500,000;

> Donor-restricted funds held by Debtor QMC of $2.17 million;

> Donor-restricted funds held by non-Debtor affiliate Quincy Medical Center Foundation, Inc. in the approximate amount of $708,000; and

> designated assets set aside by the Board of Trustees for future capital improvements in the approximate amount of $3.82 million.[1]

As reported on the Debtor's Schedules of Assets and Liabilities, as amended, total liabilities were approximately $75,175,190 as of June 30, 2011, including approximately $56,466,747.18 in principal of senior secured indebtedness, (plus $2,136,790.07 in accrued interest on such indebtedness) owed to the Company's bondowners, approximately $487,529.50 for prepetition Prepetition Indenture Trustee fees and expenses,[2] approximately $2,643,656 in secured claims other

---

[1] The balance of these Board designated assets at the closing of the Sale transaction will be available for distribution to the holders of Class 2 Claims.

[2] These fees and expenses were paid pursuant to the interim order authorizing continued use of cash collateral.

than those held by the company's bondowners, approximately $2,155,307.00 of subordinated secured indebtedness owed to Boston Medical Center arising out of the Company's clinical affiliation with that entity, approximately $5,239,114.54 in claims entitled to priority under the Bankruptcy Code, and approximately $6,046,045,61 of unsecured liabilities. The unsecured liabilities are disclosed in more detail at section III.E. below.

### E.   Prepetition Financing of the Company

Mass Development Bond Obligations

On or about May 28, 2008, QMC obtained financing through the issuance for its benefit of $60,250,000 of Massachusetts Health and Educational Facilities Authority, now known as Massachusetts Development Finance Agency ("Mass Development") Revenue Bonds, Quincy Medical Center Issue, Series A (2008) (the "Bonds"). U.S. Bank, N.A. serves as trustee for the holders of the Bonds (the "Prepetition Indenture Trustee"). The Bonds included four separate types reflecting differing amounts, maturities and interest rates/yields as follows:

| Amount | Interest Rate | Maturity | Yield | CUSIP |
|---|---|---|---|---|
| $ 3,020,000 | 5.125 % | Jan. 15, 2012 | 5.30 % | 57586C2B0 |
| 6,565,000 | 5.850 % | Jan. 15, 2018* | 6.00 % | 57586CZ73 |
| 17,745,000 | 6.250 % | Jan. 15, 2028* | 6.50 % | 57586CZ81 |
| 32,920,000 | 6.500 % | Jan. 15, 2038* | 6.72 % | 57586CZ99 |

*   Yield to the January 15, 2018 optional redemption date at a redemption price of 100%.

As of the Petition Date, the amount owed by QMC on account of the Bonds is approximately $58,603,537.25 including accrued interest of approximately $2,136,790.07 exclusive of fees, costs and expenses (including, without limitation, Indenture Trustee fees, attorneys' fees and other professional fees and disbursements), charges, and all other obligations incurred or owing under the Indenture, against which obligations there is approximately $6.3 million in certain bond reserve funds (comprised of a $1.55 million Debt Service Fund and a $4.75 million Debt Service Reserve fund) plus a Mass Development Project Fund escrow account of $3.97 million.

As security for the Company's obligations under the Bonds, the Prepetition Indenture Trustee was granted a first priority mortgage against and security interest in substantially all of the Company's assets, including the Hospital and all revenues generated through its operation.

BMCC Obligations

Boston Medical Center Corporation ("BMCC") asserts a claim in the amount of approximately $2.1 million as of the Petition Date arising out of the Company's clinical affiliations with BMCC and represented by two secured, subordinated promissory notes dated June 30, 2008 and June 30, 2009, respectively, identified in the Plan as the "BMCC Subordinated Claims". BMCC asserts a first priority security interest in the Company's assets to secure BMCC Subordinated Claims. Pursuant to a subordination agreement by and among QMC, the Prepetition Indenture Trustee and BMCC dated as of June 30, 2008, the BMCC Subordinated Claim and related security

interest are subordinated to the claims and security interest asserted by the Prepetition Indenture Trustee. Based on the expected value to be realized by the Company from the Sale, the Company believes that the BMCC Subordinated Claims are unsecured.

<u>Unsecured Debt</u>

As reported on the Debtor's Schedules of Assets and Liabilities as amended, as of June 30, 2011, the Company's accrued unsecured liabilities totaled approximately $11,285,160.15, including accounts payable and certain accrued expenses due to third parties for goods and services supplied prior to the Petition Date of approximately $6,046,045.61 and accrued obligations to employees or providers of employee benefits of approximately $5,239,114.54 (entitled to priority status in accordance with Bankruptcy Code sections 507(a)(4) and (5), and set forth on Schedule E)[3]

It is anticipated that the remaining employee and employee benefit plan obligations, as well as certain third-party payor obligations will be assumed by Steward in connection with the Sale.

## IV.    The Chapter 11 Cases

The Debtors filed their voluntary petitions commencing these Chapter 11 Cases on July 1, 2011—the Petition Date. The purpose of the Chapter 11 filings was to provide the best means for completing the sale process, stabilizing business operations while the process is completed, and distributing sale proceeds in the manner provided by the Bankruptcy Code.

### A.    First Day Orders

On July 1, 2011, the Debtors filed several motions seeking the relief provided by certain so-called "first day orders." First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business conduct that may not be authorized specifically under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

The "first day orders" in the Chapter 11 cases authorized, among other things:

- the joint administration of each of the Debtors' bankruptcy cases [Docket No. 24];

- the payment of employees' accrued prepetition wages and certain employee benefit claims [Docket No. 61]

- the maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date [Docket No. 25];

---

[3] This figure excludes approximately $1,035,542.28, which was paid after the Petition Date, pursuant to orders entered by the Bankruptcy Court, for items including employee and medical service provider salary, wages and similar payments, employee benefits, and patient refunds.

- extension of the time to file schedules of assets and liabilities and statements of financial affairs [Docket No. 101];

- procedures for interim compensation and reimbursement of expenses of professionals [Docket No. 83];

- authority to refund certain overpayments to patients and insurers [Docket No.108];

- retention by the Debtors of Casner & Edwards LLP as bankruptcy counsel, Mintz Levin Cohn Ferris Glovsky and Popeo, P.C. as special counsel, and Navigant Consulting Inc. as financial advisors as [Docket Nos. 184, 213 and 234]

**B.**    **Creditors' Committee**

Since it is usually impractical for unsecured creditors to participate directly in a Chapter 11 case, bankruptcy law provides for an official committee of unsecured creditors to represent the interests of the unsecured creditors as a group (which usually selects counsel to represent the committee at the expense of the bankruptcy estate). The membership of the creditors' committee typically includes the largest unsecured creditors who are willing to serve, provided that they are representative of the creditor body.

The Official Committee of Unsecured Creditors ("Creditors' Committee") appointed in the Company's jointly-administered Cases is composed of the following creditors:

The Claflin Company
Attn: Bill Almon
455 Warwick Industrial Drive
Warkwick, RI 02886

Biomet, Inc.
Attn: Sherri Morissette, Esq.
56 E. Bell Drive
Warsaw, IN 46582

Roche Diagnostics
Attn: Wayne Mathias
9115 Hague Road
Indianapolis, IN 46250

Sodexo USA
Attn: Brad Hamman
283 Cranes Roost Blvd., Suite 260
Altamonte Springs, FL 32701

Massachusetts Nurses Association
Attn: Roland Goff, Labor Counsel

13

340 Turnpike Street
Canton, MA 02021

Counsel to the Creditors' Committee is: Jeffrey D. Sternklar, Esq. of the law firm Duane Morris LLP in Boston, Massachusetts. Deloitte Financial Advisory Services LLC is the financial advisor to the Creditors' Committee.

The Debtors have worked closely with the Creditors' Committee on all significant aspects of the Chapter 11 Cases, including the sale procedures, the sale process and development of the Plan. The Plan provides for the Creditors' Committee to designate / supervise designation of the Liquidation Trustee to oversee the implementation of liquidation of certain assets, and distributions from the Liquidation Trust to the general unsecured creditors following consummation of the Plan.

**C.**    **Sale of the Hospital**

   **1.**    **Completion of the Sale Process**

The primary focus of the Company and its professionals during the initial stages of these cases was to complete the sale process commenced prepetition in a manner that would maximize the value of the Hospital and related assets for the benefit of the Company's creditors. The initial steps included the filing on the Petition Date of the Sale Motion and accompanying motion to establish procedures governing the submission of competing bids and other aspects of the proposed sale (the "Sale Procedures"). [Docket No. 105] In accordance with the order establishing the Sale Procedures, the Debtors have solicited additional offers to purchase the Debtors' assets. Competing bids were due to be delivered on August 8. 2011 (the "Bid Deadline"). No counteroffers to the proposed Sale were received as of the Bid Deadline, however, pursuant to the Sale Procedures, the Debtors solicited separate bids for one particular asset: Debtor QED's 10% beneficial interest (the "BMC NAB Shares") in BMC NAB Business Trust, a Massachusetts business trust (the "BMC NAB Trust"). The Debtors received one bid for the BMC NAB Shares from an affiliate of Boston Medical Center, Inc., which owns the other 90% interest in the BMC NAB Trust, and an allocation of a portion of the purchase price for the BMC NAB Shares from Steward. An auction to determine the prevailing bidder for the BMC NAB Shares was conducted on August 15, 2011. On August 17, 2011, the Bankruptcy Court designated Steward as the Prevailing Bidder for the Sale of the Assets, as well as the prevailing bidder for the BMC NAB Shares.

The sale process was designed to be relatively quick: 11 weeks from the Petition Date to the Sale Hearing. Given the extensive prepetition marketing efforts, this period provided sufficient time for interested parties to complete due diligence and make a bid for the Company's assets. Thus, a critical component of the Sale Procedures consisted of utilizing the virtual deal room website developed and maintained by Navigant containing due diligence materials, whereby prospective buyers who executed a confidentiality agreement could gain electronic access to all material information and documents concerning the Company, its operations, and its assets and liabilities.

