**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

|  |  |
|---|---|
| In re: ) </br> ) </br> QUINCY MEDICAL CENTER, INC. ) </br> QMC ED PHYSICIANS, INC. ) </br> QUINCY PHYSICIANS CORPORATION ) </br> ) </br>        Debtors. | Chapter 11 </br> Case No. 11-16394-MSH </br> through 11-16396 </br> Jointly administered |

**MEMORANDUM OF DECISION ON MOTIONS OF APURV GUPTA AND VICTOR MUNGER FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIMS**

Apurv Gupta and Victor Munger, senior executives of the debtor, Quincy Medical Center, Inc. ("QMC"), filed substantively similar motions seeking allowance of administrative expense claims under Bankruptcy Code §503(b)(1), 11 U.S.C. § 503(B)(1), for severance pay due them under QMC's Executive Severance Policy dated January 1, 2011. After an initial hearing, I denied the executives' motions as to QMC but determined that the motions also sought relief in the alternative against Quincy Medical Center, a Steward Family Hospital, Inc. ("Steward"), which purchased substantially all of QMC's assets. *In re Quincy Medical Center, Inc.*, 466 B.R. 26, 32 (Bankr. D. Mass. 2012) ("*QMC I*"). After giving Steward time to respond to the motions, I conducted a second non-evidentiary hearing at the conclusion of which I solicited additional memoranda and affidavits from the parties and ordered QMC to file an affidavit regarding certain schedules to the asset purchase agreement between QMC and Steward referred to during the hearing. Upon receipt and review of the additional materials I took the matter under advisement. For the reasons set forth below I will grant Dr. Gupta's and Mr. Munger's motions as to Steward.

1

**Facts**

*QMC I* contains a thorough recitation of the background and facts concerning the relationship among QMC, Steward and the executives. Only those facts which are relevant to the issues presently before me are reprised here.

Dr. Gupta served as Senior Vice President for Clinical Affairs/Chief Medical Officer of QMC pursuant to an employment agreement effective October 1, 2009. Mr. Munger served as QMC's Senior Vice President of Human Resources pursuant to a letter agreement effective March 1, 2010. Both executives were included in QMC's executive severance policy as set forth in a memorandum dated January 1, 2011. The policy entitled them to, among other things, a minimum of six and a maximum of twelve months' base salary continuation upon termination of employment other than for cause.

On June 30, 2011, QMC and its affiliates signed an Asset Purchase Agreement (the "APA") whereby they agreed to sell substantially all of their assets to Steward. The APA provides that it is governed by Massachusetts law. On July 1, 2011, QMC and certain affiliates commenced this case by filing voluntary petitions under chapter 11 of the Bankruptcy Code. A motion to sell the debtors' assets to Steward was filed the same day and the motion was subsequently allowed by order dated September 26, 2011. The order approving the sale made the APA as well as the order itself binding on Steward and QMC, including QMC's employees, officers and directors. The sale was consummated on October 1, 2011.

Among the assets not purchased by Steward and for which the APA states Steward assumed no liability are those assets defined in the APA as "Excluded Assets." The Excluded Assets include contracts identified on schedule 2.2(b) to the APA. Schedule 2.2(b) was not

2

attached to the copy of the APA filed with the court.[1] Steward, however, provided an unverified and undated copy of schedule 2.2(b) in connection with its objection to the Munger and Gupta motions. No party has asserted that the copy of schedule 2.2(b) submitted by Steward is not what it purports to be. That schedule includes a section entitled "Excluded Medical Staff Agreements." Listed as item 18 in that section is the "Employment Agreement between Quincy Medical Center and Dr. Apurv Gupta to serve as Quincy's Senior Vice President for Medical Affairs/Chief Medical Officer, effective October 1, 2009." Mr. Munger's employment contract, which the parties refer to as a "letter agreement," does not appear anywhere on schedule 2.2(b).

Section 9.1 of the APA provides:

> Not later than ten (10) Business Days prior to the Closing, Purchaser shall offer employment by Purchaser to each of the Employees who remain employed by Seller as of a recent date, as specified by Seller to Purchaser at least three Business Days in advance of Purchaser commencing delivery of such offers of employment, such employment to commence immediately following the Closing. Seller shall deliver to Purchaser with such listing of Employees as of such date a reconciliation of such list with the list of Employees delivered to Purchaser pursuant to Section 5.14 [that is, a document reconciling the list of Employees with those who gave notice of their intention *not* to become employed by Steward]. Purchaser shall likewise deliver as soon as practicable such an offer to any individual not included on the list but who is an Employee as of the Closing Date. Each such offer of employment shall be at the same salary or hourly wage rate and position in effect immediately prior to the Closing. Such individuals who accept such offer of employment are hereinafter referred to as the "Transferred Employees."