**D.**    **Other Postpetition Events**

   **1.**    **Bar Date**

14

Bankruptcy law provides for pre-bankruptcy claims against a debtor to be asserted in two ways: a creditor may file a proof of claim or, if its claim is listed on the schedule of liabilities filed by the debtor with the Court (the "Schedules") and is not listed therein as contingent, unliquidated or disputed, then this listing is the equivalent of a proof of claim. If a creditor files a proof of claim for an asserted liability that has already been listed in the Schedules, the proof of claim filed by the creditor supersedes and replaces the claim listed in the Schedules.

The deadline, or Bar Date, for filing most proofs of claim will be established at a later date, pursuant to a motion to be filed by the Debtors and an order of the Bankruptcy Court (the "Bar Order"). Notice of this deadline will be mailed to all creditors of the Debtors pursuant to the Bar Order.

For further information concerning the process by which Claims against the Debtors will be Allowed or Disallowed, see Section VI, "Allowance of Claims," at page ____.

The Bar Order applies to prepetition Claims, meaning, Claims arising before July 1, 2011, when the Debtors' Chapter 11 petitions were filed. Claims arising on or after the Petition Date are subject to deadlines and procedures established by the Plan. See Section I(E), "Postpetition Claims," at page ____.

## 2.    Cash Collateral Usage and Adequate Protection

At the time of their Chapter 11 filings, substantially all of the Debtors' assets were subject to liens asserted by U.S. Bank National Association, as trustee for the holders of the Company's 2008 MASS DEVELOPMENT bond issue (the "Prepetition Indenture Trustee"). The Prepetition Indenture Trustee's Secured Claim and its disposition under the Plan are discussed below in Section V(B), "Secured Claims," at page ____.

Bankruptcy law permits use of cash collateral only with the lienholder's consent or Court approval. Since use of cash collateral was essential to the ongoing operation of the Company's business, the Company filed on the Petition Date a motion for continued use cash collateral. Pursuant to a series of Orders, the Debtors have been authorized to use cash collateral through the Chapter 11 cases and completion of the sale process.

On July 1, 2011, the Bankruptcy Court entered the *Emergency Order Authorizing Interim Use of Cash Collateral and Providing Adequate Protection* [Docket No. 26] providing for the continued use of cash collateral on an emergency basis for one week and granting adequate protection to the Prepetition Indenture Trustee. On July 7, 2011, the Bankruptcy Court entered the *Interim Order Under Bankruptcy Code Sections 105, 361, 362, 363 and 507(b), and Bankruptcy Rules 2002, 4001 and 9014, (I) Authorizing Debtors to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling Final Hearing* [Docket No. 60] authorizing the continued use of cash collateral on an interim basis and granting certain protections to the Prepetition Indenture Trustee, including adequate protection for any diminution in the value of its collateral. The interim order was continued and amended on three occasions in order to amend certain dates and deadlines. The final order was granted by the Bankruptcy Court on August 31, 2011, by order entered September 1, 2011 [Docket No.266].

## E.    Development of Plan

15

The Debtors determined that a Chapter 11 plan of liquidation would provide the best means to liquidate the Debtors' remaining assets, wind up their affairs and provide the most expeditious and highest possible distribution to all creditors. As a result, the Debtors prepared and filed the Plan and this Disclosure Statement and will work cooperatively with the Prepetition Indenture Trustee, the Creditors Committee and creditors toward confirmation and implementation of the Plan. See Section XIII, "Alternatives to the Plan," at page ____ for a comparison of the projected timing and amount of distributions under the only available alternative to the Plan: conversion of the Chapter 11 Cases to Chapter 7.

## F.   Reclamation Claims

Bankruptcy law authorizes vendors who have sold goods to a debtor in the ordinary course of business to reclaim such goods (subject to certain limitations) if: (a) the debtor was insolvent when the goods were delivered; (b) the seller demanded reclamation in writing; (c) such demand was made within 10 days after the debtor received possession of the goods (or within 20 days, if the 10 day period would expire after the Petition Date); and (d) the seller is otherwise entitled to reclamation under applicable state law. This right of reclamation is subject to any superior rights of other creditors in the goods. In this case, reclamation claims have no value because of the Prepetition Indenture Trustee's superior rights arising out of its perfected security interest in the Debtors' inventory.

## V.   Classification of Claims and Their Treatment Under the Plan

The Debtors' liabilities and their treatment under the Plan, are described below in the following order:

| Class | Claims | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Claims | Unimpaired | Deemed to accept |
| 2 | Bondowner Secured Claims | Impaired | Entitled to vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to accept |
| 4 | General Unsecured Claims | Impaired | Entitled to vote |
| 5 | Subordinated Claims | Impaired | Deemed to reject |

## A.   Administrative Claims

### 1.   Administrative Claims in General

Administrative Claims under Bankruptcy Code Section 507(a)(1) consist of expenses incurred during the Chapter 11 Cases, including quarterly fees payable to the Office of the United States Trustee. Under bankruptcy law, these Claims are entitled to priority payment over all unsecured Claims arising before the Petition Date. Accordingly, the Plan provides that, except as otherwise agreed to by the holder of an Allowed Administrative Claim, each holder of an Allowed Administrative Claim will be paid the full amount of such Allowed Claim, in Cash, not later than the date on which initial distributions are made.

All motions and Proofs of Claim seeking payment of an asserted Administrative Claim must be filed and served on counsel to the Debtors, the Liquidation Trustee, the U.S. Trustee and the Prepetition Indenture Trustee no later than the Administrative Claim Bar Date, which shall be forty-five (45) days after the Confirmation Date.

Approximately five days prior to the Effective Date, the Debtors shall estimate the aggregate Allowed amount of Priority Tax Claims, Priority Claims, and Administrative Claims that are not Fee Claims that are not yet Allowed as of the Effective Date. The total amount so estimated shall be consented to in writing by the Prepetition Indenture Trustee and shall comprise the "***Administrative and Priority Claims Escrow Amount***." On the Effective Date, the Debtors shall fund an interest-bearing account (the "***Administrative and Priority Claims Escrow Account***") to be held by the Liquidation Trustee with Cash equal to the Administrative and Priority Claims Escrow Amount, and thereafter the Administrative and Priority Claims Escrow Account shall be maintained in trust for the benefit of the holders of such Claims. Upon allowance, Allowed Priority Tax Claims, Allowed Priority Claims, and Allowed Administrative Claims that are not Fee Claims that are to receive Cash, shall be paid in Cash from the Administrative and Priority Claims Escrow Account.

Administrative Claims are not classified in the Plan, are Unimpaired and are therefore not entitled to vote to accept or reject the Plan.

### 2.      Claims Related to Operation of the Business

Subsequent to the Petition Date, the Debtors have paid on a current basis for goods and services obtained, and any other liabilities incurred, in the operation of their business. The Debtors will cease operations upon closing of the Sale, anticipated to occur as early as October 1, 2011. Accordingly, the Debtors project that (other than Fee Claims of professionals in connection with the Chapter 11 Cases, which are subject to special procedures established by the Court) no significant Administrative Claims will be outstanding on the Effective Date. If you believe that you hold an unpaid Administrative Claim other than a Fee Claim, you should comply with the requirement (described in the preceding section) to file an application seeking allowance of such claim.

### 3.      Claims Related to Administration of Chapter 11 Cases

The lawyers, accountants and other professionals who have supplied services to the Debtors and the Creditors' Committee have received monthly and quarterly payments pursuant to various Orders of the Court. These payments are interim in nature; final determination of Fee Claims for services and expenses through the Effective Date will take place pursuant to applications filed on or before forty-five (45) days after the Effective Date.

The Plan provides that each Fee Claim will become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

No later than five days prior to the Effective Date, the Retained Professionals shall deliver to the Debtors an estimate of their Fee Claims prior to and as of the Effective Date. If a Retained Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Retained Professional. The total amount so estimated shall comprise the "*Fee Claims Escrow Amount*." On the Effective Date, the Debtors shall fund an interest-bearing account (the "*Fee Claims*

*Escrow Account*") to be held by the Liquidation Trustee with Cash equal to the Fee Claims Escrow Amount, and thereafter the Fee Claims Escrow Account shall be maintained in trust for the benefit of the holders of such Claims. Upon allowance, Allowed Fee Claims that are to receive Cash, shall be paid in Cash from the Fee Claims Escrow Account.

### B.   Priority Claims (Class 1)

For reasons of public policy, the bankruptcy law entitles certain types of unsecured Claims arising before the Petition Date—such as certain taxes, customer deposits, wages and employee benefits—to be paid in full prior to other unsecured Claims.

As of the Petition Date, the Debtors were liable on a priority basis for certain taxes and employee-related claims, including accrued employee wage and benefit liabilities. By Order dated July 6, 2011, the Court authorized the Debtors to pay their employees on account of (a) prepetition wages and salaries, and (b) reimbursable out-of-pocket business-related expenses. The Order also authorized the Debtors, in the ordinary course of business, to (a) permit their employees to use their accrued and unpaid vacation time, and (b) honor and fund their employee benefit obligations to the extent such programs were in effect prior to the bankruptcy filings. As a result of this Order, substantially all employee-related Claims as of the Petition Date have been paid in full.

Although the Debtors believe that there are no outstanding Priority Claims, the Plan establishes Class 1 for any such Claims that exist, and provides that they will be paid in full in Cash, or shall receive such other treatment that leaves its Claim Unimpaired, on the Initial Distribution Date.

Allowed Priority Claims are placed in Class 1, are Unimpaired and hence deemed to accept the Plan.