As required by section 9.1 of the APA, at least three business days before Steward was to

---

[1] It is unclear whether schedule 2.2(b) existed when the APA was signed. Section 1.3(a)(iv) provides:
> [w]ith respect to all other Schedules …, including without limitation the classification of executory contracts as Purchased Contracts, Excluded Contracts or Transitional Contracts, such Schedules (including any amendments to the original Schedules) shall be subject to the mutual agreement of the parties as embodied in (i) such Schedules as exist and are appended to this Agreement as of the date hereof and (ii) such Schedules as are subsequently included and incorporated into this Agreement.

3

make offers of employment to the QMC employees, QMC was to provide Steward with a list of its employees reconciled to remove the names of any employee who chose not to become employed by Steward. According to the Declaration of Robert E. Annas, a managing director of Navigant Capital Advisors, LLC ("Navigant"), which had been employed by QMC to assist in the sale transaction (the "Annas Affidavit"), Navigant maintained an electronic data room containing "due diligence" information relevant to QMC and available for review by qualified potential purchasers, including Steward. According to the Annas Affidavit the names of both Dr. Gupta and Mr. Munger appear consistently on QMC employee lists which were posted to the electronic data room on the March 28, 2011, September 13, 2011 and September 15, 2011.

> Section 9.2(a) of the APA provides:
>
> Purchaser shall provide, or cause to be provided, for a period ending not earlier than the end of the third month following the Closing Date or such longer period of time required by applicable Law, to each of the Transferred Employees, base wage and salary levels provided to such Employees immediately prior to the Closing. Purchaser shall provide each Transferred Employee with employee benefits consistent with similarly-situated employees of Purchaser (provided that nothing in this Section 9.2 shall require Purchaser to pay severance to any Transferred Employee).

Under section 5.14(c) of the APA Steward was responsible for the severance pay or other payments to any individual employed by QMC as of the closing date in the event that Steward terminated the employment of such employee at or following the closing date. That section provides:

> Except as set forth in Section 5.14(c) of the Seller Disclosure Schedule [that is, a document reconciling the list of Employees with any who gave notice of their intention not to become employed by Steward] no Employee has given as of the date hereof notice of intention to leave Seller's employ before or after the Closing, and upon Purchaser's termination of the employment or engagement of any employees or consultants of Seller at or following the Closing, Purchaser shall be liable to any such persons for severance or retention pay or any other payments otherwise due them as employees of or consultants for Seller (including accrued salary or vacation in accordance with normal policies).

Both Dr. Gupta and Mr. Munger were QMC employees in good standing on October 1, 2011, the date of the closing. Neither was offered employment by Steward.[2]

QMC sent each of Dr. Gupta and Mr. Munger letters dated October 7, 2011 stating that each was terminated effective October 1, 2011. Each letter gave the same reason for the termination, namely, that QMC, having sold its assets to Steward, was no longer operating a hospital and no longer had a need for the services each provided. The letters also noted that under the APA Steward was to offer employment to all employees of QMC.

Mr. Munger asserts a claim against Steward in the amount of $135,000, consisting of a severance pay claim of $90,000, representing six months' salary, and a claim of $45,000, representing the minimum three months' salary he would have received had Steward hired and then fired him.

In a supplemental pleading [# 609] filed after his representation in court that he would do so, Dr. Gupta amended his original claim to seek from Steward $234,000, consisting of a severance claim of $156,000, equal to six months' salary, and a claim of $78,000, representing three months' salary.[3]

**Positions of the Parties**

Dr. Gupta, Mr. Munger and QMC argue that the APA is clear: Steward was required to offer employment to those individuals who were employed by QMC on an agreed upon date at or

---

[2] The inclusion of Dr. Gupta's employment contract among the Excluded Assets does not alter the fact that on the closing date he was an employee of QMC.

[3] The amended claim is half of what Dr. Gupta initially requested. His amended claim is brought under the APA, not under his employment contract which was excluded from the assets purchased by Steward.

5

near the closing and who were on the list of employees QMC provided to Steward prior to the closing. According to QMC and the claimants, because Dr. Gupta and Mr. Munger met both criteria, Steward had no choice but to offer them employment. Its failure to do so constituted a breach of the APA and resulted in claims by the executives that must be borne by Steward. In other words, the claimants and QMC assert that as a consequence of Steward's breach of the APA, both Dr. Gupta and Mr. Munger should be treated as if they had been employed by Steward as of the closing and then had their employment immediately terminated. Therefore, they maintain that Steward owes each terminated claimant three months' salary[4] plus six months' severance pay[5] as provided for in the APA.