### C.   Secured Claims (Class 2 and Class 3)

A claim is "secured" when a creditor holds a lien on particular assets ("collateral") to secure payment of the claim. To the extent that the value of the collateral exceeds the principal amount of the secured claim, then the secured claim may include interest, along with reasonable fees and costs of collection that the debtor agreed to pay. If the amount of the secured claim exceeds the value of the collateral, then the claim is considered to be a "secured claim" under bankruptcy law only to the extent of the value of the creditor's interest in the collateral. In certain instances, the value of the collateral is computed after deducting any costs that the bankruptcy estate is entitled to collect from the collateral relating to its preservation or sale. Bankruptcy law requires secured claims to be paid in full unless the secured creditor otherwise agrees.

As of the Petition Date, the following Secured Claims were asserted:

#### 1.   Bondowner Secured Claims (Class 2)

The Bondowner Secured Claims are comprised of any Claims of a Prepetition Bondowner against the Debtors arising under, in connection with or related to the Prepetition Bond Documents*,*

including all principal, accrued and unpaid interest thereon and costs, expenses, and fees owing thereunder or relating thereto as of the Petition Date.

The Class 2 Bondowner Secured Claims are Allowed, not subject to offset, defense, counterclaim, reduction, or credit of any kind whatsoever, in the amount of $58,603,537.25.

Holders of Class 2 Bondowner Secured Claims shall receive the Debtors' Net Estate Assets on, or as soon as practicable after, the Effective Date. The Debtors' Net Estate Assets include all assets of the Debtors' Estates, whether in the Debtors' possession or control on or prior to the Effective Date or received by the Debtors after the Effective Date, that were not previously distributed to the Prepetition Bondowners pursuant to a Final Order of the Bankruptcy Court, including without limitation, all Cash, including Cash Collateral, Net Sale Proceeds and Unrestricted Donor Funds; provided that the Liquidation Trust Cash Payment, the Causes of Action, the Donor Restricted Funds, the Post-Effective Date Expenses Amount, the Wind-Down Expenses Amount and any amounts paid or payable from the Administrative and Priority Claims Escrow Account and the Fee Claims Escrow Account on account of Allowed Administrative, Priority Claims, Priority Tax Claims and Fee Claims shall not be considered Net Estate Assets.

The Debtors' Net Estate Assets are not sufficient to pay the Bondowner Secured Claims in full. Therefore, Class 2 is Impaired under the Plan and entitled to vote to accept or reject the Plan.

### 2.     Other Secured Claims (Class 3)

Claims other than the Bondowner Secured Claims that are secured by a valid, perfected and enforceable Lien on property in which a Debtor has an interest, to the extent of the value of the creditor's interest in the Debtor's interest in such property are placed in Class 3 as Other Secured Claims, with each distinct secured claim in a separate subclass.

As of the Petition Date, the Debtors listed eight parties as likely holders of other secured claims. The creditors are, primarily, equipment lessors which filed financing statements listing equipment located at the Debtor's hospital as collateral. The amount of these potential Other Secured Claims is undetermined pending the filing of proofs of claim for these (and, potentially, other) claimants.

Each holder of an Allowed Other Secured Claim shall receive, in the sole discretion of the Plan Administrator or the Liquidation Trustee, as applicable, either: (i) the Collateral securing its Other Secured Claim; (ii) Cash in an amount equal to the value of the Collateral securing its Other Secured Claim, including, to the extent applicable, postpetition interest under section 506(b) of the Bankruptcy Code; or (iii) other treatment of its Other Secured Claim in a manner that leaves such Claim Unimpaired within the meaning of section 1124(1) of the Bankruptcy Code.

Class 3 is Unimpaired, and hence deemed to accept the Plan.

### D.     General Unsecured Claims (Class 4)

Unsecured claims not entitled to priority under the Bankruptcy Code are called "general unsecured claims." In order to be Allowed, a General Unsecured Claim must (a) either be set forth in a proof of claim properly filed with the Court on or before the Bar Date or be listed by the

Debtors in their Schedules filed with the Court as an obligation other than a liability that is disputed, unliquidated or contingent, and (b) not be Disallowed by Order. For more information on the process by which Claims are Allowed, see Section VI(A), "How Claims are Allowed," at page ___.

The Debtors' books and records indicate that on a consolidated basis, their unsecured liabilities for goods and services unpaid as of the Petition Date were approximately $6 million, excluding claims entitled to priority under the Bankruptcy Code. The Debtors project that General Unsecured Claims will be Allowed in a range of from $6 to $7 million, excluding claims arising from the rejection of executory contracts.

On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Class 4 General Unsecured Claim becomes an Allowed Class 4 General Unsecured Claim, or (iii) the date such Class 4 General Unsecured Claim becomes payable pursuant to any agreement between the Liquidation Trustee and the holder of such Class 4 General Unsecured Claim, each holder of an Allowed Class 4 General Unsecured Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Class 4 General Unsecured Claim, its pro rata share of 100% of the Liquidation Trust Interests.

Class 4 General Unsecured Claims are Impaired and therefore entitled to vote to accept or reject the Plan.

### E.     Subordinated Claims (Class 5)

Subordinated Claims consist of Claims that are subordinated pursuant to contract (including the BMCC Subordinated Claims), or applicable legal or equitable principles, including general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or pursuant to any other authority, including orders of the Bankruptcy Court. No property of the Estate will be distributed to or retained by Holders of Class 5 Subordinated Claims.

BMCC asserts the BMCC Subordinated Claims in the amount of approximately $2.1 million as of the Petition Date. While BMCC asserts a first priority security interest in the Company's assets to secure the BMCC Subordinated Claims, this claim and security interest are subordinated to the claims and security interest asserted by the Prepetition Indenture Trustee and are not entitled to receive any property on account of such claims until the Bondowner Secured Claims are satisfied in full. Based on the expected value to be realized by the Company from the Sale, the Bondowner Secured Claims will not be satisfied in full and therefore BMCC Subordinated Claims are classified as Class 5 Subordinated Claims. This classification and proposed treatment only relates to the BMCC Subordinated Claims and shall have no impact upon any claims of BMCC or its affiliates that are not governed by the BMCC Subordination Documents; those claims are classified in Class 4 as general unsecured claims.

### VI.     Allowance of Claims

### A.     How Claims are Allowed

No Claim will be paid unless it is Allowed. Any Claim as to which liability and amount are determined by a Final Order of the Bankruptcy Court (or such other court or forum as the Liquidation Trustee and the holder of such Claim agree to or as the Bankruptcy Court may direct)

shall be Allowed in such amount.  If you hold a Claim that arose before the Petition Date, and you filed a proof of claim before the Bar Date established by the Court,[4] then your Claim will automatically be Allowed unless it is the subject of an objection prior to the deadline for filing objections to claims which deadline has not yet been determined by the Bankruptcy Court.  Even if you did not file a proof of claim, if your Claim is listed in the Schedules filed by the Debtors (including as such Schedules may be amended) as an obligation that is not disputed, unliquidated or contingent, then your Claim will automatically be Allowed in the amount listed in the Schedules, unless it is the subject of an objection or an amendment to the Schedules.  If a creditor files a proof of claim for an asserted liability that has already been listed in the Schedules, the proof of claim filed by the creditor supersedes and replaces the Claim listed in the Schedules.  If an objection is filed to your Claim, then you will receive written notice, an opportunity to respond and a hearing before the Court on any disputed issues.  The Court will then determine the Allowed Amount of your Claim, if any.

If your Claim is Allowed as just described, then you will be entitled to distributions under the Plan based on the Allowed Amount of your Claim.  There is nothing else you need to do, provided that the Claims Agent has your correct address.  See Section VII(A), "Changes of Address," at page 33.

No disputed Claim shall be Allowed except in the amount either agreed upon between the holder of such Claim and the Liquidation Trustee or as determined by a Final Order of the Bankruptcy Court (or such other court or forum as the Liquidation Trustee and the holder of such Claim agree to or as the Bankruptcy Court may direct).

Concerning Claims arising on and after the Petition Date, see Section VI(E) "Postpetition Claims," at page 31.

**B.**     **Late-Filed Claims and Amendments**

Each Claim as to which a proof of claim was required to be filed on or before the Bar Date and as to which a proof of claim was not filed on or before the Bar Date will be Disallowed pursuant to the Plan as of the Effective Date without any further notice to an action, order or approval of the Bankruptcy Court and holders of such claims may not receive any distributions on account of such claims, unless such late proof of claim is deemed timely filed by a final order of the Bankruptcy Court.  A proof of claim that has not been timely filed will be of no force or effect whatsoever, including for purposes of any distribution under the Plan; nor will any action (including giving notice to the Debtors or otherwise making an "informal" proof of claim) serve for purposes of the Plan and distributions required of the Liquidation Trust as a substitute for timely filing a proof of claim.  In no event will the Allowed Amount of any Claim exceed the amount set forth in a proof of claim therefor filed on or before the Bar Date except to the extent that the claimant has obtained prior to entry of the Confirmation Order, on notice to the Debtors, the Prepetition Indenture Trustee and the Creditors' Committee, an Order permitting the filing of an amended proof of such Claim increasing the amount thereof.  After entry of the Confirmation Order, no Order allowing or disallowing a Claim may be reconsidered, pursuant to Code Section 502(j) or otherwise, so as to increase the Allowed Amount thereof.

---

[4] See Section IV(C)(1), "Bar Date," at page 11 for a discussion of the Bar Date.

### C.    Claims Subject to Pending Objection

**N**o payments or distributions shall be made with respect to all or any portion of a Contested Claim unless and until all objections to such Contested Claim have been settled or withdrawn or have been determined by Final Order, and the Contested Claim, or some portion thereof, has become an Allowed Claim.  To the extent that a Contested Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, without any interest to be paid on account of the time period during which such Claim was Contested.