Steward raises several points in response. First, it argues that Dr. Gupta and Mr. Munger lack standing to assert their claims because they are not parties to the APA and the APA expressly disclaims third party beneficiary rights. Thus, Steward asserts, it has no obligation to Dr. Gupta or Mr. Munger directly. In a related argument Steward asserts that if it did breach the APA only QMC may seek damages and QMC's exclusive remedy under the APA is indemnification. Steward alleges that QMC's indemnification claim is time-barred under the APA and, in any event, lacking in merit because my ruling in *QMC I* denied Dr. Gupta's and Mr. Munger's administrative expense claims against QMC. Furthermore, maintains Steward, even if it were required to indemnify QMC to the extent Dr. Gupta's and Mr. Munger's claims were treated as general unsecured claims in the bankruptcy case, it would only have to reimburse

---

[4] Under section 9.2 of the APA, Steward agreed to employ all Transferred Employees for at least three months.

[5] Under section 5.14(c) of the APA, Steward agreed that if it terminated any QMC employee after the closing it would be liable to that employee for severance pay due that employee under QMC's severance policy.

6

QMC for the amounts actually paid on those claims, which Steward estimates would be seven cents on the dollar.

Steward further maintains that compelling Steward to pay QMC's former executives' claims is in the nature of specific performance, which is a disfavored remedy in the context of personal service contracts. Steward reasons that because it did not offer employment to Dr. Gupta or Mr. Munger, neither falls within the definition of a Transferred Employee under the APA and consequently Steward cannot be liable for their pay or severance claims. Steward also alleges that prior to the closing it notified QMC orally that it had no intention of employing Dr. Gupta or Mr. Munger and insisted that QMC terminate them before the closing. During the second hearing in this matter, Steward's attorney represented that QMC orally informed Steward that Dr. Gupta's and Mr. Munger's employment would be terminated prior to the closing.[6] Finally, Steward asserts that Dr. Gupta's contract was among those listed in the APA schedule 2.2(b) as excluded from the sale and thus Steward has no liability to Dr. Gupta.

QMC and the claimant executives retort that section 5.14(c) of the APA renders Steward directly liable to the executives. They note that the September 26th order authorizing the sale by QMC to Steward expressly binds, among others, QMC's employees. Therefore they conclude that Dr. Gupta and Mr. Munger can proceed directly against Steward. Moreover, to the extent a standing problem exists, the executives assert that it is easily cured by QMC's assigning to them its rights under the APA. They rebut the notion that requiring Steward to pay their claims is in the nature of specific performance by pointing out that Steward is not being compelled to employ Dr. Gupta and Mr. Munger for any period of time but merely to treat them as if they had been

---

[6] Steward has not proffered any affidavit or other evidence as to these allegations.

7

employed for an instant after the closing. They observe, moreover, that section 11.10 of the APA provides that in the event of a breach of the APA, the non-breaching party is entitled to specific performance which the parties expressly agreed not to oppose specific performance on the grounds that money damages may provide an adequate remedy. Finally, the executives and QMC argue that the APA could not be amended orally and thus any discussions between Steward and QMC concerning the pre-closing termination of Dr.Gupta's and Mr. Munger's employment are irrelevant and unenforceable.

Regarding QMC's argument that it could assign its rights under the APA to the claimants, Steward responds that section 13.8 of the APA prohibits QMC from assigning any claims under the APA without Steward's express written consent, which of course Steward has not given.

## Authority of Bankruptcy Court

As discussed in *QMC I*, jurisdiction of the bankruptcy court to hear and rule upon disputes arising from the sale by QMC to Steward is expressly reserved in the September 26, 2011 order approving the sale. *Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009); *First Marblehead Corp. v. Education Resources Institute, Inc.* 2011 WL 6141004, at *6–7 (D.Mass. Dec. 8, 2011). *See also In re The Education Resources Institute, Inc.*, 442 B.R. 20, 24-25 (Bankr. D. Mass. 2010).