All Claims of any Entity that owes money or property to or asserts disputed possession of or control over property of the Debtors shall be deemed to be Contested and shall not be Allowed unless and until such Entity pays in full any amount or returns any property of or owed to the Debtors.

### D.    Estimation of Claims

The Plan provides that the Liquidation Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether a proof of Claim has been filed or a party in interest has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Liquidation Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

### E.    Postpetition Claims

The Debtors have been paying on a current basis for goods and services obtained since the Petition Date in the operation of the Debtors' business.  Any Claim of this type is considered to have been Allowed by reason of having been paid.

For any Claim arising from or after the Petition Date, all motions and Proofs of Claim seeking payment of such an asserted Administrative Claim must be filed and served on counsel to the Debtors, the Liquidation Trustee, the U.S. Trustee and the Prepetition Indenture Trustee no later than the Administrative Claim Bar Date, which shall be forty-five (45) days after the Confirmation Date.

Unless the Liquidation Trustee, the U.S. Trustee or any party in interest objects to a Priority Tax Claim, or Administrative Claim that is not a Fee Claim, within forty-five (45) days after the Confirmation Date (or such later date as extended by the Bankruptcy Court at the request of the Liquidation Trustee), such Priority Tax Claim or Administrative Claim that is not a Fee Claim, shall

be deemed Allowed in the amount requested.  In the event that the Liquidation Trustee, the U.S. Trustee or any party in interest objects to a timely filed Priority Tax Claim or Administrative Claim that is not a Fee Claim and such objection cannot be resolved by the Liquidation Trustee in accordance with Section IX.B of the Plan, the Bankruptcy Court shall determine the Allowed amount of such Priority Tax Claim or Administrative Claim.

### F.        Claims Paid or Payable by Third Parties

The Debtors or the Liquidation Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be deemed disallowed without any further notice to the holder of the Claim or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Liquidation Trustee.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Liquidation Trustee on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the Debtors or the Liquidation Trustee, as the case may be, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Debtors or the Liquidation Trustee, as applicable, annualized interest at the federal judgment rate which was in effect as of the Petition Date on such amount owed for each day after the two-week grace period specified above until the amount is repaid.

The Debtors and the Liquidation Trustee shall not be required to make any distributions under the Plan on account of an Allowed Claim that is payable pursuant to an insurance policy until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that an insurer agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurer's agreement, such Claim is deemed expunged without any further notice to or action, order, or approval of the Bankruptcy Court.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance.

## VII.        Distributions to Creditors

Unless otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, at the end of the calendar quarter in which such a Claim becomes an Allowed Claim, or as soon as practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Contested Claims, distributions on account of any such Contested Claims shall be made pursuant to the provisions set forth in Article IX hereof.  Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

The Prepetition Indenture Trustee shall be deemed to be the holder of the Allowed Prepetition Bondowner Secured Claims, as applicable, solely for purposes of distributions to be made hereunder, and the Debtors or the Liquidation Trustee, as applicable, shall make all distributions on account of such Allowed Prepetition Bondowner Secured Claims to or on behalf of the Prepetition Indenture Trustee.  The Prepetition Indenture Trustee shall hold or direct such distributions for the benefit of the holders of the Allowed Prepetition Bondowner Secured Claims, as applicable.  The Prepetition Indenture Trustee shall arrange to deliver such distributions to or on behalf of the holders of the Allowed Prepetition Bondowner Secured Claims as provided for under the Prepetition Indenture and the Plan (in the event of a conflict, the Plan governs); provided, however, the Prepetition Indenture Trustee shall retain all rights as trustee under the Prepetition Indenture in connection with delivery of distributions to the Prepetition Bondowners; provided further, however, that the Debtors' obligations to make distributions in accordance with Section III.C.2 of the Plan shall be deemed satisfied upon delivery of distributions to the Prepetition Indenture Trustee.  The Debtors shall not incur any liability whatsoever on account of any distributions made by the Prepetition Indenture Trustee.

Subject to Bankruptcy Rule 9010, and unless otherwise provided herein, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the last known address of such holder as set forth (a) in the Schedules filed with the Bankruptcy Court unless the Debtors have been notified in writing of a change of address, including by the filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected in such Schedules for such holder, (b) on the Proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such holder giving details of a change of address; *provided that* all Plan Distributions due to Prepetition Bondowners under Section III.C.2 of the Plan shall be made to the Prepetition Indenture Trustee for the benefit of the Prepetition Bondowners in accordance with Section VIII.B of the Plan.  If any Plan Distribution is returned as undeliverable, no Plan Distributions shall be made to such holder unless the Debtors are notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned.  After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution and the undeliverable Plan Distributions made to the holders of Administrative Claims, Priority Claims, Priority Tax Claims, Other Secured Claims and Bondowner Secured Claims shall be turned over to the Prepetition Indenture Trustee for the benefit of the Prepetition Bondowners.

The Delivery of Liquidation Trust Distributions is governed by VI.A.13 of the Plan.

A.       **Changes of Address**

If your address has changed since you filed your proof of claim, or if it changes in the future, please notify the Claims Agent of your new address.  Similarly, if you did not file a proof of claim and have any reason to believe that the Claims Agent does not have your correct current address, please notify the Claims Agent of your address.  Notices may be sent to the Claims Agent at the following address:

*For delivery by US Mail:*
Quincy Medical Center, Inc. Claim Processing Center,
C/O Epiq Bankruptcy Solutions, LLC

FDR Station, P.O. Box 5014
New York, New York 10150-5014

*For delivery by hand or other courier service:*
Quincy Medical Center, Inc. Claims Processing Center,
C/O Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, New York 10017

### B.     Transfer of Claims

If you are the transferee of a Claim, whether before or after the Effective Date, you are required to comply with Rule 3001(e) of the Federal Rules of Bankruptcy Procedure. Notice of any transfer must be served on the Claims Agent at the address set forth in the preceding section. The Plan provides that if the Claims Agent receives a notice in accordance with Fed. R. Bankr. P. 3001(e) of the transfer of a Claim, then effective not more than ten (10) days thereafter, any distributions made by the Debtors or the Liquidation Trust upon approval of the Oversight Committee will be remitted to the transferee set forth in such notice, *provided, however,* that neither the Claims Agent, the Debtors, the Liquidation Trust, nor the Oversight Committee will have liability for failing to do so if they act in good faith.

### VIII.   Executory Contracts and Unexpired Leases

### A.     Assumption and Rejection

The Bankruptcy Code permits the rejection of executory contracts and unexpired leases that are burdensome to the Chapter 11 estate. Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have rejected each executory contract and unexpired lease to which it is a party, unless such contract or lease: (a) was assumed or rejected previously by the Debtors; (b) is to be assumed and assigned pursuant to the Sale Order; (c) previously expired or terminated pursuant to its own terms; (d) is the subject of a motion to assume filed on or before the entry of the Confirmation Order; or (e) is set forth in the Plan Supplement as an executory contract or unexpired lease to be assumed. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above as of the Effective Date.

The Purchaser may, in accordance with the Sale Order, designate Transitional Contracts (as defined therein) to be additional assigned agreements (the "Further Assigned Agreements"), and the Debtors will seek this Court's further order authorizing the assumption and assignment of such Further Assigned Agreements.

### B.     Rejection Damage Claims

If the rejection of an executory contract or unexpired lease by the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages will be forever barred and will not be enforceable against the Debtors, the Debtors' estates, the Liquidation Trust or any properties thereof, whether by way of setoff, recoupment, or otherwise, unless a proof

of claim therefor is filed not later than the earlier of (i) any applicable deadline established by Order, including the Sale Order, or (ii) thirty (30) days after entry of the Confirmation Order.

## IX.    Other Provisions of the Plan

### A.    Substantive Consolidation/Merger

The Plan provides for substantive consolidation of all of the Debtors, meaning that they are treated as a single entity so that all General Unsecured Claims will be paid the same percentage regardless of the Debtor(s) liable for the Claim. The Debtors, the Prepetition Indenture Trustee and the Creditors' Committee reached agreement that substantive consolidation is warranted and in the best interest of creditors based upon a thorough review of the Debtors' affairs and applicable legal standards.

### B.    Bar Against Setoff, Recoupment, etc.

Other than with respect to the Prepetition Bondowner Claims, the Debtors and the Liquidation Trustee may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), pursuant to applicable non bankruptcy law, or as may be agreed to by the holder of a Claim, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) any Claims, rights, and Causes of Action of any nature that the Debtors or the Liquidation Trustee may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), without notice, leave or order of the Bankruptcy Court; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Liquidation Trustee of any such Claims, rights, and Causes of Action that the Debtors or the Liquidation Trustee may possess against such holder.

### C.    Releases, Exculpations and Injunction

The Plan provides that neither the Debtors, nor their bankruptcy estates, nor the Prepetition Indenture Trustee, nor any Bondowner, nor the Creditors' Committee, nor any member of the Creditors' Committee, nor any officer, director, shareholder, affiliate, partner, member, employee, agent, financial advisor, attorney or other professional of any of the foregoing, will have or incur any liability to any holder of a Claim, nor to any other entity, for any act, event or omission in connection with or arising out of the Cases, commencement of the Cases, the Plan or implementation of the Plan, except for gross negligence or willful misconduct.

*Releases by the Debtors*

**Upon the occurrence of the Effective Date, each of the Debtors, the Liquidation Trustee, any successors or assigns thereto, and each of their respective Representatives, is deemed to release the Released Parties, from any and all Causes of Action that the Debtors or Liquidation Trustee otherwise would be entitled to assert (whether individually or collectively) based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Sale Transaction, the Chapter 11 Cases, the subject matter of, or the**

transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section X.C of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Debtors, the Estates, and the Released Parties; (b) a good faith settlement and compromise of the Claims released by this Section X.C of the Plan; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under Section X.C of the Plan from asserting any Claim or Cause of Action released by Section X.C of the Plan.