## Discussion

**The APA and Specific Performance**

Steward argues that the time-honored reluctance of courts to impose the remedy of

8

specific performance in situations involving personal service contracts justifies barring Dr. Gupta and Mr. Munger from obtaining such a remedy from Steward. Steward's position is overly simplistic. Although courts have been hesitant to order specific performance, the usual circumstance in which such unwillingness arises is when the party alleged to have breached the contract would otherwise be ordered to render services to the non-breaching party. *Redgrave v. Boston Symphony Orchestra, Inc.*, 557 F. Supp. 230, 235 (D. Mass. 1983). Here if Steward did indeed breach the APA, its liability will be confined to the payment of money. The fact that the process of calculating monetary damages involves assuming that Steward has employed both Dr. Gupta and Mr. Munger for an instant after the closing, at which point they were deemed terminated, involves none of the pragmatic problems arising in situations where services must actually be provided if specific performance were to be ordered. Nothing in the APA requires Steward to be burdened with actually employing Dr. Gupta or Mr. Munger for any length of time.  Moreover, the parties' waiver of any objection to specific performance as set forth in section 11.10 of the APA undercuts Steward's argument on this point.

**The APA and Third Party Beneficiaries**

Whether a contract confers rights of enforcement on non- parties depends upon the intent of the parties to the contract.  The intent to confer third party beneficiary status is found where "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Rae,* 386 Mass. at 194, 435 N.E.2d 628, quoting Restatement (Second) of Contracts § 302(1)(b) (1981). On the other hand, the mere fact "[t]hat the plaintiffs derive a benefit from a contract between others does not make them intended third-party beneficiaries and does not give them the right to enforce that agreement." *Cumis Ins. Society, Inc. v. BJ's*

9

*Wholesale Club, Inc.*, 455 Mass. 458, 464, 918 N.E.2d 36, 42 (Mass. 2009). Moreover, where the parties have expressly and unambiguously stated an intention to exclude third party beneficiaries, that intent is controlling. *See Volpe Constr. Co. v. First Nat'l Bank,* 30 Mass. App. Ct. 249, 256–257, 567 N.E.2d 1244 (1991), quoting 4 Corbin, Contracts § 777, at 25 (1951) ("it is plain that, 'if two contracting parties expressly provide that some third party who will be benefited by performance shall have no legally enforceable right, the courts should effectuate the expressed intent by denying the party any direct remedy'"). *Cumins,* 455 Mass. at 464, 918 N.Ed.2d at 42-43.

In this case section 13.8 of the APA contains a standard no-third-party-beneficiaries clause. The claimants urge, however, that section 5.14(c) of the APA manifests a specific intent of the parties to grant QMC employees third party beneficiary status and this section trumps the more general language in section 13.8. Indeed, when interpreting a contract containing two seemingly contradictory clauses, it is a basic tenet of contract interpretation that the more specific clause prevails over the general one. *Lawson v. F.D.I.C.*, 3 F.3d 11, 17 (1st Cir. 1993); *Lembo v. Waters,* 1 Mass. App. Ct. 227, 233 (1973). Moreover, "a contract is to be construed to give a reasonable effect to each of its provisions if possible … [and] … should be construed so as to give it effect as a rational business instrument and in a manner which will carry out the intention of the parties." *McMahon v. Monarch Life Ins. Co.,* 345 Mass. 261, 264, 186 N.E.2d 827, 830 (1962). Courts must "construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished." *Brynes v. Gloucester,* 297 Mass. 156, 158 (1937).

The parties have not cited, nor have I found, any cases applying Massachusetts law in

10

situations where a contract contains a boilerplate no-third-party-beneficiaries clause and also a more specific clause evidencing the contracting parties' intent to confer such rights on specific beneficiaries. Outside of Massachusetts a few courts have found contracts to create rights in third party beneficiaries despite express language in the contract to the contrary. *See, e.g., Versico v. Engineered Fabrics Corp.*, 238 Ga. App. 837, 841, 520 S.Ed.2d 505, 508-099 1999) (finding direct cause of action by assignee of building against buyer of roofing contractor's business even though purchase agreement between buyer and its seller stated there were to be no third party beneficiaries of the contract which also called for the buyer to take over the seller's warranty obligations).

In *Lapping v. HM Health Services, Inc.*, 2005 WL 407588 (Ohio App. 11 Dist. Feb. 18, 2005), a case with some factual similarities to the one here, the appeals court affirmed the trial court's holding that a physician was an intended third party beneficiary of an agreement between his employer, Warren General Hospital (the "Hospital"), and HM Health Services ("HM") involving HM's purchase of the assets of the Hospital. The court found that the Hospital and HM, acknowledging that their medical staffs would need to be combined, included the following provision in the purchase agreement:

> [HM] represents and warrants that those physicians with medical staff privileges at Warren General Hospital who have applied for privileges at St. Joseph Health Center have received the same clinical privileges that they held at Warren General Hospital prior to the closing.