*Exculpation*

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct or the liability of any Debtor provided, further, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*Third Party Release*

As of the Effective Date, each holder of a Claim voting to accept the Plan or deemed to accept the Plan, and each other holder of a Claim or Interest to the fullest extent permitted by law as such law may be extended or interpreted subsequent to the Effective Date, are deemed to have unconditionally, conclusively, irrevocably, absolutely and forever released the Released Parties from any and all Causes of Action in connection with or related to the sale and restructuring efforts undertaken by the Debtors, the Chapter 11 Cases and the Plan (other than the rights to enforce the Plan and the contracts, instruments, releases and other agreements or documents assumed, passed through or delivered in connection with the Plan).

*Injunction*

Except as otherwise expressly provided in the Plan or Confirmation Order, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been discharged pursuant to Article X.A, released pursuant to Article X.C or Article X.E, or are subject to exculpation pursuant to Article X.D are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the Liquidation Trustee: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estate of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estate of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the entry of the Confirmation Order, and notwithstanding an indication in a proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or the Liquidation Trustee, as applicable, and any such Entity agree in writing that such Entity will: (1) waive all Claims against the Debtors and the Liquidation Trustee related to such action and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

### D.      Creditors' Committee

On the Effective Date, any committee appointed in the Chapter 11 Cases, including the Creditors' Committee, pursuant to section 1102 of the Bankruptcy Code shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

### E.      The Liquidation Trust

On or before the Effective Date, the Debtors, on their own behalf and on behalf of their beneficiaries, shall execute the Liquidation Trust Documents, in a form acceptable to the Prepetition Indenture Trustee and the Creditors' Committee, each in the exercise of its sole and absolute discretion, and all other necessary steps shall be taken to establish the Liquidation Trust.  Section VI.A.5 of the Plan sets forth certain of the rights, duties, and obligations of the Liquidation Trustee.

On the Effective Date, the Debtors shall transfer to the Liquidation Trust the Liquidation Trust Cash Payment and any and all interest in the Causes of Action, which property shall automatically vest in the Liquidation Trust for the benefit of the holders of General Unsecured

Claims, free and clear of all Liens, Claims, and encumbrances, except to the extent set forth in Section VI.A.10 of the Plan and the other provisions of the Plan or in the Liquidation Trust Documents, pursuant to section 1141 of the Bankruptcy Code.

The Liquidation Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Accordingly, the Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Causes of Action, make timely distributions to the holders of Allowed General Unsecured Claims of Cash and property and not unduly prolong its duration. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Documents.

The Liquidation Trust shall be governed and administered by the Liquidation Trustee subject to the terms of the Plan and the Liquidation Trust Documents including the rights of the Oversight Committee.

The Liquidation Trustee shall deposit and maintain any and all proceeds of the Causes of Action in a segregated account for distribution solely in accordance with section VI.A.10 of the Plan and the Liquidation Trust Documents.

The Liquidation Trustee shall distribute to holders of Allowed General Unsecured Claims the Liquidation Trust Cash Payment and the Liquidation Trust Cause of Action Recoveries in accordance with Article III of the Plan and the Liquidation Trust Documents, beginning on the Effective Date.

All holders of Allowed General Unsecured Claims shall furnish to the Liquidation Trustee its, his or her employer or taxpayer identification number ("TIN") as assigned by the Internal Revenue Service within thirty (30) days of a written request for such TIN by the Liquidation Trustee. If a holder of an Allowed General Unsecured Claim fails to provide the Liquidation Trustee with the requested TIN within thirty (30) days of the written request, such holder shall be deemed to have waived: (a) its, his or her interest in the Liquidation Trust, including the right to receive a distribution, and (b) its, his or her rights and Claims under this Plan, including the right to receive a Plan Distribution.

Any Liquidation Trust Distribution or delivery to a holder of an Allowed General Unsecured Claim shall be made at the last known address of such holder as set forth (a) in the Schedules filed with the Bankruptcy Court unless the Liquidation Trustee has been notified in writing of a change of address, including by the filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected in such Schedules for such holder, (b) on the Proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such holder giving details of a change of address; *provided* that all Liquidation Trust Distributions due to holders of Bondowner Deficiency Claims shall be made to the Prepetition Indenture Trustee for the benefit of the Prepetition Bondowners. If any Liquidation Trust Distribution is returned as undeliverable, no Liquidation Trust Distributions shall be made to such holder unless the Liquidation Trustee is notified of such holder's then current address within ninety (90) days after such Liquidation Trust Distribution was returned. After such date, if such notice was not provided,

29

a holder shall have forfeited its right to such Liquidation Trust Distribution and the undeliverable Liquidation Trust Distributions made to any holder of an Allowed General Unsecured Claim on account of such Allowed General Unsecured Claim shall revert to the Liquidation Trust for distribution to the holders of Allowed General Unsecured Claims

The amount of any checks issued by the Liquidation Trustee under the Plan that remain uncashed for a period of one hundred twenty (120) days after the date of such distribution and shall revert to the Liquidation Trust free and clear of any Claim, Lien or interest of the Person to whom the check was issued.

No distributions of less than twenty-five dollars ($25.00) shall be made by the Liquidation Trustee to any holder of an Allowed General Unsecured Claim.

Any amounts that revert to the Liquidation Trust pursuant to subsections (a) and (b) above shall become part of the Liquidation Trust Assets and shall be included in any subsequent distributions made pursuant to the Plan

Holders of General Unsecured Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Liquidation Trust Assets. The beneficial interests in the Liquidation Trust shall not be certificated, except as otherwise provided in the Liquidation Trust Documents.

The Liquidation Trustee and the Liquidation Trust shall be discharged or dissolved, as the case may be, at such time as (i) all Liquidation Trust Assets have been liquidated; (ii) all distributions required to be made by the Liquidation Trustee under the Plan have been made; and (iii) the Liquidation Trust is otherwise fully administered. In no event shall the Liquidation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets or the dissolution of the Debtors.

### F.     Disposition of Remaining Assets

Certain assets are not proposed to be transferred to the Purchaser in connection with the Sale. The Plan provides for the liquidation or transfer of these remaining assets as follows.

#### 1.     Causes of Action

Avoidance Actions are more fully disclosed in Section X at page _____.

#### 2.     Donor Restricted Funds

Certain funds held by the Debtors were received through charitable gifts and bequests, the use of which funds is explicitly restricted by the donor and the transfer of which is subject to applicable

non-bankruptcy law, including Massachusetts state law, pursuant to sections 363(d)(1) and 541(f) of the Bankruptcy Code. A schedule of these gifts and bequests and the amount of such funds is attached hereto as <u>Schedule IX(F)</u>. Donor Restricted Funds shall not be considered Net Estate Assets of the Debtors' Estates for distribution to creditors. The Debtors will retain possession of the Donor Restricted Funds on and after the Effective Date, and shall continue to exist as separate legal entities on and after the Effective Date for the sole purpose of administering the Donor Restricted Funds and completing the corporate dissolution process pursuant to applicable Massachusetts law. Donor Restricted Funds shall be transferred or distributed to a suitable charitable organization at the direction of the Debtors' governing board consistent with and pursuant to applicable Massachusetts law, including the doctrine of cy près, subject to the review of the Attorney General of the Commonwealth of Massachusetts. The Debtors will seek an order of the Supreme Judicial Court of Massachusetts approving such transfers.

All funds proposed to be Donor Restricted Funds are listed on Schedule IX(F). All creditors of the Debtors reserve their rights to make any and all legal arguments and to assert that any and all of their claims can be satisfied from Donor Restricted Funds. The Debtors, the Prepetition Indenture Trustee and the Prepetition Bondowners reserve their rights to assert that any funds listed on Schedule IX(F) should be Unrestricted Donor Funds. To the extent that any funds listed as Donor Restricted Funds as of the Effective Date are later determined to be Unrestricted Donor Funds, such Unrestricted Donor Funds shall become Net Estate Assets and shall be distributed to the Prepetition Indenture Trustee, on behalf of and for the benefit of the Prepetition Bondowners, pursuant to section III.C.2(c) of the Plan.

### G.    Effective Date

The Effective Date of the Plan is significant to creditors primarily because it triggers the payment of proceeds of the Sale to the Prepetition Indenture Trustee and initial distribution to the Liquidation Trust. On the Effective Date, the Debtors shall pay all Administrative Claims, Priority Tax Claims, Other Secured Claims and Priority Claims that are Allowed as of or prior to the Effective Date in full or such other treatment as prescribed by Article II and sections III.C.1 and III.C.3 of the Plan. On the Effective Date, the Debtors shall also fund the Liquidation Trust, the Administrative and Priority Claims Escrow Account and the Fee Claims Escrow Account. Following the occurrence of the Effective Date, the Liquidation Trustee shall pay, out of the Administrative and Priority Claims Escrow Account, all Administrative Claims, Priority Tax Claims, Other Secured Claims and Priority Claims that become Allowed after the Effective Date in full or such other treatment as prescribed by Article II and sections III.C.1 and III.C.3 of the Plan

The Effective Date will occur on the Business Day when certain conditions specified in Article XI of the Plan are satisfied. These conditions include the following:

- The Confirmation Order is a Final Order.

- The Office of the Attorney General of the Commonwealth of Massachusetts has issued its report detailing its review of the Sale Transaction.

- The closing of the Sale Transaction.

- The Effective Date must occur on or before December 1, 2011, which date may be extended by the Prepetition Indenture Trustee in the exercise of its sole and absolute discretion or at the written request of the Creditors' Committee and with the prior written consent of the Prepetition Indenture Trustee, which consent shall not be unreasonably withheld.