Dr. Lapping applied for privileges at St. Joseph's and when they were refused, sued HM for breach of contract. HM, denied that it was liable, relying on the purchase agreement which stated that "[e]xcept as otherwise expressly provided herein," there were no third party beneficiaries to the agreement. The court found that HM's representation and warranty that physicians who

applied for staff privileges at St. Joseph's would receive them demonstrated an intention to create third party rights in Dr. Lapping as a member of the class of physicians who applied for hospital privileges. The court found that HM's representation and warranties carved physicians' rights to staff privileges out of the general exclusion of third party beneficiary rights. The court noted that the phrase "[e]xcept as otherwise expressly provided herein" introducing the no-third-party-beneficiary clause was consistent with its interpretation.

In the case before me, while the boilerplate no-third-party-beneficiary clause in section 13.8 of the APA lacks the introductory phrase "except as otherwise provided herein" found in the contract in *Lapping*, there exists the same apparent conflict between the general anti-third party beneficiary clause and the more specific contract provision reflecting an intent to benefit a defined class. The intent of the specific contract provision here is even more imperative than the one in *Lapping* which dealt with representations and warranties. Section 5.14(c) of the APA states that Steward "*shall be liable* to any [QMC employee] terminated at or following the closing." (Emphasis added). I note also that while section 9.2(a) of the APA states that "[Steward] shall provide each Transferred Employee with employee benefits consistent with similarly-situated employees of [Steward] (*provided nothing in this Section 9.2 shall require [Steward] to pay severance pay to any Transferred employee)* (emphasis added), section 9.2(a) is not the source of the executives' claims.  Their claims to the right to severance pay arise from *QMC's* (not Steward's) executive severance policies, which section 5.14(c) of the APA mandates be honored by Steward.

I predict that were the Massachusetts Supreme Judicial Court to rule on this issue, it would conclude that section 5.14(c) of the APA manifests an explicit intent to benefit a class of

12

non-party beneficiaries to the APA, namely QMC's employees on the closing date,[7] and that this intent trumps the boilerplate no-third-party-beneficiary clause of section 13.8. Dr. Gupta and Mr. Munger are Transferred Employees within the meaning of the APA and as such they became employees of Steward on October 1, 2011 when the sale closed. Steward's refusal to treat them as employees was a de facto termination of their employment and under section 5.14(c) of the APA Steward is liable to the executives "for severance or retention pay or any other payments otherwise due them as employees of or consultants for [QMC]."

Steward is, therefore, liable to each of Dr. Gupta and Mr. Munger for severance pay equal to six months' compensation under QMC's executive severance policy; $156,000 for Dr. Gupta and $90,000 for Mr. Munger.

Furthermore, under section 5.14(c) of the APA Steward is liable to the executives for "any other payments otherwise due them as employees [of QMC]." Section 9.2(a) of the APA requires that Steward "provide, or cause to be provided, for a period ending not earlier than the third month following the Closing Date …, to each of the Transferred Employees, base wage and salary levels provided to such Employees immediately prior to the Closing," in other words the same wages and salaries provided them by QMC. Since Dr. Gupta and Mr. Munger are Transferred Employees, they are entitled to these "other payments," namely the three months of salary called for by section 9.2(a) of the APA. Therefore, I find the executives are entitled to three months' salary; $78,000 for Dr. Gupta and $45,000 for Mr. Munger.

---

[7] The fact that there may have been discussions between QMC and Steward about excluding Dr. Gupta and Mr. Munger from the class of beneficiaries is not relevant to the issue of whether the parties intended to benefit the class generally. The language of section 5.14(c) compels the conclusion that the parties intended to benefit the class of Transferred Employees. Their subsidiary intent as to who should have been included in that class does not bear on the third party beneficiary question.

**Conclusion**

Because the intent of the parties was to make Transferred Employees third party beneficiaries under section 5.14(c) of the APA, the motions of Dr. Gupta and Mr. Munger seeking allowance of claims against Steward are allowed in the amounts set forth above.

Separate orders will issue.

Dated: September 25, 2012                                      By the Court,

_____
Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel of Record

John Morrier
Casner & Edwards, LLP
Boston, MA
Counsel to Quincy Medical Center, Inc.

Charles Bennett
Murphy & King, P.C.
Boston, MA
Counsel to Victor Munger

Bruce Gladstone
Cameron & Mittleman LLP
Providence, RI
Counsel to Apurv Gupta

James D. McGinley
Edwards Wildman Palmer LLP
Boston, MA
Counsel to Quincy Medical Center, a Steward Family Hospital, Inc.