These conditions may be waived only by consent of the Prepetition Indenture Trustee, who shall act at the direction of the Required Consenting Bondowners, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. Absent a stay of the Confirmation Order, the Debtors, the Prepetition Indenture Trustee and the Creditors' Committee project that the Effective Date will occur in November 2011. Thereafter, the Court will retain jurisdiction for certain limited purposes, such as resolving objections to Claims and enforcing the Plan.

## H.      **Binding Effect; Discharge**

On the Effective Date, the terms of the Plan shall be immediately effective, enforceable, binding upon the Debtors, the Liquidation Trustee, any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all nondebtor parties to executory contracts and unexpired leases with the Debtors.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with applicable law and the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted, provided that any such alteration or interpretation, other than as required by applicable law, must be in form and substance reasonably acceptable to the Debtors, the Prepetition Indenture Trustee and the Creditors' Committee; provided, however, that the Debtors and the Prepetition Indenture Trustee (as applicable) may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such order by the Bankruptcy Court, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms

Entry of the Confirmation Order will be deemed to be a determination by the Court only as to the matters expressly set forth therein and not as to any other matter involving the Debtors, their estates and any party-in-interest in the Cases. Accordingly, if you have an objection to any provision of the Plan, you must object to confirmation in the manner and within the time described in the notice included with this Disclosure Statement.

The Plan also provides that all causes of action of the Debtors' estates and all objections to Claims are preserved and transferred to the Liquidation Trust, exception any causes of action released pursuant to Article X of the Plan. Accordingly, all parties must assume that the rights of

the Debtors or the Creditors' Committee to prosecute an action or objection to any Claim by or on behalf of the Liquidation Trust will not be limited by reason of *res judicata*, collateral estoppel or any other legal doctrine, in connection with the Plan.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of its assets or properties, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (2) the holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan. Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any governmental unit thereof specified in section 101(27) of the Bankruptcy Code.

**I.**     **Binding Effect of Orders Relating to Asset Sales**

The Plan provides that, notwithstanding any other provision of the Plan, the purchaser of assets pursuant to the Sale Order and all other orders of the Court authorizing the Debtors to transfer assets  shall remain obligated to perform any remaining obligations under the applicable asset purchase agreement with the Debtors concerning such assets.

**X.**     **Avoidance Actions**

**A.**     **Preferential or Fraudulent Transfers**

The bankruptcy law permits a Chapter 11 debtor's bankruptcy estate to avoid and recover certain transfers of an interest of the debtor in property, if the transfers were made within 90 days before the bankruptcy filing or, in the case of a transfer to an insider of the debtor, within one year before the bankruptcy filing.  In general terms, such a preferential transfer can be recovered if it was made by an insolvent debtor, to or for the benefit of a creditor, and account of an antecedent debt, if the transfer allowed the creditor to receive more than it would have under a Chapter 7 liquidation. However, various defenses are available.  An otherwise preferential transfer is excepted from recovery if, for example, the transfer was made in the ordinary course of business, or the creditor receiving the transfer provided the debtor with new value (such as additional products or services) after the transfer.

Federal bankruptcy law and state law permit a Chapter 11 debtor's bankruptcy estate to recover fraudulent transfers.  There are two primary categories of transfers which could be

33

fraudulent: first, in general terms, transfers made for less than reasonably equivalent value while the debtor was in financial distress; and second, transfers made by the debtor with actual intent to hinder, delay or defraud its creditors.

Under the Plan, the right to pursue recovery of alleged preferential transfers and alleged fraudulent transfers, excepting claims released pursuant to the Plan, will be transferred to the Liquidation Trust. The Liquidation Trustee will have the sole authority and responsibility to pursue any preference actions and fraudulent transfer actions against any party alleged to have received such a transfer from the Debtors.

## XI.  Certain U.S. Federal Income Tax Consequences of the Plan

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION AND MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims.

The following summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, governmental authorities or agencies and investors in pass-through entities).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON

THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### A.      Consequences to Debtors

Debtors Quincy Medical Center Inc. and Quincy ED Physicians Inc. are non-profit corporations established under Massachusetts General Laws Chapter 180, and are tax exempt organizations pursuant to federal law.  Accordingly, neither Quincy Medical Center, Inc. nor Quincy ED Physicians, Inc. will incur federal or state or state income tax liabilities as a result of the Sale transaction. Debtor Quincy Physician Corporation is a non-profit corporation established under Massachusetts General Laws Chapter 180, however, it is not a tax exempt organization, however, in the ordinary course of its operations, its expenses and its income are equal.  Further, the Plan does not provide for forgiveness of any liabilities that are the direct and exclusive responsibility of Quincy Physician Corporation.

In addition to the foregoing, Internal Revenue Code section 108(a)(1) provides for an exclusion from gross income of any cancellation of indebtedness which occurs in a case under title 11 of the United States code, such as the Debtors' Chapter 11 Cases.

For these reasons, each of the Debtors believes that there will be no material tax consequences to the Debtors as the result of the Plan.

### B.      Consequences to Holders of Secured Claims and General Unsecured Claims

The Debtors believe that the Plan should be treated as a plan of liquidation for U.S. federal income tax purposes because the Liquidation Trust is being created solely for the purpose of litigating the Causes of Action and winding up the Debtors' affairs.

### 1.      Gain or Loss

In general, a holder of an Allowed Bondowner Secured Claim, Other Secured Claim or an Allowed General Unsecured Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim representing accrued but unpaid interest).  For a discussion of the U.S. federal income tax treatment of any Claim for accrued but unpaid interest, *see* "Distributions in Discharge of Accrued Interest," below.

In general, the "amount realized" by a holder will equal the sum of (a) the amount of any cash received by such holder (excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such cash, as discussed below) and (b) the fair market value of its undivided interest in the other underlying assets of the Liquidation Trust (subject to any liabilities assumed by the Liquidation Trust or to which such assets are subject) on the Effective Date.  Although subject to significant uncertainty, the Debtors believe that any distributions of cash to a holder of a Claim after the Effective Date (in contrast to a distribution from the Liquidation

35

Trust, as discussed below) should be treated as a distribution in liquidation (satisfaction) of such holder's Claim.

As discussed herein and in the Plan, on the Effective Date, substantially all of the Debtors' Assets not otherwise distributed on the Effective Date (including the Causes of Action) will be transferred to the Liquidation Trust.  Certain Claim holders will receive a beneficial interest in the Liquidation Trust entitling them to share in any proceeds from such assets on the same relative basis as would have been received absent such transfer.  However, for U.S. federal income tax purposes, because the Liquidation Trust has been structured to qualify as a "grantor trust," each recipient of an interest in the Liquidation Trust will be treated as directly receiving, and as a direct owner of, its allocable percentage of the Liquidation Trust Assets, and the proceeds thereof.  See "Tax Treatment of the Liquidation Trust and Holders of Beneficial Interests" below.  Accordingly, as noted above, each holder would take into account in determining the "amount realized" in respect of its Claim its share of any cash and the fair market value of its undivided interest in the other underlying assets of the Liquidation Trust (subject to any liabilities assumed by the Liquidation Trust or to which such assets are subject) as if received and held directly.  Pursuant to the Plan, the Liquidation Trustee will make a good faith valuation of the Liquidation Trust Assets, and all parties must consistently use such valuation for all U.S. federal income tax purposes.  The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Any amount a holder receives following the Effective Date as a distribution in respect of an interest in the Liquidating Trust should not be included for U.S. federal income tax purposes in the holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such holder's interest in the Liquidating Trust.  See "Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests," below.

Where gain or loss is recognized by a holder in respect of its Allowed Bondowner Secured Claim, Other Secured Claim or Allowed General Unsecured Claim, the character of such gain or loss (as long-term or short-term capital, or ordinary) will be determined by a number of factors, including the tax status of the holder, whether the Claim in respect of which any property was received constituted a capital asset in the hands of the holder and how long it had been held, the manner in which a holder acquired such Claim, whether such Claim is an installment obligation for U.S. federal income tax purposes, whether such Claim was originally issued at a discount or acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

A holder's initial aggregate tax basis in its undivided interest in the underlying assets of the Liquidation Trust generally will equal the fair market value of such interest when received.  A holder's holding period in any property received generally will begin the day following the Effective Date (or such later date as the holder's Claim was Allowed).

## 2.    Distributions in Discharge of Accrued Interest

Pursuant to the Plan, all distributions in respect of a Claim will be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes), with any excess allocated to the portion of the Claim representing accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.

In general, to the extent any amount received (whether stock, cash or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Such loss may be ordinary, but the tax law is unclear on this point. Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

### 3.       Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, taxpayers are required to disclose on their U.S. federal income tax return of certain types of transactions in which the taxpayer participated after January 1, 2003, including, among other types of transactions, the following: (a) certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds; and (b) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. These categories are very broad; however, there are numerous exceptions. Holders are urged to consult their tax advisors regarding these rules and whether the transactions contemplated by the Plan would be subject to these rules and require disclosure on the holders' tax returns.

### C.       Tax Treatment of the Liquidation Trust and Holders of Beneficial Interests

Upon the Effective Date, the Liquidation Trust shall be established for the benefit of holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date.

### 1.       Classification of the Liquidation Trust

The Liquidation Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust, which is a disregarded entity.

However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtors, the Liquidation Trustee, and holders of

Bondowner Secured Claims and General Unsecured Claims) are required to treat, for U.S. federal income tax purposes, the Liquidation Trust as a grantor trust of which the holders are the owners and grantors. The following discussion assumes that the Liquidation Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge such classification, the U.S. federal income tax consequences to the Liquidation Trust, the holders of Class 2 Bondowner Secured Claims and General Unsecured Claims, and the Debtors could vary from those discussed herein (including the potential for an entity level tax on any income of the Liquidation Trust).

### 2.      General Tax Reporting by the Trust and Beneficiaries

For all U.S. federal income tax purposes, all parties (including the Debtors, the Liquidation Trustee, and the holders of Bondowner Secured Claims and General Unsecured Claims) must treat the transfer of Liquidation Trust Assets to the Liquidation Trust as a transfer of such assets directly to the holders, followed by the transfer of such assets by the holders to the Liquidation Trust. Consistent therewith, all parties must treat the Liquidation Trust as a grantor trust of which such holders are the owners and grantors. Thus, such holders (and any subsequent holders of interests in the Liquidation Trust) will be treated as the direct owners of an undivided interest in the assets of the Liquidation Trust for all U.S. federal income tax purposes. Pursuant to the Plan, the Liquidation Trust will determine the fair market value of the assets of the Liquidation Trust as of the Effective Date, and all parties, including the holders, must consistently use such valuation for all U.S. federal income tax purposes, such as in the determination of gain, loss, and tax basis. The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Accordingly, each holder will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Liquidation Trust. *See* "Allocation of Taxable Income and Loss" below. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a holder are not dependent upon the Liquidation Trust distributing any cash or other proceeds. Therefore, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidation Trust even if the Liquidation Trust has not made a concurrent distribution to the holder. In general, a distribution of cash by the Liquidation Trust to a holder will not be taxable to the holder as such holder is regarded for U.S. federal income tax purposes as already owning the underlying assets or realizing the income.

The Liquidation Trustee will file with the IRS returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Liquidation Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct the holder to report such items on its U.S. federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their U.S. federal income tax returns.

Such items generally would be reported on the holder's state and/or local tax returns in a similar manner.

### 3.    Allocation of Taxable Income and Loss

The Plan provides that allocations of Liquidation Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein or in the Plan) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Liquidation Trust interests, taking into account all prior and concurrent distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidation Trust Assets. The tax book value of the Liquidation Trust Assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the Treasury Regulations and any other applicable administrative and judicial authorities and pronouncements.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. THE FOREGOING SUMMARY ALSO DOES NOT DISCUSS ASPECTS OF FOREIGN TAXATION LAWS AND REGULATIONS THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

### XII.    Acceptance and Confirmation of Plan

### A.    Acceptance of the Plan

Bankruptcy law provides that any class of creditors whose rights are "impaired" (that is, not fully honored) under a proposed plan of reorganization or liquidation has the right, as a class, to accept or reject the plan. Each member of the class may vote on this decision. A class of creditors accepts a plan if ballots cast in favor of the plan represent more than one-half in number and at least two-thirds in dollar amount of the claims for which ballots are timely received. A class of equity interests accepts a plan if ballots cast in favor of the plan represent at least two-thirds in amount of the interests for which ballots are timely received.

Claims in Class 1 and Class 3 will be paid in full in Cash and are therefore unimpaired. Accordingly, these classes are deemed to have accepted the Plan and no votes will be solicited from holders of claims in Class 1 and Class 3.

Claims in Class 2 and Class 4 are impaired.  The holders of Claims in Class 2 and Class 4 are therefore entitled to vote to accept or reject the Plan.

Class 5 Claims are impaired and will receive no property under the Plan.  The holders of Claims in Class 5 are deemed to have rejected the Plan and no votes will be solicited from holders of Class 5 Claims.

**B.**    **Voting Procedures**

*The Solicitation Package*

Epiq Bankruptcy Solutions LLC ("Epiq"), the Debtors' claims and solicitation agent ("Claims Agent"), will facilitate the solicitation process. The Depository Trust Company ("DTC") will assist Epiq as special voting agent for solicitation of votes of, and communication with, holders of Bondowner Secured Claims in Class 2.

The following materials constitute the Solicitation Package:

• notice of the Confirmation Hearing;

• one or more Ballots and Master Ballots and voting instructions;

• a pre-addressed postage pre-paid return envelope;

• this Disclosure Statement with all exhibits including the Plan;

• a customized letter from the Debtors to the holders in each of the voting classes (tailored to each class) urging them to vote to accept the Plan (the forms of which are attached hereto as Exhibit [___]);

• a letter from the Creditors' Committee supporting confirmation of the Plan (attached hereto as Exhibit [___]);

• a letter from the Prepetition Indenture Trustee supporting confirmation of the Plan (attached hereto as Exhibit [___]);

• any supplemental solicitation materials the Debtors may file with the Bankruptcy Court; and

• the Disclosure Statement Order, which, among other things: (a) approves this Disclosure Statement as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code; (b) establishes the procedures for voting on the Plan; (c) schedules a hearing to consider confirmation of the Plan; and (d) sets the deadline for voting on and for objecting to confirmation of the Plan.

The Solicitation Package is being distributed to holders of Bondowner Secured Claims and General Unsecured Claims as of the Voting Record Date.

Holders of Priority Claims, Other Secured Claims, and Subordinated Claims will also receive a notice of non-voting status in lieu of a Ballot.

The Solicitation Package (except for Ballots and Master Ballots) may also be obtained by accessing the Debtors' website at http://dm.epiq11.com/QMC or by requesting a copy from Epiq by writing to

> *For delivery by US Mail:*
> Quincy Medical Center, Inc. Claim Processing Center,
> C/O Epiq Bankruptcy Solutions, LLC
> FDR Station, P.O. Box 5014
> New York, New York 10150-5014

> *For delivery by hand or other courier service:*
> Quincy Medical Center, Inc. Claims Processing Center,
> C/O Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, Third Floor
> New York, New York 10017

Holders of General Unsecured Claims in Class 4 as of the Voting Record Date (i.e. only those who held General Unsecured Claims in Class 4 as of the Voting Record Date) are entitled to vote to accept or reject the Plan. They may do so by completing the appropriate Ballot and returning it to Epiq in the self-addressed postage-paid envelope provided by the Voting Deadline. Voting instructions are attached to each Ballot.

Holders of Bondowner Secured Claims in Class 2 as of the Voting Record Date i.e. only those who held Bondowner Secured Claims in Class 2 as of the Voting Record Date) are also entitled to vote to accept or reject the Plan. They may do so by completing the appropriate Ballot (the "Beneficial Owner Ballot"), making an appropriate election, and returning the Beneficial Owner Ballot to their bank, broker or other nominee (each a "Record Holder") with instructions for their Record Holder to return the Beneficial Owner Ballot to DTC as part of the Record Holder's Master Ballot and deliver the holder's Bondowner position into the appropriate election account at The Depository Trust Company ("DTC").

THE BALLOTS AND/OR THE PRE-ADDRESSED POSTAGE PRE-PAID ENVELOPES ACCOMPANYING THE BALLOTS WILL CLEARLY INDICATE WHETHER THE BALLOT MUST BE RETURNED TO EPIQ OR THE HOLDERS' RECORD HOLDER AND WILL CLEARLY INDICATE THE APPROPRIATE RETURN ADDRESS. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.

EACH BALLOT WILL CONTAIN A PROVISION STATING THAT A VOTING CREDITOR, BY VOTING, ACKNOWLEDGES HIS, HER OR ITS CONSENT TO THE RELEASE, INDEMNIFICATION, EXCULPATION AND RELEASE PROVISIONS OF THE PLAN, AS FOLLOWS:

> BY VOTING, I FURTHER ACKNOWLEDGE THAT A VOTE TO ACCEPT THE PLAN IS ALSO A VOTE TO ACCEPT THE THIRD PARTY RELEASE PROVISIONS CONTAINED IN ARTICLE X OF THE PLAN

*Class 4 General Unsecured Claims*

Claimants should contact Epiq for answers to any questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan. Epiq will also provide additional copies of all materials, and oversee the voting tabulation. Epiq will also answer questions from holders of Claims in classes not entitled to vote.

BALLOTS CAST BY HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASS 4 ENTITLED TO VOTE MUST BE RECEIVED BY EPIQ BY THE VOTING DEADLINE, AT THE ADDRESS LISTED ON THE APPLICABLE BALLOT, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER OR PERSONAL DELIVERY.

*Class 2 Bondowner Secured Claims*

The Prepetition Indenture Trustee will not vote on behalf of the holders of Bondowner Secured Claims.  Class 2 Bondowner Secured Claims holders must submit their own Ballots through their respective Record Holders in accordance with the voting instructions summarized below.

1. Voting Instructions For Beneficial Owners

A beneficial owner holding Allowed Bondowner Secured Claims in "street name" through a Record Holder (a "Beneficial Owner"), in order to vote to accept or reject the Plan, must complete and sign the Beneficial Owner Ballot.

ALL BENEFICIAL OWNER BALLOTS MUST BE RETURNED TO THE RECORD HOLDER FOR PROCESSING. ALLOW SUFFICIENT TIME FOR THE RECORD HOLDER TO COMPLETE PROCESSING AND FORWARD YOUR BALLOT ON TO THE VOTING AGENT BY THE VOTING DEADLINE.

All Beneficial Owners should carefully review and follow the instructions appended to the Ballot before returning their completed Beneficial Owner Ballots to their Record Holders. Failure to timely deliver a ballot could result in that holder not receiving a distribution on or about the Effective Date. Such holders will need to contact DTC directly - after the Effective Date - to make arrangements to receive their distributions.

2. Voting Instructions for Record Holders

A Record Holder that on the Voting Record Date is the registered holder of Allowed Bondowner Secured Claims for a Beneficial Owner can obtain the votes of the Beneficial Owners by filling out the Master Ballot and effecting the Beneficial Owner's vote.

• Complete the Master Ballot and attach the Beneficial Owner's Ballot to the Master Ballot.

• Include the "VOI" number on the Master Ballot for each account delivered.

• Submit the Master Ballot and required attachments to the Special Voting Agent by the Voting Deadline.

## ADDITIONAL INSTRUCTIONS

Instructions for completing and returning the ballot are found on the ballot itself. If you hold a Class 2 or Class 4 Claim, you should first review this Disclosure Statement and the Plan and then complete the ballot. In order for your vote to count, it must be **ACTUALLY RECEIVED** not later than _____ P.M. on _____, 2011 by the Claims Agent at the following:

*For delivery by US Mail:*
Quincy Medical Center, Inc. Claim Processing Center,
C/O Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, New York 10150-5014

*For delivery by hand or other courier service:*
Quincy Medical Center, Inc. Claims Processing Center,
C/O Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, New York 10017

Submission of ballots by facsimile, or by any means not including an authorized signature in ink, is prohibited.

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED.

All votes to accept or reject the Plan must be cast by using the ballot provided, or a copy of the ballot provided. The ballot must be signed by the holder of the Claim, or by an officer, partner or authorized agent of such holder. Ballots signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity should indicate such capacity and be accompanied by proper evidence satisfactory to the Debtors of their authority to so act. Please be sure to fill in the name of the creditor or stockholder on whose behalf the ballot is being filed.

The voting procedures Order approved by the Court permits the Debtors, with the consent of the Prepetition Indenture Trustee and the Creditors' Committee, to waive certain of the above requirements in certain instances.

On each ballot there is a space in which to write the amount you believe is the amount of your Claim. However, if this amount differs from the actual Allowed Amount of your Class 2 Claim or Class 4 Claim then the actual Allowed Amount of the Claim is the amount for which your vote will be counted. **THE AMOUNT OF THE CLAIM SPECIFIED ON YOUR BALLOT WILL NOT SUPERSEDE OR AMEND ANY PROOF OF CLAIM FILED WITH RESPECT TO YOUR CLAIM.** In addition, the Debtors reserve all rights they may have to object to any particular Claim or to the voting of any particular Claim.

TO OBTAIN ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, CALL EPIQ AT (646) 282-2400.

HOLDERS OF CLASS 2 BONDOWNER SECURED CLAIMS AND/OR THEIR RECORD HOLDERS MAY CONTACT DTC DIRECTLY, AT [insert], WITH ANY QUESTIONS RELATED TO THE SOLICITATION PROCEDURES APPLICABLE TO SUCH CLAIMS.

EPIQ AND DTC SHALL NOT COUNT ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN.

CLAIMS HOLDERS MAY CAST ONLY ONE BALLOT FOR EACH CLAIM HELD. BY SIGNING AND RETURNING A BALLOT, EACH CLAIM HOLDER WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT THE HOLDER WAS NOT CAST ANY OTHER BALLOTS WITH RESPECT TO SUCH CLAIM OR, IF IT HAS CAST AN EARLIER BALLOT THEN THAT EARLIER BALLOT IS THEREBY SUPERSEDED AND REVOKED.

ALL BALLOTS ARE ACCOMPANIED BY SELF-ADDRESSED, POSTAGE PRE-PAID RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.

### C.    Confirmation of the Plan

The Court will hold a confirmation hearing before deciding whether to confirm the Plan. Once confirmed, the Plan will become effective on the Effective Date.  For a discussion of the Effective Date, see Section IX(G), "Effective Date," at page 38.

A hearing on confirmation of the Plan, and on any objections to the Plan, will be held on _____, 2011 at _____. before the Honorable Melvin S. Hoffman, in the United States Bankruptcy Court, 565 Main Street, Worcester, Massachusetts. The confirmation hearing may be adjourned from time to time by the Court without further notice, except for an announcement made at the confirmation hearing or any adjournment of that hearing. In order to object to confirmation of the Plan, a creditor or other party in interest must file a written objection with the Clerk of the United States Bankruptcy Court, and serve a copy of the objection on:

| | |
|---|---|
| Counsel to the Debtors: | John T. Morrier, Esq. |
| | Michael J. Goldberg, Esq. |
| | A. Davis Whitesell, Esq. |
| | Andrew T. Imbriglio, Esq. |
| | Casner & Edwards, LLP |
| | 303 Congress Street |
| | Boston, Massachusetts 02210 |
| | Fax: 617.426.8810 |
| | |
| Counsel to the Prepetition | Michael Messersmith, Esq. |
| Indenture Trustee: | Matthew Micheli, Esq. |

Kathryn Schmanski, Esq.
Kaye Scholer LLP
70 West Madison Street
Suite 4100
Chicago, IL 60602
fax: (312) 583-2360

Counsel to the Creditors' Committee:

Jeffrey D. Sternklar, Esq
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
Phone (617)
Fax (857) 401-3105

United States Trustee:

Stephen Meunier, Esq.
Office of the United States Trustee
446 Main Street, 14th Floor
Worcester, MA 01608
Fax: (508) 793-0558

Objections must be filed and served by not later than _____ p.m. on _____, 2011. In order to preserve an objection, anyone filing an objection to confirmation must also attend the hearing on confirmation, either in person or through counsel, except that a corporation may appear only through counsel.

Code Section 1128(b) provides that any party in interest may object to confirmation of a plan. Objections to confirmation of the Plan are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE COURT**. The Debtors, the Prepetition Indenture Trustee and the Creditors' Committee reserve the right, in order to resolve any objection to confirmation of the Plan or otherwise, to modify the Plan without further notice or disclosure, so long as the modification does not adversely change the treatment of any creditor who has not accepted the modification.

The Plan will be confirmed if it meets the requirements set forth in the bankruptcy law. Among the most significant requirements are:

- The Plan must have been accepted by at least one impaired class of creditors.

- If any class does not accept the Plan, the Court must find that the Plan is fair and equitable to, and does not unfairly discriminate against, such class.

- If any creditor does not accept the Plan, the Court must determine that the Plan provides such creditor with at least as great a distribution as the creditor would receive in a Chapter 7 liquidation.

45

- The Court must determine that confirmation of the Plan is not likely to be followed by the need for liquidation or further reorganization, except as contemplated by the Plan.

The Debtors and the Creditors' Committee believe that the foregoing requirements are or will be met.  If the Court determines that all confirmation requirements are satisfied, it will enter an order confirming the Plan.

## XIII.  <u>Alternatives to the Plan</u>

Effective upon the Sale, the Debtors will have ceased all business operations and will have liquidated a substantial portion of the bankruptcy estates' assets.  There is no alternative to the Plan that would provide for continuation of the Debtors as ongoing businesses.  The two available approaches to liquidation are conversion to Chapter 7 or liquidation under the Plan.

The Debtors, the Prepetition Indenture Trustee and Creditors' Committee have determined that the Plan represents the more efficient and cost-effective approach to liquidating the Debtors' remaining assets because (a) the procedural costs inherent in converting the Cases to Chapter 7, including Administrative Claims of the Chapter 7 trustee and professional persons engaged by the trustee, would likely reduce the ultimate distribution to the Debtors' creditors, and (b) conversion to Chapter 7 would significantly delay the distribution to creditors because, among other things, a new deadline for creditors to file claims in the Chapter 7 cases would be established and the Chapter 7 trustee would have to spend time (and money) getting up to speed on the Cases.

Accordingly, the Debtors and the Creditors' Committee believe that the Plan is the best mechanism to provide the earliest possible dividend to creditors, while at the same time permitting the orderly completion of the liquidation process.

## XIV.    Conclusion

    The Debtors would like to express their appreciation for the patience and cooperation of creditors during these Chapter 11 Cases.  The Debtors believe that the Plan represents the best possible outcome for all involved and they urge you to accept the Plan.

QUINCY MEDICAL CENTER, INC.
QMC ED PHYSICIANS, INC.
QUINCY PHYSICIAN CORPORATION


By:_____
Mark O'Neill
Chief Executive Officer, Treasurer, President

Dated: _____, 2011

56949.0/514912.3

EXHIBIT IX(F)

**Quincy Medical Center: Restricted Funds as of 6/30/11**

| Fund # | Fund Name | Amount $ |
|--------|-----------|----------|
| 200 | Charitable Donations | $ 77,226 |
| 300 | Cardiac Services | $ 34,047 |
| 400 | Cancer Services | $ 26,595 |
| 500 | Capital Projects | $ - |
| 600 | Prenatal / Child services | $ 56,382 |
| 700 | Transitional Care Unit | $ 20,071 |
| 800 | Specific Equipment | $ - |
| 900 | Quincy Visiting Nurses Assoc/Nurses Apprec | $ 79,432 |
| 1000 | Emergency Department | $ 225,652 |
| 1100 | Nobili Book Fund | $ 33,563 |
| 1200 | Asian Services | $ 72,466 |
| 1300 | Other Restricted | $ 105,619 |
| 1400 | Marie A. Curry Income Fund | $ 93,063 |
| 1500 | Allene Tompkins Income Fund | $ 52,204 |
| 1500 | Allene Tompkins Income Fund(nursing ed) | $ 34,349 |
| 1600 | Simon Fireman Imaging Center | $ 34,683 |
| 1700 | Larry Butler Scholarship | $ 12,076 |
| 1800 | Restricted General Unassigned | $ 61,915 |
| 1900 | Rehabilitation Services | $ 891 |
| 2200 | Cultural Competency | $ 6,157 |
| 2300 | Interpreter Services | $ 30,145 |
| 2400 | Quincy South Shore Aids Con | $ 14,518 |
| 2500 | Grateful Patients | $ - |
| 2600 | Annual Appeal | $ 45,031 |
| 2700 | Physician Fund | $ 344 |
| 2800 | Medication Safety | $ 77,579 |
|  | Marie A. Curie | $ 870,864 |
| 2100 | Allene Tompkins Fund | $ 107,500 |
|  | **Total Restricted Funds** | **$ 2,172,372** |
|  | QMC Foundation Funds | $ 707,879 |
|  | **Total Restricted Funds + QMC Foundation Funds** | **$ 2,880,251** |

**Investment Summary as of 6/30/11:**

| | |
|---|---|
| Unrestricted Funds | $ 3,824,617 |
| Restricted Funds | $ 2,172,372 |
| **Total Investment Funds** | **$ 5,996,989** |